**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

---

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

       Plaintiff,

v.

WALMART INC. and WAL-MART STORES
EAST, LP,

       Defendants.

---

CASE NO. 4:22-cv-00037-SMR-SBJ

**DEFENDANTS' APPENDIX OF
EVIDENCE IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

Defendants Walmart Inc. and Wal-Mart Stores East, LP (collectively "Walmart") submit the following exhibits in support of their Motion for Summary Judgment:

**Table of Contents**

<u>Exhibits</u>                           <u>App. Page</u>

1. Tiffanee Johnson Orientation Checklist……………………………………001

2. Walmart's Discrimination & Harassment Prevention Policy………………002

3. Walmart's Open Door Communications Policy……………………………007

4. Tiffanee Johnson Deposition Transcript Excerpts…………………………010

5. Coachings/Discipline of Tiffanee Johnson…………………………………040

6. Coaching/Discipline History of Tiffanee Johnson…………………………044

7. Kendra Mouton Deposition Transcript Excerpts……………………………050

8. Patricia Hemsley Deposition Transcript Excerpts…………………………067

9. Career Preferences of Tiffanee Johnson……………………………………082

10. Lisa Elrod Deposition Transcript Excerpts…………………………………083

11.   Tiffanee Johnson's EEOC Charge of Discrimination………………………..089

12.   Complaint …………………………………………………………………..090

13.   Tiffanee Johnson's EEOC Intake Form……………………………………097

14.   Walmart Department Manager Job Description…………………………...100

15.   Career Preferences Internal Applicant List for Consumables

      Department Manager position………………………………………………103

16.   Tiffanee Johnson's Exit Interview………………………………………...104

17.   Hillary Elko Deposition Transcript Exceprts……………………………105

18.   Declaration of Lisa Elrod…………………………………………………109

19.   General Merchandise Support Manager Job Description………………...112

20.   Ashley Bishop Deposition Transcript Excerpts…………………………114

21.   Job History of Abigail Hunt……………………………………………...118

22.   Tiffanee Johnson's Declaration…………………………………………...120

23.   Declaration of Patricia Hemsley…………………………………………124

* * * *

26.   Johnson's Facebook Messaging with Samantha Finn……………………125

Dated this 25th day of April, 2023.

WALMART INC. and WAL-MART STORES
EAST, LP, Defendants,

By:  /s/ Heidi A. Guttau
      Heidi A. Guttau (IA# 15513)
      Christopher R. Hedican (IA# 16099)
of   BAIRD HOLM LLP
      1700 Farnam St, Ste 1500
      Omaha, NE  68102-2068
      Phone: 402-344-0500
      Fax: 402-344-0588
      Email:  hguttau@bairdholm.com
      Email:  chedican@bairdholm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of April 2023, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Miles Shultz – miles.shultz@eeoc.gov
Kelly Bunch – kelly.bunch@eeoc.gov
Justin Mulaire – justin.mulaire@eeoc.gov
Hannah Henkel – hannah.henkel@eeoc.gov

And I hereby do certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

N/A

/s/ Heidi A. Guttau

DOCS/2955731.1

# NAO PARTICIPANT CHECKLIST



**ASSOCIATE:** Tiffanee Johnson

**PERSONNEL ASSOCIATE:** Tammy

**ORIENTATION DATE:** 6/27/2014

### Employment Paperwork
- [x] Associate Information Form
- [x] EEO Information Form
- [x] W-4 (completed online)
- [x] Employment Eligibility Form (I-9) (completed online)
- [x] Alcohol and Drug Free Workplace Policy
- [x] Alcohol and Drug Free Workplace Acknowledgement
- [x] WOTC Screening (completed online)
- [N/A] Minor School Information Form (if applicable)
- [ ] State Tax Credit Form (if applicable)
- [ ] Other State-Specific Forms (if applicable)

### Time Clock Policy and Procedures
- [x] Time Clock Instruction
- [ ] Time Adjustments
- [x] Rest Breaks, Meal Periods, and Days of Rest
- [x] Working Off the Clock
- [x] Pay Policies and Records

### Dress Code Guidelines
- [x] Proper Display of Badge (on and off the clock)
- [x] Duty to Report a Lost or Stolen Badge
- [x] Clean Personal Hygiene
- [x] Potentially Offensive Tattoos Must Be Covered
- [x] Earrings Must Not Pose a Safety Risk
- [x] Facial Jewelry is Not Allowed
- [x] Clothing Must Be Walmart-Approved Color and Style

### Benefits
- [x] Associate Discount Card
- [x] Benefits Overview

### Customer Service Expectations
- [x] 10-Foot Attitude
- [x] Acknowledge /Act / Appreciate (3As)
- [x] 3 Basic Beliefs
- [x] Fast / Friendly/ Clean
- [x] Sundown Rule

### Store Operations
- [x] Store Associate Structure
- [x] Backroom Operations
- [x] Salesfloor Operations
- [x] Front End Operations

### General Policies and Procedures
- [x] Violence Free Workplace
- [x] Guiding Principles of Ethical Behavior
- [x] Non-Retaliation

### General Policies and Procedures (continued)
- [x] Harassment
- [x] Non-Discrimination
- [x] Gifts and Entertainment
- [x] Personal Relationships with Other Associates

### Asset Protection / Safety Discussion
- [x] Asset Protection Overview / Role of AP Team
- [x] Identifying and Preventing Shrink
- [x] Safety Overview
- [x] Emergency Procedures
- [x] Emergency Flip Chart
- [x] Safety Demonstration
  - Proper Lifting Techniques
  - Box Cutter Usage
  - Ladder Usage
- [x] Spills
- [x] Backroom – Asset Protection and Safety Tour
  - Safety Board
  - Fire Safety
  - Electrical Safety
  - Proper Ladder Safety
  - Warehouse Steel Racks
  - Lock Out / Tag Out Procedures
  - Powered Lifting Equipment (PLE)
  - Baler / Compactor
  - Hazardous Waste Storage Area
  - Eye Wash Station
  - First Aid Kit Locations
- [x] Backroom – Shrink
  - Receiving
  - Personal Responsibility (Lockers)
- [x] Salesfloor – Asset Protection and Safety Tour
  - Salesfloor – Shrink, Front End Controls
  - Associate Purchases
  - Ringing Up Family / Friends
  - Asset Protection Office
  - Salesfloor – Safety
  - Housekeeping – General Safety
  - Personal Protection Equipment (PPE)
  - Drill for a Spill Activity

### Store Manager Discussion
- [x] Attendance / Punctuality
- [x] Open Door Policy
- [x] Coaching and Disciplinary Actions
- [x] Protect Your Signature
- [x] Careers
- [x] Grass Roots

**Associate Signature:** Tiffanee Johnson   **Personnel Associate Signature:** Tammy Alice   **Date:** 6/27/2014

*Associate must complete this document. Sign and date above, and file in associate's personnel file.*

Revised June 2013

Johnson
EXHIBIT NO. 1
SARAH DITTMER
888-388-2723

WM_Johnson_0000385

App. 001

Content Name: en_US_09010aff8121ea39_A_pd-19_2.htm
Version #: 3.1
Start Date: 2017-11-14 22:24:36
End Date: 2018-01-31 20:56:20

WMT $##.## +#.##    Associate Name | Logout



# Discrimination & Harassment Prevention Policy

### Updated: March 1, 2016

| State Specific |
| --- |
| California |

We believe in fostering a workplace culture and customer experience where everyone is and feels included. We respect the dignity of every individual and value their unique skills.  Having a workforce of associates from diverse backgrounds makes us a better company.  Respectful and professional conduct furthers our mission, promotes productivity, minimizes disputes and enhances our reputation in the communities where we work.

All associates, customers, members, or other individuals with whom we have contact in the course of our business should be treated fairly and respectfully without regard to their personal appearance, beliefs, culture, affiliations, or any other characteristics, as long as their conduct does not interfere with the legitimate interests of Walmart or other individuals.

We are also committed to providing an environment that is free of discrimination or harassment based on an *individual's status*.

*Individual's status* means an individual's race, color, ancestry, ethnicity, religion, sex, pregnancy, national origin, age, disability, marital status, veteran status, sexual orientation, gender identity or expression, genetic information or any other legally protected status. Individual's status also includes an individual's marriage to or association with someone with any status listed above.

We will not tolerate any form of discrimination or harassment in any aspect of our business. This means that we strictly prohibit any discrimination or harassment, as described within this policy, by or directed at:

- an associate
- job applicant
- customer
- member
- supplier
- or person working on behalf of Walmart.

This "zero tolerance" approach applies regardless of whether such conduct rises to the level of unlawful discrimination or harassment.

This policy applies to all associates who work for Walmart Stores, Inc., or one of its subsidiary companies, in the United States (Walmart).

Johnson
EXHIBIT NO. 2
SARAH DITTMER
888-388-2723

WM_Johnson_0000606

App. 002

Managers and supervisors should use the Discrimination and Harassment Prevention Management Guidelines

Reporting Procedures
Investigation and appropriate action
Confidentiality

# Prohibited conduct

### Discrimination

We prohibit any discriminatory action based on an individual's status in all aspects of our business.

For purposes of this policy, Discriminatory action includes, but is not limited to

- firing,
- refusing to hire,
- denying training,
- failing to promote or
- discriminating in pay or other terms, conditions or privileges of employment based on an individual's status.

It also includes encouraging or assisting anyone to take discriminatory actions.
We prohibit associates from designing, implementing or executing a business process in any manner that discriminates against, singles out or subjects to heightened scrutiny a person based on an individual's status.

For the purposes of this policy, a business process includes, but is not limited to

- sales and purchase of goods and services
- customer service;
- verification or acceptance of any form of payment, including checks, money orders and credit cards; acceptance of shopping cards, gift cards, gift certificates and coupons;
- refunds, returns and/or exchanges of merchandise;
- surveillance, investigation or detention of suspected shoplifters, and
- use of Electronic Article Surveillance.

### Harassment

We prohibit any form of harassment based on an individual's protected status in all aspects of our business. This includes, but is not limited to:

- Pressure for sexual activity, including offering employment benefits in exchange for sexual favors or denying employment benefits in response to a refusal to provide sexual favors
- Repeated unwanted sexual flirtations, advances, or propositions;
- Using slurs or negative stereotyping;

WM_Johnson_0000607

- Using slurs or negative stereotyping;
- Verbal kidding, teasing, joking or making offensive comments about an individual's status, appearance, or sexual activity;
- Leering or making offensive gestures;
- Circulating or displaying offensive pictures, cartoons, posters, letters, notes, e-mails, social media, text messages, invitations, or other materials;
- Using company e-mail or Internet resources to receive, view, or send offensive jokes, pictures, posters, or other similar materials;
- Intimidating acts, such as bullying or threatening based on an individual's status;
- Offensive physical contact such as patting, grabbing, pinching, or intentionally brushing against another's body;
- Physical touching or assault, as well as impeding or blocking movements;
- Any other conduct that shows hostility toward, disrespect for or degradation of an individual based on the individual's status.

Harassing conduct, such as that listed above, is prohibited regardless of whether it is welcome or unwelcome and regardless of whether the individuals involved are of the same or are of a different sex, sexual orientation, race, or other status.

**Retaliation**

We prohibit taking negative action against any individual for reporting conduct that violates this policy, cooperating in an investigation, opposing discrimination or harassment, or filing or assisting another individual in filing a complaint of discrimination or harassment with a government agency or court.

# Reporting procedures

We are committed to preventing discrimination and harassment in all aspects of our business and will take all reasonable measures to prevent it. However, if we are not aware that discrimination or harassment is taking place, we cannot address the situation.

If you experience, observe or become aware of any conduct that may violate this policy, you should immediately report the violation to any salaried member of management or confidentially and/or anonymously to the Global Ethics Office, email: ethics@walmart.com or phone: 1-800-WMETHIC (1-800-963-8442). If you believe a salaried member of management may be violating this policy, you do not have to report the violation to that person. You may report the possible violation to another salaried member of management or call/email the Global Ethics Office.

**Managers**

If you observe, receive a report or otherwise become aware of a possible violation of this policy, you must immediately report such conduct to the appropriate level of management for investigation. A salaried member of management who fails to report a violation of this policy may be subject to disciplinary action, up to and including termination.

Appropriate level of management includes, but is not limited to, facility management, Human Resources or Global Ethics.

WM_Johnson_0000608

We will take appropriate steps to ensure there is no retaliation of any kind for using the reporting procedures described in this policy. Retaliation of any kind for using the reporting procedures is strictly forbidden and violates this policy.

## Investigation and appropriate action

We take all reported violations of this policy seriously, and we will promptly and thoroughly investigate all allegations in accordance with the procedures set forth in the management guidelines.

In order to conduct a prompt and thorough investigation, we ask that you cooperate and tell the truth to the individual who investigates your report. If you do not cooperate or you fail to tell the truth, we will be unable to conduct a proper investigation or take prompt remedial action. Any associate who refuses to cooperate in an investigation or fails to tell the truth during an investigation may be subject to disciplinary action up to and including termination.

We will take appropriate action to eliminate conduct that violates this policy and are committed to ensuring that there is no recurrence of such conduct. We may put reasonable interim measures in place during an investigation of a reported policy violation including, but not limited to, suspension or transfer of the associate who reportedly violated this policy. Suspensions are unpaid; however you may use available PTO in accordance with the applicable PTO Policy for scheduled hours during your suspension. If you are suspended and the allegations against you are not substantiated, you will be returned to work and paid for all scheduled hours missed while suspended and PTO used during that time will be reinstated.

We will take further appropriate action once the reported violation has been thoroughly investigated. If an investigation reveals that an associate has violated this policy (or any other policy), that associate will be subject to disciplinary action up to and including termination and any other appropriate corrective action.

## Confidentiality

Walmart will make every reasonable effort to maintain the confidentiality of all parties involved in any investigation. We will disclose information to only those having a need to know in order to facilitate the investigation or resolution.

## For more information

If you have questions or need further guidance, please contact

- your HR representative
- Ethics Office using one of these methods:
  - www.walmartethics.com and select "Report a Concern"
  - Access True North on the WIRE and select "Report a Concern"
  - Email: ethics@walmart.com

WM_Johnson_0000609

- 1-800-WMETHIC (1-800-963-8442)

**This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.**

**Last Modified: November 15, 2017**

WM_Johnson_0000610

App. 006

Content Name: en_US_09010aff8001a4a9_A_pd-27.htm
Version #: 1.4
Start Date: 2016-10-26 14:36:45
End Date: Currently Active
WM Week 39

WMT $##.## +#.##   Associate Name | Logout

# Open Door Communications Policy

### Updated: August 10, 2012

At Walmart, our open door philosophy is an integral part of our culture, reflecting a tradition of open communication and a culture of listening to our associates. We encourage and expect all associates to actively participate in making the company a better place to work and shop. The open door process offers each associate an opportunity to bring suggestions, observations, or concerns to the attention of any supervisor or manager without fear of retaliation. We also welcome early identification of opportunities and challenges and mutual resolution of complaints.

This policy applies to all associates who work for Walmart Stores, Inc., or one of its subsidiary companies in the United States (Walmart).

Managers and supervisors should utilize the supplemental **Open Door Communications Management Guidelines** for additional guidance in administering this policy.

Open door communications
Initiating an open door conversation
Pay for open door activities
Open door communication review
Confidentiality

## Open door communications

We encourage associates to use the open door process for open discussions on all matters related to the company and expect associates to treat everyone participating in the process with dignity and respect. Anything related to Walmart is a fair subject to raise in an open door communication, including your ideas, suggestions and concerns. We encourage you to discuss ways to improve customer service and accomplish other operating efficiencies.

While we cannot promise that your views or opinions will always prevail, the open door process ensures that you will always be heard. We will consider your views and opinions along with the views and opinions of other associates in making decisions that will improve the workplace and the company.

## Initiating an open door conversation

You are encouraged to give your immediate supervisor the first opportunity to listen to, address, and resolve ideas, suggestions, or concerns. If you have a concern about your supervisor or if you believe your supervisor has not satisfactorily addressed or resolved an idea, suggestion, or concern, you may contact your next level of supervision

_Johnson_
EXHIBIT NO. 3
SARAH DITTMER
888-388-2723

1/3

WM_Johnson_0000598

satisfactorily addressed or received an idea, suggestion, or concern, you may contact your next level of supervision.

If you want to have an open door discussion with a supervisor or manager from another work location, we encourage you to call or send an e-mail. You must obtain permission from a salaried member of management before traveling to another work location during your work hours for open door activities.

If you have a concern or problem related to the Statement of Ethics, you can also call the Global Ethics Office at 1-800-WMETHIC (1-800-963-8442) or e-mail **Ethics@Walmart.com** or **Compliance@Walmart.com**.

## Pay for open door activities

If you are a current associate, we strongly encourage you to use the open door during your normal work hours. You will receive compensation for any time you spend on open door activities that occur during your work shift. You will not be compensated for open door activities conducted outside of your working hours, including participation in face to face communication, telephone calls, writing letters or e-mails, preparing other written documents or traveling regarding an open door, unless your supervisor, manager or other member of management expressly directs or authorizes you to engage in open door activities outside your normal work hours.

## Open door communication review

Walmart takes all open door communications seriously. We will investigate any complaints or concerns you raise promptly and thoroughly, and will follow up with you on a periodic basis until resolution is obtained and communicated.

It is important for you to cooperate with the individual who reviews your concern and provide accurate information to the best of your knowledge.

During our review and after the review is complete, we may take appropriate action, including suspension and discipline of associates consistent with other company policies.

Retaliation for initiating an open door communication or cooperating in a review relating to any open door communication is strictly prohibited. Any associate who retaliates against another associate for initiating or cooperating in an open door review will be subject to disciplinary action, up to and including termination.

## Confidentiality

Walmart will treat concerns, comments and complaints raised through the open door with confidentiality and respect. Those managers involved in reviewing the matter **may not** disclose any specific information to anyone not directly involved in resolving the concern. We will advise or consult only with those who have a need to know about the situation, including witnesses who may have knowledge of the circumstances surrounding the concern and who may be interviewed as a part of the review.

## For more information

If you have questions or need further guidance, please contact your HR representative. Additionally, our **Guiding Principles** may assist you in determining the best course of action if there is no policy providing specific direction for your situation.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

WM_Johnson_0000599

App. 008

**This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.**

**Last Modified: February 1, 2011**

WM_Johnson_0000600

```
                                1
1           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF IOWA
2                   CENTRAL DIVISION

3  U.S. Equal Opportunity
   Commission,
4
           Plaintiff,        No. 4:22-cv-00037
5
      vs.
6                            Deposition of
   Walmart Inc. And Wal-Mart  TIFFANEE JOHNSON
7  Stores East, LP,           taken on 2-8-23
                              in Ottumwa, Iowa
8          Defendants.

9           *   *   *   *   *
10
11
12
13
14
15
16
17          *   *   *   *   *
18         The deposition of TIFFANEE T. J. JOHNSON,
19  taken on behalf of the Defendants, before Sarah J.
20  Dittmer, Certified Shorthand Reporter, Registered
21  Professional Reporter, and Notary Public in the State
22  of Iowa, taken at 129 West Fourth Street, Ottumwa,
23  Iowa, on the 8th day of February, 2023, commencing at
24  9:57 a.m., pursuant to the Federal Rules of Civil
25  Procedure.
              Sarah J. Dittmer & Associates
              reportingwhereur@yahoo.com
```

```
                                2
1          A P P E A R A N C E S
2  Miles E. Shultz
   Attorney at Law
3  230 South Dearborn, Suite 2920
   Chicago, Illinois 60604
4
   and
5
   Hannah Henkel
6  Attorney at Law
   310 West Wisconsin Avenue, Suite 500
7  Milwaukee, WI 53203        for Plaintiff.

8  Heidi A. Guttau
   Attorney at Law
9  1700 Farnam Street, Suite 1500
   Omaha, Nebraska 68102      for Defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
              Sarah J. Dittmer & Associates
              reportingwhereur@yahoo.com
```

### EXHIBIT 4

```
                                3
1                   INDEX
2  Examination by:                          Page
3  Ms. Guttau..............................  5
4  Mr. Shultz.............................. 199
5  Ms. Guttau.............................. 205
6  Exhibits:
7  1  NAO Participant Checklist............. 38
8  2  Discrimination & Harassment Prevention
9     Policy.............................. 40
10 3  Open Door Communications Policy....... 41
11 4  Global Statement of Ethics............ 41
12 5  Disciplinary Actions.................. 45,46
13 6  Coachings on Walmart's System......... 47
14 7  Hours Availability.................... 56,57
15 8  Employment History.................... 57,59
16 9  CP-Historical Preferences............. 63,72
17 10 Blueprints............................ 66,67,88
18    126,129,131,132,140,142,143,147,149,150,151,
19    155,160,166,172,174,186
20 11 Charge of Discrimination.............. 89,90,
21    144,154
22 12 Complaint............................. 100,101,
23    105,109,153,154
24 13 EEOC Inquiry Information.............. 111,112,
25    114,115,200
              Sarah J. Dittmer & Associates
              reportingwhereur@yahoo.com
```

```
                                4
1           (CONTINUED) INDEX
2  (Continued) Exhibits:                    Page
3  14 Department Manager Job Description.... 110
4  15 CP-Internal Applicants................ 119
5  16 Exit Interview........................ 164
6  17 Some Information Provided to EEOC..... 167,168,
7     169,170,202
8  18 April 29, 2019 Phone Notes............ 171,172,
9     177,202
10 19 April 30, 2019 Phone Notes............ 177,178,
11    203
12 20 April 30, 2019 E-mail Exchange with
13    Melissa Lawent.................... 174
14 21 Response to Walmart to the EEOC....... 175,176
15 22 Declaration of Tiffanee Johnson....... 178,179
16 23 EEOC's Initial Disclosures............ 179
17 24 EEOC's Supplemental Disclosures....... 181,184
18 25 EEOC's Answers to Interrogatories..... 184
19 26 Facebook Messages with Samantha Finn.. 182,183
20 27 Text Messages with Tiffany Shafer..... 187
21 28 Facebook Messages with Tana
22    FacingReality Maxwell........... 188
23 29 Facebook Messages with Denise Harden.. 189
24          *   *   *   *   *
25
              Sarah J. Dittmer & Associates
              reportingwhereur@yahoo.com
```

**Sarah J. Dittmer, CSR, RPR        reportingwhereur@yahoo.com**

---

**5**

1          TIFFANEE T. J. JOHNSON,
2  being produced, sworn as hereinafter certified, was
3  examined and testified as follows:
4          EXAMINATION
5  BY MS. GUTTAU:
6  Q.     Ms. Johnson, my name's Heidi Guttau, and I'm
7  an attorney from Baird Holm law firm in Omaha.  And I
8  represent both of the Walmart defendants in the
9  lawsuit that the EEOC has filed that involved a
10 claim -- a charge that you filed.  Do you understand
11 that?
12 A.     Yes.
13 Q.     And we haven't met before today, have we?
14 A.     No.
15 Q.     And where do you presently live?
16 A.     Here in REDACT.
17 Q.     Have you ever been deposed before?
18 A.     No.
19 Q.     And you're welcome to call me "Heidi."
20 Would you prefer that I call you "Ms. Johnson" or
21 "Tiffanee"?
22 A.     "Tiffanee's" fine.
23 Q.     Okay.  Have you ever testified in court?
24 A.     No.
25 Q.     And I'm sure Miles and Hannah explained how

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

**6**

1  a deposition goes.  You understand that you're under
2  oath just as if you were in a court of law?
3  A.     Yes.
4  Q.     And if you have -- If you don't understand a
5  question today, just let me know, and I can restate
6  it or reframe it.  I want to make sure that you
7  understand the questions that I ask.  Okay?
8  A.     Okay.
9  Q.     And if you do answer a question, then I will
10 assume that you understood it; is that fair?
11 A.     Yes.
12 Q.     And we'll have to do a good job -- Sarah's
13 got a good sign.  We'll try to speak clearly, one at
14 a time.  And sometimes it can get a little
15 conversational.  So we'll just have to pause
16 ourselves and make sure we try not to speak over each
17 other.  Okay?
18 A.     Y am.
19 Q.     And it's not a marathon, so if you need a
20 break at any time, just let me know.  We can take
21 breaks whenever you need, lunch break.  I would just
22 ask, if there's a question pending, that you'd answer
23 that before we break.  Okay?
24 A.     Yes.
25 Q.     Are -- Do you have any physical or mental

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

**7**

1  condition that would prevent you from answering
2  questions truthfully today?
3  A.     No.
4  Q.     Are you on any medications today?
5  A.     No.
6  Q.     Okay.  Today, as we talk about different
7  entities involved in this lawsuit, if I say "EEOC,"
8  do you understand that I'm referring to the Equal
9  Employment Opportunity Commission?
10 A.     Yes.
11 Q.     And if I refer to "Walmart," can we agree
12 that I'm referring to your former employer?
13 A.     Yes.
14 Q.     What did you do to prepare for your
15 deposition today?
16 A.     What do you mean by "prepare"?
17 Q.     Did you meet with anybody to prepare for
18 today?
19 A.     I met with her yesterday.
20 Q.     Okay.  Hannah?
21 A.     Yeah.
22 A.     And --
23 A.     Sorry.
24 Q.     Nope, that's fine.  Was that in person?
25 A.     Yes.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

**8**

1  Q.     And for how long?
2  A.     About three hours.
3  Q.     Okay.  Anybody else that you've met with or
4  talked to to prepare for the deposition today besides
5  Hannah?
6  A.     No.
7  Q.     Did you review any documents to prepare for
8  your deposition?
9  A.     Yes.
10 Q.     And what did you review?
11 A.     We went over the declaration, the messages
12 between me and Sam, and a message between me and
13 another old worker at Walmart, Tana -- Shantana.
14 Q.     Shantana.  Okay.
15 A.     I think that's all I can remember.
16 Q.     Okay.  If you remember anything else later,
17 will you let me know?
18 A.     Yes, ma'am.
19 Q.     What's your date of birth?
20 A.     REDACT th, 1992.
21 Q.     And what's your current address?
22 A.     REDACT, here in REDACT.
23 Q.     Can you spell that?
24 A.     REDACT.
25 Q.     How long have you lived at that address?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

**21**

1  A.      A little bit more than three.
2  Q.      Okay.  Do you recall what year?
3  A.      2019.
4  Q.      So -- And then you said you left Waste
5  Management in November of 2022.  The post office
6  asked you to come back.  What did they ask you to
7  come back -- into what position?
8  A.      It was a clerk's position that I applied
9  for.
10 Q.      And is that at the 616 West Second address?
11 A.      Correct.
12 Q.      And so you accepted that position?
13 A.      I did.
14 Q.      All right.  Was that full-time?
15 A.      Yes.
16 Q.      And what kind of benefits did that have?
17 A.      It has the medical, dental, vision.  And
18 that's all until -- That's all.
19 Q.      Okay.  And who's your -- Are you still
20 working at the post office?
21 A.      Yes.
22 Q.      Okay.  So since November, have you had any
23 other employers other than the post office?
24 A.      No.
25 Q.      Okay.  Who's your supervisor there?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**22**

1  A.      Vonda Ford.
2  Q.      V-O-N --
3  A.      Correct.
4  Q.      -- D-A?
5          Okay.  And Ford?
6  A.      F-O-R-D, yes.
7  Q.      Okay.  And what's your rate of pay there?
8  A.      20.05.
9  Q.      And do you intend to stay at the post office
10 or are you looking for other positions?
11 A.      No.  I plan to stay.
12 Q.      Okay.  Any other employment since you left
13 Walmart that we have not talked about?
14 A.      No.
15 Q.      All right.  Let's back up, then, to when you
16 first joined Walmart.  I believe it was in 2014.
17 Does that sound right?
18 A.      Yes.
19 Q.      Okay.  When you were first hired at
20 Walmart -- First, tell me about that hiring process.
21 How -- What did you do to get hired there?
22 A.      An online application and an interview.
23 Q.      Do you recall who interviewed you?
24 A.      I don't.
25 Q.      Do you recall Lisa -- and I think her last

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**23**

1  name at the time might have been Macko, who is the
2  personnel coordinator.  And then her name later
3  became Lisa Elrod.  Do you know who I'm talking
4  about?
5  A.      Yes, I do.
6  Q.      Okay.  Did she play any role in your hiring,
7  if you know?
8  A.      I don't know.
9  Q.      What was your first position at Walmart?
10 A.      A overnight stocker.
11 Q.      And how long did you do that?
12 A.      I don't know exactly, because the modular
13 team is overnights as well.
14 Q.      So when you say that, how's that different?
15 What's -- What do you mean the modular team's a
16 little bit different?
17 A.      Because it's different jobs.
18 Q.      Okay.
19 A.      So -- But it was all overnight.  So I don't
20 know exactly, like, when I stopped being the
21 overnight stocker.
22 Q.      Okay.  What's modular team?  What's that
23 mean?
24 A.      Resetting the mods on the shelf.
25 Q.      What's a mod, just for the record?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**24**

1  A.      The placement of items.
2  Q.      Like the display?
3  A.      Correct.
4  Q.      Okay.  So did you start as a part-time
5  overnight stocker, do you recall?
6  A.      Yes.
7  Q.      Okay.  And when did you go to full-time?
8  A.      I don't remember that.
9  Q.      That's fine.  Did you apply to go to
10 full-time?  Or how did that work when you wanted to
11 go to full-time?
12 A.      I spoke with the manager about becoming
13 full-time.
14 Q.      Do you recall who the manager was then?
15 A.      I first spoke with Don and then PJ.
16 Q.      Do you recall Don's last name?
17 A.      I don't remember.
18 Q.      Do you recall what his role was?
19 A.      He was an assistant manager.
20 Q.      And what was PJ's role?
21 A.      Comanager.
22 Q.      And what was -- Just talking about manager
23 level, what was your understanding of, like, the
24 hierarchy below store manager?  Do you know what
25 levels of management were below that?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**Sarah J. Dittmer, CSR, RPR          reportingwhereur@yahoo.com**

**25**

1  A.      The comanager, then the assistant manager,
2  then the support managers and department manager.
3  Q.      Okay.  Back to when you were first hired, do
4  you recall, did -- I'm blanking on the name.  Well,
5  Kendra Moulton wasn't there in 2014, was she?
6  A.      No.
7  Q.      Okay.  All right.  Do you recall, at the
8  time you did leave Walmart, who was your direct
9  supervisor?
10  A.      Cassie Riegel.
11  Q.      Do you know what her title was?
12  A.      She was an assistant manager.
13  Q.      And do you know how to spell her last name?
14  A.      Not exactly, no.
15  Q.      Okay.  We can find it.  And how did you get
16  along with Cassie?
17  A.      Pretty well.
18  Q.      Did you believe Cassie treated you fairly?
19  A.      Yes.
20  Q.      I forgot to ask -- Sorry.  Backing up.  On
21  your employment at Waste Management, was that
22  full-time or part-time?
23  A.      Full-time.
24  Q.      Okay.  And the same with the -- I assume the
25  post office is full-time right now?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**26**

1  A.      Yes.
2  Q.      And what's your wage rate there?  Is that
3  hourly or salaried?
4  A.      Hourly.
5  Q.      And do you know what your hourly rate is?
6  A.      For the post office?
7  Q.      Yes.  Uh-huh.
8  A.      20.05.
9  Q.      Okay.  With your employers before Walmart,
10  did you ever file any complaints or charges of
11  discrimination against any of those employers?
12  A.      No.
13  Q.      Okay.  Have you filed any complaints like
14  that, of discrimination or retaliation, against any
15  employers since Walmart?
16  A.      No.
17  Q.      Have you ever filed for unemployment?
18  A.      Yes.
19  Q.      Do you recall when that was?
20  A.      2020.
21  Q.      And was that after your job at Aldi?
22  A.      It was right after COVID.
23  Q.      Oh, okay.
24  A.      I was still an associate at Aldi.
25  Q.      Okay.  And why did you file for

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**27**

1  unemployment?
2  A.      They wouldn't let me work due to me being
3  pregnant.
4  Q.      Oh, okay.  Because of COVID?
5  A.      Yes.
6  Q.      All right.  And did you get unemployment at
7  that time?
8  A.      I did.
9  Q.      And then were you able to return to Aldi
10  after you had your baby?
11  A.      Yes.
12  Q.      Okay.  Okay.  Back to your employment with
13  Walmart.  How long were you on overnights,
14  approximately?
15  A.      From when I started in 2014 until I left for
16  my maternity leave.
17  Q.      And do you recall when -- approximately when
18  your maternity leave started?
19  A.      October -- The weekend before I had my baby.
20  So it was like October 20th, 21st, or something like
21  that.
22  Q.      And that was 2017?
23  A.      Correct.
24  Q.      All right.  So overnights that whole time,
25  either stocking or modular team?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**28**

1  A.      Yes.
2  Q.      All right.  Do you recall who your direct
3  supervisor was when you went on maternity leave?
4  A.      I don't remember.
5  Q.      Okay.  What were your job -- Can you just
6  describe, in your own words, what your job duties
7  were on overnights?
8  A.      For both jobs?
9  Q.      Yeah.
10  A.      Okay.  For the overnight stocker, just
11  assisting customers, stocking the shelves, and
12  keeping the work area clean.  And for mod team, it's
13  taking the items off the shelf, resetting the shelves
14  and cleaning them, and then replacing the items on
15  the shelves, and keeping a clean work area, and
16  assisting customers as well.
17  Q.      What would a typical overnight shift hours
18  be?
19  A.      10 to six, I believe.
20  Q.      10 p.m. to six a.m.?
21  A.      Yes.
22  Q.      Okay.  Did you, up through -- From 2014 and
23  through October 20th, 2017, did you enjoy your work
24  at Walmart?
25  A.      Not quite.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

33

1  behind.  And that's it.  That's what happened.
2  Q.     Do you recall who the other employee was?
3  A.     Her name was Phyllis.  I don't remember the
4  last name.
5  Q.     And what happened after -- Did you report
6  that?
7  A.     Yes.
8  Q.     And who did you report to?
9  A.     Brody.
10 Q.     Do you know if Phyllis reported it as well?
11 A.     I don't.
12 Q.     And what did Brody say when you reported
13 that?
14 A.     He said he would look and see if he can find
15 the customer.  And that was it.
16 Q.     Did you have any conversations with anybody
17 else at the store about that?
18 A.     Well, yes.
19 Q.     Who else?
20 A.     Are you talking about employee or
21 management?
22 Q.     Either.
23 A.     Employee.  Because she was right there at
24 the time.
25 Q.     Who was that?

---

35

1  afterwards or --
2  A.     Right after.
3  Q.     Okay.  Do you recall a year that this
4  happened, approximately?
5  A.     I don't.
6  Q.     Was it -- Just to put it in context, you
7  were still on overnight, so it was --
8  A.     Correct.
9  Q.     -- before you had your baby?
10 A.     Yes.
11 Q.     Okay.  And did you report -- or complain
12 about it any further?
13 A.     No.
14 Q.     Do you know whether or not they found that
15 customer or if anything was done?
16 A.     I don't.
17 Q.     Okay.  So overnight stocker -- And let's
18 back up too.  Did you -- During your entire time at
19 Walmart, did you ever hold any kind of supervisory or
20 management position?
21 A.     No.
22 Q.     When you started at Walmart, did they have
23 some kind of orientation?
24 A.     Yes.
25 Q.     Can you tell me, just generally, what you

---

34

1  A.     Her name's Taquera.
2  Q.     Any idea how to spell that?
3  A.     T-A-Q-U-E-R-A.
4  Q.     And she -- What was her title, if you know?
5  A.     Just a overnight stocker as well.
6  Q.     What did she tell you?
7  A.     She didn't tell me anything.  She was right
8  there recording it.
9  Q.     Oh, okay.  And did she get it on video?
10 A.     Yes.
11 Q.     Okay.  The actual assault?
12 A.     Yeah.
13 Q.     Okay.  And did you turn that in to anybody
14 in management?
15 A.     No.
16 Q.     Okay.  Did you ever talk to anybody else,
17 besides Brody, in management regarding the assault?
18 A.     I told Samantha, but I don't know if she was
19 at the store at the time.
20 Q.     Okay.  Do you know what her title was?
21 A.     I don't.
22 Q.     All right.  And when you say "Samantha,"
23 what's her last name?
24 A.     Finn.
25 Q.     And did you tell her at the time or

---

36

1  remember about that, if anything?
2  A.     I know one-day orientation.  It was multiple
3  people in there.  Morning hours.  I don't know
4  exactly the hours.
5  Q.     Do you recall anything that they covered in
6  orientation with you?
7  A.     No.
8  Q.     Okay.  Assume you were in there with other
9  new employees?
10 A.     Uh-huh.
11 Q.     Is that a "yes"?
12 A.     Yes.  Sorry.
13 Q.     That's all right.  I do that too, so -- When
14 you -- During your employment at Walmart, if you
15 needed to find a policy or some employee guidance,
16 how would you find that?
17 A.     Ask HR how to access it.
18 Q.     Okay.  Did you ever have to do that?
19 A.     No.  Not that I remember.
20 Q.     Were you familiar with something called "the
21 wire" at Walmart?
22 A.     It sounds familiar.
23 Q.     Does it -- It was their internal kind of
24 Internet system with all their policies and trainings
25 and that type of thing.  Did you ever deal with the

---

37

1  wire?
2  A.      I'm sure I had to.
3  Q.      Okay.
4  A.      Yeah.
5  Q.      When you -- Strike that.
6          Did you ever have to do some computer-based
7  learning or training?
8  A.      Yes.
9  Q.      Okay.  When you did that, tell me how that
10 worked.  Like where would you go and how would you do
11 that?
12 A.      It would be in HR.  And just log on and do
13 trainings.
14 Q.      And would that happen periodically
15 throughout your employment?
16 A.      Yes.
17 Q.      Do you recall, either during orientation or
18 during your employment, receiving any type of
19 training or doing any training regarding
20 discrimination?
21 A.      No.
22 Q.      Okay.  How about regarding harassment?
23 A.      No.  I don't remember.
24 Q.      How about regarding the breastfeeding
25 policies at Walmart?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

38

1  A.      I don't remember that either.
2  Q.      But you knew if you had a question about any
3  issues like that, you could go to HR?
4  A.      Correct.
5  Q.      I want to -- I've marked a few exhibits.
6  I'm going to hand you what we've marked as Exhibit 1,
7  Johnson Exhibit 1.  If you want to just take a moment
8  to look at that.
9  A.      Okay.
10 Q.      Okay.  Do you know -- Have you seen this
11 document before?
12 A.      It looks familiar, yes.
13 Q.      Okay.  And is six -- The date at the bottom,
14 it says, 6-27-2014.  Is that approximately when you
15 started at Walmart?
16 A.      Yes.
17 Q.      Okay.  And then to the left, is that your
18 signature where it says "Associate Signature"?
19 A.      Yes.
20 Q.      All right.  Do you recall if you would have
21 checked these boxes and signed this or how that
22 worked?
23 A.      I'm pretty sure I did.
24 Q.      Okay.  Does this appear to be a true and
25 correct copy of your signature as well on this

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

39

1  document?
2  A.      Yeah.
3  Q.      Okay.  And to me, it looks like checklists,
4  possibly.  It has "Orientation Date" at the top, so
5  maybe an orientation checklist.  Does that sound
6  right?
7  A.      Yes.
8  Q.      All right.  And it does have, in the upper
9  right column, "General Policies and Procedures."
10 Talks about harassment, nondiscrimination.  Do you
11 recall anything about reviewing those policies or
12 procedures?
13 A.      I don't remember, no.
14 Q.      Okay.  But if you checked them --
15 A.      I probably got them, yes.
16 Q.      Okay.  Okay.  And then also, if you want to
17 look down at the bottom, it says, "Store Manager
18 Discussion," bottom right-hand side.  Do you see
19 that?
20 A.      Uh-huh.  Yes.  Sorry.
21 Q.      Talks about open-door policy.  Do you recall
22 reviewing that policy?
23 A.      I don't remember reviewing it.
24 Q.      Okay.  Do you know what open-door -- what
25 that meant at Walmart?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

40

1  A.      Yes.
2  Q.      What did it mean, in your own words?
3  A.      Pretty much a stepladder for management.
4  Q.      And "stepladder," how do you -- what do you
5  mean by that, I guess?
6  A.      Going up the management scale.
7  Q.      If you had issues?
8  A.      Yes.
9  Q.      Okay.  And then the next one down talks
10 about coaching and disciplinary actions.  What was
11 your understanding of what a coaching was at Walmart?
12 A.      They had verbal coaching and written
13 coaching.
14 Q.      Okay.  Next, I'm going to hand you what I
15 marked -- what we marked Johnson Exhibit 2.  If you
16 want to just take a moment -- You don't have -- You
17 can read it all.  You can read -- take your time to
18 read anything I put in front of you.  I'll just tell
19 you, my question is just going to be if you recall
20 this policy at all.
21 A.      And you say do I remember this --
22 Q.      Yes.
23 A.      -- policy?
24          I don't remember it, no.
25 Q.      Okay.  You don't remember ever receiving

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

41

1  training on it?
2  A.      I'm sure I did, but I don't remember it.
3  Q.      That's fine.  It's been a few years, so it's
4  understandable.
5  A.      Yes, it has.
6  Q.      All right.  The same question -- I'm going
7  to hand you what we've marked as Exhibit 3.  And my
8  same question -- and it will be for this -- if you
9  recall receiving or reviewing this policy.
10  A.      This one doesn't look familiar right now.
11  Q.      Okay.  Exhibit 3 doesn't look familiar?
12  A.      No.
13  Q.      Okay.  Might have received it, but don't
14  recall?
15  A.      Yes.
16  Q.      Okay.  But were familiar with the concept of
17  open-door at Walmart?
18  A.      Correct.
19  Q.      Okay.  Do you recall ever receiving training
20  or having discussions with your supervisors regarding
21  Walmart's statement of ethics?
22  A.      No.  I don't remember.
23  Q.      Okay.  That was going to be my next
24  question.  I'll just hand this to you.  This is
25  Exhibit 4, Johnson Exhibit 4.  And you don't have to

---

42

1  read all this.  I just -- or we'll be here all day.
2  My question was -- is do you recall receiving this or
3  receiving access to this?
4  A.      This doesn't look familiar --
5  Q.      Okay.
6  A.      -- either.
7  Q.      And so you may have received training on a
8  statement of ethics, but not --
9  A.      Don't remember.
10  Q.      -- not sure either way.
11         Okay.  You talked about coachings.  Did you
12  ever receive any coachings or discipline during your
13  time at Walmart?
14  A.      Yes.
15  Q.      Do you recall what those were for?  Just in
16  general.  And we can go through them in more detail,
17  but --
18  A.      I had a verbal for job performance while
19  overnight.  And I got a verbal, if I'm -- I believe
20  it's a verbal -- sorry -- for attendance.  Overnights
21  as well.
22  Q.      Did you receive any coachings once you moved
23  to days?
24  A.      No.
25  Q.      I'm going to jump back.  With lawyers, we

---

43

1  jump around a little bit because things come to mind.
2  So my apologies.
3  A.      Nope.  That's fine.
4  Q.      I forgot to follow up.  Besides what we
5  discussed regarding Brody, did you have any other
6  complaints regarding Brody?
7  A.      He referred to me as the black Tiffanee, but
8  that was the other one.
9  Q.      Okay.  Any other issues or complaints with
10  Brody?
11  A.      No.
12  Q.      And did you ever report him referring to you
13  as black Tiffanee up the chain?
14  A.      No.
15  Q.      Okay.  Did you ever hear him -- Did you ever
16  personally hear him refer to you as black Tiffanee?
17  A.      No.
18  Q.      How did you first learn of that?
19  A.      From the other Tiffany.
20  Q.      Okay.  What's her -- Do you recall her last
21  name?
22  A.      Shafer.
23  Q.      And do you recall when she told you this?
24  A.      I don't remember.
25  Q.      What did she tell you?

---

44

1  A.      That he had asked her, Where's the black
2  Tiffanee at, one night.  But that was it.
3  Q.      Okay.  Besides that one time, did she ever
4  report -- or tell you that he said that any other
5  time?
6  A.      No.
7  Q.      So she told you she had -- he had said that
8  once, and that was it, as far as any allegations
9  regarding using the term "black Tiffanee"?
10  A.      Yes.
11  Q.      Okay.  Did you ever report Brody up the
12  chain on any of the issues or complaints you had
13  regarding him?  And when I say "up the chain," up to
14  management above him.
15  A.      No.
16  Q.      What -- Do you know what Brody's race is?
17  A.      He's white as well.
18  Q.      Okay.  You also mentioned a PJ as a -- He
19  was a comanager?
20  A.      Correct.
21  Q.      Okay.  Do you know what PJ's race is?
22  A.      He's white.
23  Q.      And did you have any complaints about PJ?
24  A.      No.
25  Q.      Tell me, how -- Did you get along well with

---

45

1  PJ?
2  A.     Yes.  He was -- put me full-time.
3  Q.     Oh, okay.  He moved you to full-time?
4  A.     Correct.
5  Q.     And that was on overnights?
6  A.     Yeah.
7  Q.     Okay.  And back on the issue of the customer
8  and the assault on you and Phyllis.  Do you recall
9  what Phyllis's race is?
10 A.     She's white as well.
11 Q.     Okay.  And you don't know if Phyllis
12 reported it higher?
13 A.     No.  I don't know.
14 Q.     Okay.  All right.  Back to coachings.  I
15 just want to -- I'm going to hand you what's been
16 marked as Exhibit 5.  And I apologize.  They're not
17 awesome copies.  If you want to take a moment to look
18 at that.
19 A.     Okay.
20 Q.     Okay.  Are those some of the coachings
21 you're referring to?
22 A.     Yes.
23 Q.     Okay.  So it looks like, January 3rd, 2015,
24 you were given a coaching for job performance
25 regarding grocery aisles.  Does that sound correct?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

47

1  one, it says, "Third Written."  And again, it's for
2  fifth absence in a six-month rolling period.  And did
3  you dispute this one at all?
4  A.     I don't remember that one.
5  Q.     Okay.  It -- Where it says "Action Plan" --
6  In the middle, it says, "Action Plan" as a row.  Do
7  you see that?  Let's look at the last page.
8  A.     Okay.
9  Q.     Okay.  And it says, I will try my best to
10 make it to work on my scheduled workdays so that it
11 will not inconvenience others.  Is that something
12 that you would have typed in?
13 A.     I don't remember.
14 Q.     Okay.  Do you recall -- And then let's back
15 up to the one on 8-8-2015.  There's also an action
16 plan that says, I will make sure that I come to work
17 to the best of my ability and on time so that I won't
18 cause anyone else to be at a strain with their work.
19 Do you recall if you typed that in?
20 A.     No.
21 Q.     Okay.  Could be, but not sure?
22 A.     It could -- Yes.
23 Q.     Okay.  Okay.  And then I'm going to hand you
24 what we marked as Exhibit 6.  One second.  Oh, there
25 we go.  And this is just, I'll tell you, a printout,

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

46

1  A.     Yes.
2  Q.     Okay.  And do you recall, was it -- Brian
3  Decker's the manager at the bottom.  Was he your
4  assistant manager at the time or do you know what his
5  role was?
6  A.     I don't remember, honestly.  I don't even
7  remember Brian.
8  Q.     Okay.  All right.  And did you dispute or
9  challenge this coaching at all?
10 A.     No.
11 Q.     Okay.  And then it looked like, on 8-8-2015,
12 the page two [sic] of Exhibit 5, it was just an
13 attendance one.  Fourth absence in a six-month
14 rolling period.  Is that correct?
15 A.     Yes.
16 Q.     Okay.  And did you dispute this one at all?
17 A.     No.
18 Q.     Okay.  And then -- Oh, also at the bottom of
19 that page two, do you recall what Don -- Donald
20 Busby's role was?
21 A.     He was the assistant manager.
22 Q.     Do you know what Patricia Hemsley's role
23 was?
24 A.     Comanager, I believe.  Yeah.  Co.
25 Q.     And then the very last page, there's a final

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

48

1  essentially, of the same thing, of the coachings
2  that's actually on Walmart's computer system.  And it
3  looks like we've got the January 3rd, 2015, and then
4  two in August 2015 on here.
5         One question I had, there was one for a job
6  performance in the second row down on March 11, 2015.
7  But then it says it was canceled.  Do you know what
8  that was about?
9  A.     I don't.
10 Q.     Okay.  On the third page of the printout, it
11 had said, on that row, Tiffanee was given Aisle 15,
12 slash, 16, as well as Aisle 18 and N1 on 3-9-15.
13        Does that refresh your recollection at all
14 about what that might have been?
15 A.     That's for the job performance for this one.
16 Q.     Well, that one's in March, so there was --
17 It looked like that one was canceled.  So I just
18 wondered if they had even talked to you about that or
19 maybe, if it was canceled, it was never brought to
20 your attention?
21 A.     No.  I don't know about that one.
22 Q.     Okay.  That's fine.  So at the time, right
23 before your maternity leave in 2017, were you
24 doing -- do you recall if you were on modulars or
25 stocking?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**Sarah J. Dittmer, CSR, RPR          reportingwhereur@yahoo.com**

49

1  A.     Modulars.
2  Q.     Modulars.  Okay.  And you said you weren't
3  sure who your supervisor was then?
4  A.     No.
5  Q.     Okay.  And I assume you applied for and
6  received maternity leave from Walmart?
7  A.     Correct.
8  Q.     Okay.  And how long did you take?
9  A.     12 weeks.
10 Q.     And when you came back, was there a time
11 that you switched to days?
12 A.     I went to days when I came back.
13 Q.     Okay.  So during your leave, is that -- did
14 you make arrangements to switch to days?  Or how does
15 that come about?
16 A.     Right before I came back, I had spoke with
17 someone in HR as far as going to days.
18 Q.     Do you recall who you spoke to?
19 A.     I don't.
20 Q.     And was it easy to switch to days?  And let
21 me rephrase that.
22        What did you have to do to get switched to
23 days?  I guess, was it a hassle?  What did you have
24 to do other than just talk to HR?
25 A.     Apply for the position that was available.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

50

1  Q.     Okay.  What position was that?
2  A.     Fabrics and crafts associate.
3  Q.     And that was an associate -- a sales
4  associate?
5  A.     Correct.
6  Q.     And when you applied for that position, did
7  you have to then interview for it?
8  A.     No.
9  Q.     Okay.  Do you know who decided that you
10 could have that position?
11 A.     I don't know.
12 Q.     Okay.  Were you notified that you had
13 received that day position in fabrics and crafts,
14 then, before you returned from leave?
15 A.     I don't remember.
16 Q.     Let me state it this way:  Did you work any
17 overnight shifts when you came back from maternity
18 leave?
19 A.     No.
20 Q.     Okay.  Who was the supervisor when you
21 joined fabrics and crafts during the days?
22 A.     Cassie.
23 Q.     And then that's the same Cassie that was
24 still your supervisor at the end of your employment?
25 A.     Correct.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

51

1  Q.     And she was assistant manager?
2  A.     Yes.
3  Q.     Okay.  Was there a department manager over
4  that area?
5  A.     Yes.
6  Q.     Who was that?
7  A.     Jodi.
8  Q.     Do you recall her last name?
9  A.     I don't.
10 Q.     And how did you get along with Jodi?
11 A.     Just fine.
12 Q.     No issues with Jodi?
13 A.     No.
14 Q.     And was she the department manager, as far
15 as you can recall, the whole time you were in fabrics
16 and crafts?
17 A.     From what I remember, yes.
18 Q.     And then did you hold that sales associate
19 position in fabrics and crafts until the time you
20 left Walmart?
21 A.     Yes.
22 Q.     Do you recall, at that time, who the
23 comanagers were?  And this would be like spring of
24 2018, when you returned.
25 A.     Just Patti.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

52

1  Q.     And that's Patti Hemsley?
2  A.     Correct.
3  Q.     And do you recall who the store manager was
4  at that time?
5  A.     Hillary.
6  Q.     Elko?
7  A.     Yes.
8  Q.     And was Lisa Elrod still a personnel
9  coordinator?
10 A.     Yes.
11 Q.     Did you know Abby Coop?
12 A.     The name doesn't sound familiar, no.
13 Q.     Okay.  She was a training coordinator that
14 helped Lisa in the personnel department.  Does that
15 ring a bell or not?  It's fine if it doesn't.
16 A.     I knew a Tammy in HR, but not Abby.
17 Q.     Okay.
18 A.     I don't remember Abby.
19 Q.     How did you get along with Patti Hemsley?
20 A.     I really didn't have any type of -- too many
21 interactions or anything with Patti.
22 Q.     Did you know her very well?
23 A.     No.
24 Q.     Okay.  The interactions that you had with
25 her, was there any issues or problems?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

53

1  A.     Just when I asked her why didn't I get one
2  position, but that was all.
3  Q.     Okay.  Was that the pharmacy position?
4  A.     Correct.
5  Q.     Otherwise, no other issues with her?
6  A.     No.
7  Q.     And then did you interact with Hillary Elko,
8  the store manager, very often?
9  A.     No.
10 Q.     All right.  Do you recall having any
11 conversations with her?
12 A.     I don't recall, no.
13 Q.     Did you personally have any issues or
14 problems with her?
15 A.     No.  Not with Hillary.
16 Q.     Okay.  And how about this Tammy in HR?  Did
17 you get along well with her or did you know her very
18 well?
19 A.     I didn't really -- No.
20 Q.     Didn't really know her?
21 A.     No.  Not really.
22 Q.     Did you have very many interactions with
23 Lisa Elrod in personnel, or Macko at the time?
24 A.     I've talked to her on multiple occasions.
25 Q.     Before -- And we'll talk more in detail

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

54

1  about when you returned from maternity leave.  But
2  before you went on maternity leave, did you have any
3  problems or issues with Lisa Elrod?
4  A.     No.
5  Q.     Okay.  Got along with her fine?
6  A.     Yes.
7         MS. GUTTAU:  All right.  We've been going a
8  little over an hour.  Does anybody need a break?
9         MR. SHULTZ:  I would love one.
10        MS. GUTTAU:  Okay.  So we'll go off the
11 record.
12        (Recessed 11:04 a.m.; resumed 11:13 a.m.)
13 BY MS. GUTTAU:
14 Q.     Do you understand you're still under oath,
15 right, Tiffanee?
16 A.     Yes.
17 Q.     Okay.  When you talked about the hierarchy
18 of managers, I wanted to ask what your understanding
19 was of those positions.  So you -- Did you report to
20 a department manager or did you report to assistant
21 manager?
22 A.     To support or assistant.
23 Q.     Support or assistant.  Okay.  And was
24 support, was that a -- like a GM or support manager
25 title?  Do you know their title or just support

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

55

1  manager?
2  A.     For overnights, it was just support, to my
3  knowledge.
4  Q.     Okay.  So you would report -- sorry -- you
5  said to a support or --
6  A.     Assistant.
7  Q.     -- or assistant.
8         Okay.  Who was, if you recall, the support
9  manager when you were on overnights?
10 A.     I know Jeanie was one.  And I can't remember
11 the other.  I know it's two of them, though.
12 Q.     Okay.  Do you recall Jeanie's last name?
13 A.     I don't.  I know Sam was a overnight support
14 at one point.  And then it was another --
15 Q.     Okay.  And that was Samantha Finn?
16 A.     Correct.
17 Q.     So she was at some time while you were there
18 overnights?
19 A.     Yes.
20 Q.     Okay.  What was your understanding of what
21 the support managers did?
22 A.     Support the associates and assistants when
23 they needed help.
24 Q.     Okay.  And what was your understanding of
25 what the assistant's role was, assistant manager?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

56

1  A.     To support the whole store, pretty much.
2  Q.     And so is a department manager below
3  assistant and support manager?
4  A.     Yes.
5  Q.     Do you -- What was a department manager's
6  role?  What was your understanding of a department
7  manager role?
8  A.     To maintain their department that they're
9  over.
10 Q.     Okay.  I'm going to hand you what I just
11 marked as Exhibit 7.  If you want to just glance
12 through those three pages.
13 A.     Okay.
14 Q.     Do you know what Exhibit 7 is?
15 A.     Hours availability.
16 Q.     Okay.  So page one, it looks like, maybe was
17 filled out closer to when you started, December of
18 2014.  It looks like the 10 p.m. to seven a.m. shift
19 for overnights; is that correct?
20 A.     Yes.
21 Q.     Okay.  And then it looked like the next two
22 pages -- one is dated 1-16-2018.  And this last page
23 is dated 1-24 of '18.  And is that, to the best of
24 your recollection, around the time that you changed
25 your availability to the daytime hours?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

61

1   A.      I don't.

2   Q.      Did you talk to anybody about that --

3   A.      No.

4   Q.      -- base pay?  No.

5           Okay.  Did you have an understanding, while

6   you worked at Walmart, that if you had any complaints

7   or problems that you should report it up the chain?

8   A.      Yes.

9   Q.      Did you ever submit any written complaints

10  to Walmart about discrimination during your

11  employment?

12  A.      No.

13  Q.      Did you ever make any verbal complaints of

14  discrimination to anybody in management at Walmart

15  during your employment?

16  A.      Not that I remember, no.

17  Q.      With other employers, besides Walmart, have

18  you ever filed any charges or lawsuits or complaints

19  of discrimination?

20  A.      No.

21  Q.      Have you ever made any claim or complaint of

22  discrimination, harassment, or retaliation for any --

23  against any housing agency or landlord?

24  A.      No.

25  Q.      Have you ever made any claim of harassment,

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

62

1   discrimination, or retaliation in being denied any

2   public accommodation or service?

3   A.      No.

4   Q.      While you were working as an overnight

5   stocker until you went on maternity leave, had you

6   ever applied for any promotions during that time

7   period?

8   A.      The overnight support.

9   Q.      Do you recall about when you applied for

10  that?

11  A.      No, I don't.

12  Q.      So it was overnight support manager?

13  A.      Yes.

14  Q.      And did you put an application in for that?

15  A.      Yes.

16  Q.      And were you selected for an interview?

17  A.      No.

18  Q.      Do you know who the decision-makers were in

19  that process?

20  A.      No.

21  Q.      Do you know who got that position?

22  A.      Thomas.

23  Q.      Do you know his last name?

24  A.      I don't.

25  Q.      And did you make any complaints about the

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

63

1   overnight support manager hiring process?

2   A.      No.

3   Q.      Next, I'm going to hand you what we marked

4   as Exhibit 9.  And take a moment to look at that.

5   And I can represent to you, this is from a tab -- a

6   page regarding your employment history at tab labeled

7   "CP, dash, Historical Preferences."  So --

8           Backing up a little bit.  So if you wanted

9   to apply for a different position or for a

10  supervisory position, what would you have to do at

11  Walmart?

12  A.      Go in the system and say you're interested

13  in the position.

14  Q.      Uh-huh.  And you -- Could you yourself go in

15  and do that at any time?

16  A.      Yes.

17  Q.      Did you have to have help from HR or you

18  could just go into the system, log in, and update

19  those?

20  A.      You can do it yourself.

21  Q.      Okay.  And if you look at the column that

22  says pref, underscore, type, underscore, desc -- I

23  think it's preference type description, or something

24  like that -- there's interest and goal.  Do you know

25  what the difference was between those?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

64

1   A.      I don't.

2   Q.      Okay.  After you returned from maternity

3   leave, it appears that you had indicated some

4   interest in some other positions in 2018.  Does this

5   look accurate for the positions that you indicated

6   interest in?

7   A.      Yes.

8   Q.      Okay.  So the top line says, "Apparel/Home

9   Sales Associate."  Was that -- Is that the same as

10  fabric?  Is that the department you --

11  A.      No.

12  Q.      No.  Okay.  That's different?

13  A.      Yes.

14  Q.      Okay.  It looks like you -- And celebration

15  sales associate, what is that?

16  A.      That's the fabrics and crafts.

17  Q.      Okay.  So that's the position you got?

18  A.      Yes.

19  Q.      Gotcha.  And then you also had cashier,

20  celebration sales associate, courtesy desk as goal.

21  Do you know if you got -- Did you ever apply for any

22  of those positions?

23  A.      Not that I remember.  But I did cashier

24  there as well.

25  Q.      Oh, okay.  At the fabric department?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**Sarah J. Dittmer, CSR, RPR        reportingwhereur@yahoo.com**

---

65

1   A.      No.
2   Q.      Oh.
3   A.      Up front.  In the front end.
4   Q.      When did you do that?
5   A.      After I came back from maternity leave.
6   Q.      How often?
7   A.      Not too often.
8   Q.      What is it, like filling in when they needed
9   help, or how did that work?
10  A.      Well, I would be in fabrics, but they'll
11  call for assistance to the front end.
12  Q.      Okay.  So you still remained a fabric
13  associate.  Just would go up when needed?
14  A.      Yes.
15  Q.      Okay.  And then it looks like, in two --
16  There's a consumables department manager, it looks
17  like you indicated interest in, February 21st, 2018.
18  Does that sound correct?
19  A.      Yeah.
20  Q.      And then hardware department manager,
21  3-6-2018.  Does that also match your recollection?
22  A.      I don't remember.
23  Q.      Okay.  How about apparel/home department
24  manager?  Do you remember indicating interest in that
25  around March of 2018?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

67

1   was located on here?  And I know we're not experts in
2   reading blueprints, but just the general area.  So
3   the front of the store's towards the -- you know,
4   towards us.
5   A.      It was somewhere around this area --
6   Q.      Okay.
7   A.      -- for fabrics.
8   Q.      I'm going to hand you a blue pen.  If you
9   want to circle approximate area of fabrics, and
10  then -- and it doesn't have to be exact -- if you
11  want to just write "fabrics" on there --
12  A.      Okay.
13  Q.      -- on Exhibit 10, that would be great.
14  A.      (The witness complied.)
15  Q.      And can you circle that fabrics area?
16  A.      Yep.
17  Q.      Perfect.  Okay.  And if you want to keep
18  that handy, that's fine.
19  A.      Okay.
20  Q.      So when you returned, that was kind of your
21  main area of work, was in the fabrics department?
22  A.      Yeah.
23  Q.      All right.  You can keep that handy.
24          So were you pleased that you were able to
25  transfer to the day shift when you returned from

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

66

1   A.      I don't remember that as well.
2   Q.      Okay.  How about pharmacy department manager
3   in April of 2018?
4   A.      Yes.
5   Q.      Okay.  And do you recall indicating interest
6   in food department manager?
7   A.      I don't remember that one either.
8   Q.      Okay.  And the same with the hardware.  Do
9   you recall that one?
10  A.      No.
11  Q.      Okay.  Before we go into the promotions and
12  stuff, I want to hand you what I've marked as Exhibit
13  10.  And the way I handed it to you, then, there's
14  some handwritten numbers at the top.  That would be
15  the back of the store.
16  A.      Okay.
17  Q.      We'll probably kind of keep this exhibit
18  handy.  And I'll ask you some questions about it
19  later too, but can you just tell me, like when you
20  were an overnight stocker, could you be anywhere in
21  the store stocking or were you in certain areas
22  usually?
23  A.      Anywhere.
24  Q.      Okay.  And when you were in the fabrics
25  department, can you tell me approximately where that

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

68

1   maternity leave?
2   A.      Yes.
3   Q.      Okay.  There was some notes that we'll go
4   through later where you had noted, I missed working
5   overnights.  If it wasn't for Dream, I would still be
6   working overnights.  But is Dream the name of your --
7   A.      My daughter.
8   Q.      -- daughter?  I love that name.
9   A.      Thank you.
10  Q.      Was the -- The switch to the day shift, was
11  that just a lateral move or a promotion or demotion,
12  do you know?
13  A.      No.  It was just -- worked with my life
14  better.
15  Q.      Okay.  Do you recall -- When you returned
16  from maternity leave and updated your preferences for
17  department manager positions, what department manager
18  positions had requisitions that you actually applied
19  for, do you recall?
20  A.      As soon as I returned --
21  Q.      Or during --
22  A.      -- or --
23  Q.      -- that time period, from January until you
24  left in May, do you recall what openings there were
25  as department manager that you applied for?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

**Sarah J. Dittmer, CSR, RPR          reportingwhereur@yahoo.com**

69

1  A.      The pet department and pharmacy.  Those were
2  two that I know for sure.
3  Q.      Okay.  Did you interview for both of those?
4  A.      Yes.
5  Q.      Were there any others that you interviewed
6  for?
7  A.      No.
8  Q.      Okay.  There were some places where a third
9  position was referenced.  But was there any others
10 that you recall applying for that you felt you should
11 have been selected for an interview?
12 A.      The position that I believe you're talking
13 about was gone before I came back from maternity
14 leave.
15 Q.      Okay.  What position was that?
16 A.      That was the housewares department.
17 Q.      And had you updated your preferences to
18 indicate that position before you came back from
19 maternity leave?
20 A.      No.
21 Q.      Okay.
22 A.      I don't believe so.
23 Q.      Okay.  Do you recall, separate from that,
24 putting any kind of application or request to be
25 considered for that opening?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

71

1          Besides updating your preferences to
2  indicate interest in the consumables and pharmacy
3  department manager positions, did you do anything
4  else to make your interests known in those positions?
5  A.      You have to take a test.
6  Q.      Okay.  And when did you take that test?
7  A.      I don't exactly remember when.  It was after
8  my maternity leave.
9  Q.      Had you ever taken it before then?
10 A.      Yes.
11 Q.      And what happened -- How many times?
12 A.      I believe once before then.
13 Q.      And did you pass it the first time?
14 A.      No.
15 Q.      What kind of test is that?  Let me clarify.
16 Is it computer -- on a computer?
17 A.      Yes.
18 Q.      Okay.  All computer based?
19 A.      Yes.
20 Q.      All right.  And how long does it usually
21 take?
22 A.      I don't remember exactly.
23 Q.      Okay.  And so then the second time you took
24 it, did you pass it?
25 A.      Yes.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

70

1  A.      No.
2  Q.      Okay.  Did you believe that that decision
3  regarding the housewares department manager position
4  was discriminatory against you in any way?
5  A.      No.
6  Q.      So besides pet, pharmacy, and housewares,
7  any other department manager positions that you had
8  applied for or put in for an opening during the time
9  period of when you went on maternity leave until you
10 left?
11 A.      Not that I remember, no.
12 Q.      Okay.  Let's talk about -- When you said
13 "pet department manager," is that also called
14 "consumables"?
15 A.      Yes.
16 Q.      Okay.  What all is covered by consumables?
17 If you were -- if you know.  Consumables department.
18 A.      All of grocery, the infants, and the pets.
19 Q.      Okay.  And for pharmacy, do you know what
20 exactly that department manager position covered?
21 A.      No, I don't.
22 Q.      Assume the pharmacy; right?
23 A.      Yes.
24 Q.      All right.  And so how did you -- Strike
25 that.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

72

1  Q.      Did anybody assist you in preparing for that
2  test the second time or help --
3  A.      Not that I remember.
4  Q.      -- you study?
5          Okay.  How about the first time?
6  A.      No.
7  Q.      So you took the test and passed it.  Okay.
8  So besides taking the test; passing it; updating your
9  preferences, as we've seen on Exhibit 9; was there
10 anything else -- Let's just talk about the
11 consumables or pets.  Can we agree we'll call that
12 consumables department manager?
13 A.      Yes.
14 Q.      Okay.  Anything else in regard to the
15 consumables department manager that you did to
16 indicate your interest in it?
17 A.      No.
18 Q.      And the same question for pharmacy.  Besides
19 updating your preference, taking and passing the
20 manager's test, was there anything else you did to
21 indicate your interest in that opening?
22 A.      No.
23 Q.      Do you remember which one was -- which
24 opening came first between consumables and pharmacy?
25 A.      The consumables.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**Sarah J. Dittmer, CSR, RPR          reportingwhereur@yahoo.com**

73

1   Q.      Okay.  And how did you first become aware of
2   the opening?
3   A.      Kendra had approached me.
4   Q.      When you say "Kendra," Kendra Moulton?
5   A.      Correct.
6   Q.      And she was an assistant manager?
7   A.      Yes.
8   Q.      Okay.  And when Kendra approached you, was
9   this after you came back from leave?
10  A.      Yes.
11  Q.      What did she say to you?
12  A.      That there was going to be an opening for
13  the consumable area and to apply.
14  Q.      How well did you know Kendra?
15  A.      Not well.  Just from Walmart.
16  Q.      Before your maternity leave, did you work
17  with her?
18  A.      No.  Not that I remember.
19  Q.      And after you returned from your maternity
20  leave, did you work with her?
21  A.      Yes.
22  Q.      About how often, just approximately, during
23  a week would you interact with her?
24  A.      In a week, once, maybe twice.
25  Q.      Okay.  What would your interactions

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

74

1   typically involve?
2   A.      The work in the areas.
3   Q.      Like work that needed to be done?
4   A.      Correct.
5   Q.      Okay.  And how did you get along with
6   Kendra?
7   A.      Fine.
8   Q.      And so she encouraged you to apply?
9   A.      Correct.
10  Q.      And you did so?
11  A.      Yes.
12  Q.      And was that by updating the preferences?
13  A.      Yes.
14  Q.      All right.  Were there any other managers
15  that encouraged you to apply for the consumable
16  department manager opening besides Kendra?
17  A.      Not that I remember, no.
18  Q.      Do you know who else was applying for the
19  consumables area or department manager position?
20  A.      Abigail.
21  Q.      And do you know her last name?
22  A.      Hunt.
23  Q.      Okay.  Do you know of anybody else who was
24  applying -- who had applied?
25  A.      No.  I don't know.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

75

1   Q.      Okay.  Did you know Abigail?
2   A.      No, I didn't know her.
3   Q.      Didn't work with her?
4   A.      No, not really.
5   Q.      I'll show you a sheet a little bit later,
6   but there was a Chastity who also applied.  I'll find
7   her last name.  I'm just going to ask you if you know
8   her.
9           MR. SHULTZ:  McNabb.
10          MS. GUTTAU:  McNabb.  Thank you.
11  BY MS. GUTTAU:
12  Q.      Did you know Chastity McNabb?
13  A.      No.
14  Q.      Okay.  Didn't work with her either?
15  A.      No.
16  Q.      All right.  So you applied -- or updated
17  your requisition or preferences to indicate interest.
18  What happened next in that process regarding just the
19  consumables department manager position?
20  A.      Afterwards, it was just the interview
21  process.
22  Q.      Okay.  Tell me about that.  Like how are you
23  notified if you're selected for an interview?
24  A.      They'll call you to the office.
25  Q.      One second.  When you say "they'll call you

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

76

1   to the office," who usually is the "they"?
2   A.      Well, management over the intercom.
3   Q.      Okay.  Did they give you a heads-up that you
4   might have an interview or do you have time ahead of
5   time to prepare, or how does that work?
6   A.      No.  Not that I remember, no.
7   Q.      Okay.  They just call people back?
8   A.      Yeah.
9   Q.      All right.  And when you say "to the
10  office," what office was -- were you called to?
11  A.      One of the management's office.
12  Q.      Before you were called back, are
13  employees -- Before employees are called back, do you
14  know if -- are you -- did you have an indication you
15  were going to get an interview or is that the first
16  you knew of it?
17  A.      I didn't have an indication.  I just figured
18  I would because I was asked to apply for it.
19  Q.      Okay.  Did you do anything to prepare for
20  the interview?
21  A.      No.
22  Q.      So one of the management's office.  When you
23  went back to interview, who was in the room with you?
24  A.      Kendra.
25  Q.      Okay.  Anybody else?  Just you and Kendra?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**Sarah J. Dittmer, CSR, RPR**          **reportingwhereur@yahoo.com**

---

77

1   A.      That's all I remember, is Kendra.
2   Q.      Okay.  Do you recall -- do you recall which
3   management office she interviewed you in?
4   A.      I don't remember.
5   Q.      All right.  And about how long did she
6   interview you?
7   A.      Maybe 10 minutes, give or take.
8   Q.      Okay.  Had you had any other interviews for
9   any positions at Walmart before this?
10  A.      Just when I got hired.  That was it.
11  Q.      Okay.  Do you recall what Kendra asked you
12  during the interview?
13  A.      I don't.
14  Q.      Do you recall anything that you told her
15  during the interview?
16  A.      No, I don't.
17  Q.      Do you recall having a -- how you felt about
18  the interview after it was completed?
19  A.      No, I don't recall how I felt.
20  Q.      Okay.  Do you recall if Kendra had any
21  paperwork with her during the interview?
22  A.      Yeah, I'm sure she had paper -- paperwork.
23  Q.      Do you recall her taking any notes during
24  that 10-minute interview?
25  A.      Yes.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

79

1   ask?
2   A.      Why didn't I get the position.
3   Q.      So how had you learned, I guess, before that
4   that you didn't get it?
5   A.      I honestly don't remember how.
6   Q.      Okay.  Did Kendra or Patti Hemsley have any
7   meeting with you either individually or together to
8   indicate you had not gotten it, or do you not
9   recall --
10  A.      No.
11  Q.      -- either way?
12  A.      I don't remember.
13  Q.      Okay.  So you don't know how you learned
14  that you had not gotten it?
15  A.      I know it wasn't from any of the management,
16  but I don't know exactly how.
17  Q.      Okay.  And so you asked her, Why didn't I
18  get the position.  What did Kendra tell you?
19  A.      Because I had small children at home and
20  they didn't think that I wanted to further my career
21  there.
22  Q.      And did she say -- When you say "they," do
23  you know who she was referring to?  Or she was just
24  talking about herself?  Or do you know?
25  A.      She said Patti, actually.  She said Patti.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

78

1   Q.      Okay.  And at the end of the interview,
2   then, what happens next in the process for a
3   department manager?
4   A.      You just go back to doing what you were
5   doing and just wait.
6   Q.      How long did you have to wait to hear of a
7   decision?
8   A.      I don't remember exactly.  I don't remember
9   exactly.
10  Q.      It's not like same day?  Do you usually have
11  to wait some days or a week?
12  A.      I don't remember --
13  Q.      That's fine.
14  A.      -- exactly.
15  Q.      That's fine.
16          And how were you notified of the decision
17  that was made regarding consumables department
18  manager selection?
19  A.      I had approached Kendra about it.
20  Q.      Okay.  Do you recall where you were when you
21  approached her?
22  A.      We were in the back hallway not far from HR.
23  Q.      And was anybody else around you?
24  A.      Not that I remember, no.
25  Q.      And when you approached her, what did you

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

80

1   Q.      And you took that to be Patti Hemsley?
2   A.      Correct.
3   Q.      Do you know whose decision it was to pick
4   the consumables department manager?
5   A.      I don't know --
6   Q.      Okay.
7   A.      -- whose decision.
8   Q.      If Kendra said it was her decision, do you
9   have any reason to dispute that?
10  A.      No, I wouldn't have a reason.
11  Q.      And Kendra herself had small children;
12  right?
13  A.      Yes.
14  Q.      Okay.  And tell me, was anything else said
15  during that conversation with Kendra in the back
16  hallway?
17  A.      No.  Not that I remember.
18  Q.      Okay.  Did you complain about what she had
19  told you to anybody in management?
20  A.      No.
21  Q.      Did you have any further conversation with
22  anybody about what Kendra had told you while you were
23  at -- Well, strike that.  Let me clarify that.
24          Regarding what you said Kendra told you
25  about having small children and what Patti had said

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

81

1   about not wanting to further your career there, did
2   you discuss that with anybody else while you were
3   still employed with Walmart?
4   A.      I believe I had told Sam.
5   Q.      And that's Sam Finn?
6   A.      Correct.
7   Q.      Do you know what her position was at that
8   time?
9   A.      She wasn't at the Ottumwa store.
10  Q.      Do you know what she was doing?
11  A.      I think she was an assistant manager at
12  Walmart in Oskaloosa.
13  Q.      And what did she tell you when you told her
14  that?
15  A.      I don't exactly remember her response.
16  Q.      Anybody else that you talked to about that?
17  A.      No, not that I remember.
18  Q.      Did you think it was odd for Kendra to say
19  that when you just had a baby?
20  A.      Yes.
21  Q.      Do you know of any other department managers
22  or above who also had small children at Walmart?
23  A.      I know Don had a baby.
24  Q.      And who is Don?
25  A.      He was the assistant manager.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

82

1   Q.      Okay.  Anybody else that you recall?
2   A.      No.  Not that I recall.
3   Q.      Could be; just don't know?
4   A.      Yes.
5   Q.      Okay.  So after that conversation with
6   Kendra, did you have any other conversations with
7   anybody else about not getting the consumables
8   department manager position?
9   A.      Not that I remember.
10  Q.      Did you file any complaint about not getting
11  that position while you were still employed?
12  A.      No.
13  Q.      And did not open-door it?
14  A.      No.
15  Q.      Do you know -- Did you know anything about
16  Abby Hunt's job history at Walmart?
17  A.      No.  Not her history, no.
18  Q.      Okay.  Did you have any knowledge one way or
19  the other whether she had prior supervisory
20  experience at Walmart?
21  A.      No, I don't know.
22  Q.      Okay.  Would you agree that having prior
23  supervisory experience at Walmart could be a factor
24  that a decision-maker would look at in making a
25  decision?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

83

1           MR. SHULTZ:  Object to form.
2           You can answer.
3   A.      Yes.
4           MR. SHULTZ:  And foundation.  Sorry.
5           MS. GUTTAU:  That's fine.
6           MR. SHULTZ:  That's my first one today.  I
7   need to be making objections sometimes.
8           MS. GUTTAU:  Yeah.  I know.  I sat
9   through --
10          Off the record.
11          (An off-the-record discussion was held.)
12  BY MS. GUTTAU:
13  Q.      Were you aware of any of her other
14  experience outside of Walmart, Abby's?
15  A.      No.
16  Q.      Okay.  If Walmart's position is that Abby
17  had more supervisory experience than you and that was
18  part of the decision, do you have any reason to
19  dispute that?
20  A.      Supervisory experience?  Yes.
21  Q.      Okay.  How -- What are your reasons?
22  A.      Because I didn't have any supervisory
23  experience.
24  Q.      Okay.  And I guess I probably asked that
25  poorly.  So let me restate it.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

84

1           If Walmart -- Walmart's position is that
2   Abby had more experience in supervisory positions
3   than you did, do you have any reason to dispute that?
4   A.      Not in supervisory experience, no.
5   Q.      Okay.  Kendra also cited in her deposition
6   an interaction that she had with you where she had
7   asked you to stock some candy displays.  Do you
8   recall that at all?
9   A.      No.
10  Q.      Okay.  She indicated that she had asked you
11  to stock some candy displays, and that when she came
12  back a half hour later, you had not done the work.
13  Do you recall anything about that?
14  A.      No.
15  Q.      Was it -- Did you enjoy switching to days?
16  A.      Yes and no.
17  Q.      Okay.  What did you like about it?
18  A.      I get to sleep through the night.
19  Q.      Yeah.  That's a good thing.  Anything else
20  that you liked more about it than nights?
21  A.      No.  Not that I can recall, no.
22  Q.      Anything that you liked less about it than
23  nights?
24  A.      Less?  No.
25  Q.      Was it a big adjustment for you to move to

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**Sarah J. Dittmer, CSR, RPR        reportingwhereur@yahoo.com**

97

1  off.
2  Q.     Oh.  Because you called off.  What's that
3  mean?
4  A.     I called off work for that day.
5  Q.     Oh, okay.
6  A.     Well, the day before, rather.
7  Q.     Do you recall if you had called off that day
8  before?
9  A.     I did.
10  Q.     Do you remember why?
11  A.     Because I was upset.
12  Q.     About?
13  A.     Not getting the position.
14  Q.     Oh.  So she -- I want to make sure I
15  understand.  So you found out you didn't get it.  You
16  called off work when you found that out.
17         And so when you asked Terri [sic] why you
18  hadn't heard, she's saying you hadn't heard because
19  you had called off or --
20  A.     Not Terri.  Patti.
21  Q.     Or I'm sorry.  Patti told you you hadn't
22  heard because you'd called off?
23  A.     Correct.
24  Q.     Okay.  Not that you didn't get the position
25  because you had called off.  Because that happened

98

1  after the interview?
2  A.     Correct.
3  Q.     Okay.  Gotcha.  I'm following.  Did she tell
4  you anything else about why the decision was made to
5  choose Terri?
6  A.     She had more experience.
7  Q.     And anything else you recall about that
8  conversation with Patti?
9  A.     No.
10  Q.     Okay.  Would you agree Terri did have more
11  experience?
12  A.     Yes.
13  Q.     Did you think that you should have been
14  picked over Terri for the pharmacy department manager
15  position?
16  A.     No.
17  Q.     You didn't believe you were more qualified
18  than Terri, did you?
19  A.     No.
20  Q.     Okay.  Did you feel -- Going back to the
21  same question in regard to the consumables department
22  manager position, did you feel you should have been
23  hired over Abby Hunt?
24  A.     Yes.
25  Q.     Why?

99

1  A.     I had more experience with Walmart than Abby
2  did.
3  Q.     You mean, like, length of service with
4  Walmart?
5  A.     Correct.  And I just knew the store.
6  Q.     Any other reasons that you believe you
7  should have been picked over Abby Hunt for the
8  consumables department manager position?
9  A.     No.
10  Q.     Okay.  Did you have any other conversations
11  with anybody else at Walmart about not getting the
12  pharmacy department manager position?
13  A.     At Walmart?  Not that I remember, no.
14  Q.     Okay.  Did you ever complain or open-door
15  the denial of the pharmacy department manager
16  promotion?
17  A.     No.
18  Q.     And when you interviewed with Patti, was it
19  just Patti in the room, or do you recall if Kendra
20  was also there for the pharmacy department interview?
21  A.     It was just Patti.
22  Q.     Okay.  And did you have any meetings with
23  either of them, besides just what we've talked about,
24  you know, talking to them in the hall where they,
25  like, officially told you you're not getting the

100

1  positions and why?
2  A.     No.  Other than discuss it, no.
3  Q.     Okay.  Do you know -- do you know whether or
4  not Abby Hunt has -- had young children at home?
5  A.     No, I didn't know.
6  Q.     Did -- How about Terri Wiggins?  Do
7  you know anything about whether or not she had kids?
8  A.     Not young children, no.
9  Q.     Do you know if she ever had young children
10  while she was working at Walmart?  Do you know one
11  way or the other?
12  A.     No.  I don't know.
13  Q.     Okay.  And Kendra, you said you knew she had
14  young ones?
15  A.     She had, yes.
16  Q.     Okay.  How about Patti Hemsley?  Do you know
17  if she had young children?
18  A.     No, I don't.
19  Q.     Don't know one way or the other?
20  A.     No, I don't.
21  Q.     Okay.  Are you claiming that the position
22  that Terri Wiggins got over you was discriminatory?
23  A.     No.
24  Q.     Let's see.  We'll be on 12.  I'm going to
25  hand you what we've marked as Exhibit 12.  If you

---

101

1  want to just flip through Exhibit 12, I'm going to
2  first ask you if you know what this is.  If you want
3  to take a moment.
4  A.      I don't know exactly what it is, but --
5  Q.      Okay.  So I can represent to you, this is
6  the complaint, or lawsuit, that the EEOC filed
7  against Walmart and Wal-Mart Stores East based on the
8  charge of discrimination that you filed against
9  Walmart.
10 A.      Okay.
11 Q.      Have you ever seen this before, Exhibit 12?
12 A.      I don't recall seeing this.
13 Q.      Okay.  If you want to turn to page three, I
14 want to look at -- towards the bottom of paragraph
15 17(c), it talks -- it says, Johnson applied for a pet
16 department manager position in February 2018 -- which
17 I think we've agreed we refer to as the consumables
18 department manager; correct?
19 A.      Yes.
20 Q.      Okay.
21         -- after she passed the manager's test and
22 Walmart managers encouraged her to apply for a
23 department manager position.
24         And I know you said Kendra had encouraged
25 you to apply.  And since that was plural, I just

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

102

1  wanted to check.  Was there any other Walmart
2  managers who encouraged you to apply for a department
3  manager position?
4  A.      At the Ottumwa store?
5  Q.      Yes.
6  A.      No.
7  Q.      Okay.  Was there managers at other Walmart
8  stores that did?
9  A.      Sam.
10 Q.      Okay.  Samantha Finn?
11 A.      Yeah.
12 Q.      And was she at Oskaloosa store at that time?
13 A.      Yes.
14 Q.      And what did she do to encourage you?
15 A.      Just told me I should apply.  She thinks I
16 would be a great fit.
17 Q.      And that was at the Ottumwa -- She was
18 encouraging you to apply at the Ottumwa store?
19 A.      Yes.
20 Q.      Okay.  Is Sam Caucasian, white?
21 A.      Yeah.
22 Q.      Okay.  And you had worked with her when she
23 was at the Ottumwa store?
24 A.      Yes.
25 Q.      Did you ever -- Besides what you said Kendra

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

103

1  told you Patti had said about small children, had you
2  ever personally heard Patti say anything negative
3  about employees with small children?
4  A.      No.
5  Q.      Anybody -- Had you ever heard any Walmart
6  managers say anything negative about employees with
7  small children?
8  A.      No.
9  Q.      Besides what we've talked about regarding
10 the black Tiffanee comment that you were told about,
11 did you ever hear any Walmart -- did you personally
12 hear any Walmart managers make any racially
13 discriminatory remarks?
14 A.      No.
15 Q.      Do you know if Hillary Elko had small
16 children?
17 A.      I don't know.
18 Q.      Okay.  Were you aware of any male managers
19 who had small children, besides, I think -- Was Don
20 male that you referenced?
21 A.      Correct.  Yes.
22 Q.      Were you aware of any other male managers
23 with small children?
24 A.      PJ had small children.
25 Q.      And P- -- And what's PJ's last name?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

104

1  A.      Finn.
2  Q.      He's Samantha's husband?
3  A.      Yeah.
4  Q.      Okay.  And what was his role at that time in
5  2018 with Walmart when you were there?
6  A.      He no longer worked for Walmart.
7  Q.      Okay.  Do you know when he left?
8  A.      I don't.
9  Q.      Do you know why he left?
10 A.      Because they went away with -- They had only
11 one comanager at the store.
12 Q.      Okay.  And he had been a co?
13 A.      Correct.
14 Q.      So is it your understanding they eliminated
15 his position?
16 A.      Yes.
17 Q.      Okay.  And so then after that kind of
18 elimination and restructure, was Patti Hemsley the
19 only comanager at the store?
20 A.      Yes.
21 Q.      Did -- Do you know when Kendra Moulton had
22 her baby?  And if it's easier to say, in connection
23 to when yours -- you had yours?
24 A.      I just knew she had him before I had my
25 daughter.  I don't know exactly when, though.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

---

105

1  Q.     Okay.  And if you want to turn to the next
2  page, on page four of Exhibit 12, if you want to read
3  subparagraph F.
4  A.     When Johnson asked Moulton --
5  Q.     Oh.  You can just read it to yourself.
6  That's fine.
7  A.     Oh.  Okay.  I gotcha.
8  Q.     Sorry.  My bad.
9         Have you had a chance to read paragraph F?
10 A.     Yes.
11 Q.     Okay.  And is that -- Does that reflect what
12 Moulton told you?
13 A.     Yes.
14 Q.     Okay.  And did anybody else witness that
15 conversation?
16 A.     No.
17 Q.     Okay.  I want to look, then -- If you want
18 to look at paragraph I on that same page.  And read
19 that to yourself.
20        Okay.  Besides -- Well, strike that.
21        So what would be your basis for claiming
22 that Walmart's decision not to promote you is based
23 on your recent childbirth or assuming that women with
24 small children will not stay in the workforce?
25 A.     Can you rephrase it?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

106

1  Q.     Sure.  So this alleges, in paragraph I, that
2  Walmart's decision not to promote you was based on
3  your recent childbirth or assumption that working
4  women with small children will not stay in the
5  workforce long-term and/or seek further promotion.
6         Can you tell me what reasons you have for
7  asserting that?  And I understand the EEOC is
8  asserting this, but is that your belief, that
9  Walmart -- Walmart's decision was based on that?
10 A.     That's what I was told, yes.
11 Q.     Okay.  So what do you base that belief on?
12 Just what you were told or anything else?
13 A.     Correct.  Just what I was told.
14 Q.     Okay.  Just Kendra's statement?
15 A.     Correct.
16 Q.     Okay.  And again, Kendra just had a baby;
17 right?
18 A.     Yes.
19 Q.     And she was in management?
20 A.     Yes.
21 Q.     Do you know who selected the candidates for
22 interviews for the consumables position?
23 A.     I don't.
24 Q.     Okay.  If Kendra said she did, do you have
25 any reason to dispute that?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

107

1  A.     No.
2  Q.     Do you think Kendra would discriminate
3  against you for having a baby or small children?
4  A.     No.
5  Q.     You just think Patti -- you think Patti
6  would because of Kendra's statement?
7  A.     Yes.  From what Kendra said.
8  Q.     Okay.  If Kendra said Patti never told her
9  that, do you have anything to dispute that besides
10 just your own statement?
11 A.     Yes.
12 Q.     What would that be?
13 A.     A conversation -- the conversation with
14 Patti afterwards.
15 Q.     Okay.  Tell me about that.
16 A.     When I asked Patti, she said that Kendra
17 shouldn't have told me that.
18 Q.     Is that exactly what Patti said to you?
19 A.     Yes.
20 Q.     When was that conversation?
21 A.     I don't remember exactly when.
22 Q.     And that was after the consumables
23 department decision?
24 A.     Yes.
25 Q.     Okay.  Where was that conversation with

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

108

1  Patti?
2  A.     I don't remember exactly.
3  Q.     In the store somewhere, though?
4  A.     Yes.
5  Q.     Had you approached Patti?
6  A.     I don't remember who approached who.
7  Q.     Okay.  Do you recall anything else that was
8  said in that conversation with Patti?
9  A.     No.  I don't recall.
10        MS. GUTTAU:  It's 12:32.  Would this be a
11 good lunch break time?
12        MR. SHULTZ:  Are you done with the
13 complaint?
14        MS. GUTTAU:  No.  Because we will go back --
15        MR. SHULTZ:  For other things.
16        MS. GUTTAU:  -- you know, back to it for
17 other things, yeah.
18        MR. SHULTZ:  Yeah, let's go on a lunch
19 break.
20        MS. GUTTAU:  Okay.
21        (Recessed 12:32 p.m.; resumed 1:19 p.m.)
22 BY MS. GUTTAU:
23 Q.     All right.  We're back on the record.  And,
24 Tiffanee, you understand you're still under oath?
25 A.     Yes.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

---

109

1  Q.     Okay.  Before we move on from the subject
2  regarding the promotion, I wanted to double-check.
3  So while you still have paragraph -- or page -- let's
4  see -- Exhibit 12, page four, paragraph F in front of
5  you talking about what Moulton told you, just to
6  confirm, Moulton told you that.  You never heard that
7  personally from Patti; correct?
8  A.     Correct.
9  Q.     Okay.  And then you said, when you had a
10 later conversation with Patti, she said Kendra
11 shouldn't have told you that?
12 A.     Yes.
13 Q.     Okay.  And you don't recall anything else
14 regarding that conversation with Patti?
15 A.     No, I don't.
16 Q.     Okay.  Okay.  Did you understand that the
17 department manager position would supervise
18 associates?
19 A.     No, I didn't understand that.
20 Q.     Okay.  Had you ever seen the job description
21 for a department manager position?
22 A.     I'm sure I have.
23 Q.     Okay.  Maybe let's go ahead and mark it just
24 to see.  I'm going to skip around here, then.
25        I'm going to hand you what's been marked as

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

110

1  Exhibit 14.
2        MR. SHULTZ:  What's 13?
3        MS. GUTTAU:  I am skipping it.
4        MR. SHULTZ:  Oh, okay.
5        MS. GUTTAU:  I'll come back.
6  BY MS. GUTTAU:
7  Q.     Have you ever seen Exhibit 14 or -- I know
8  there's a lot of job descriptions at Walmart -- any
9  similar department manager description?
10 A.     It looks familiar.
11 Q.     Okay.  Just don't recall for sure?
12 A.     No.
13 Q.     Okay.  The department managers that you
14 worked with -- Well, did you work with some
15 department managers?
16 A.     No.
17 Q.     Okay.  So didn't have a good --
18 A.     Well, I'm sorry.  Jodi in fabrics.
19 Q.     And would she supervise you at all?
20 A.     She would tell me the tasks that needed to
21 be done, yes.
22 Q.     Okay.  I'm going to hand you -- Well, let me
23 ask you this:  Do you recall when you first called
24 the EEOC to report discrimination?
25 A.     I know it was after I left the company in

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

111

1  2018.  Not sure exactly when.
2  Q.     And did you call the Iowa Civil Rights
3  Commission ever or just the EEOC office?
4  A.     Just the EEOC.  I did an online thing.
5  Q.     Okay.  Okay.  I'm going to hand you what I
6  marked as Exhibit 13.  You already have that.  If you
7  want to take a moment to look at that.
8        MR. SHULTZ:  This is 13?
9        MS. GUTTAU:  Yep.
10 A.     Okay.
11 BY MS. GUTTAU:
12 Q.     Okay.  Do you know what Exhibit 13 is?
13 A.     It looks like my submission.
14 Q.     Okay.  So is this something you submitted
15 online?
16 A.     Yes.
17 Q.     Okay.  And so is Exhibit 13 -- you would
18 type in the answers; is that correct?
19 A.     Yes.
20 Q.     Okay.  And so looking at -- So -- And I'll
21 represent to you, this was produced by the EEOC.  And
22 I think everything was written on there other than
23 the circle on the front.  That was mine, and I forgot
24 to white it out before I made a copy, so --
25        If you want to look at page three of Exhibit

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

112

1  13.  If you want to read, under Supplemental
2  Information, it says, What reasons were given for the
3  action taken against you.  Can you read that
4  paragraph to yourself.
5  A.     Okay.
6  Q.     Okay.  I'm going to look back -- I should
7  have -- I see the date on the front.  If you want to
8  look at page one, about five lines down, it says,
9  Submission (initial inquiry) date 9-27-2018.
10        Does that refresh your recollection as to
11 when you would have submitted this?
12 A.     It looks around the time, yes.
13 Q.     Okay.  And so when you first submitted a
14 complaint -- again, I'm back on page one -- were you
15 originally just asserting race and color under the
16 second category?
17 A.     For the discrimination?
18 Q.     Yeah.
19 A.     Yes.
20 Q.     When did you first add a claim that you were
21 discriminated against based on your gender for having
22 small children?
23 A.     Upon speaking with the person who initially
24 called me from the EEOC.
25 Q.     Do you know who that was?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

113

1   A.      I don't know his name.
2   Q.      Okay.  Before that, did you think that you
3   had been discriminated against based on small --
4   having small children or because of your gender?
5   A.      Based on having small children and because
6   of my gender?  I'm trying to make sure I got your
7   question right.
8   Q.      Yeah.
9   A.      Can you rephrase that?
10  Q.      So when you first filed, you put race and
11  color as the reason for your complaint.
12  A.      Uh-huh.
13  Q.      And you said, after you talked to somebody
14  there, you added the based on your gender and having
15  small children; correct?
16  A.      Correct.
17          MR. SHULTZ:  Objection.  Foundation.
18  BY MS. GUTTAU:
19  Q.      Okay.  And did you add it after you talked
20  to somebody at the EEOC, as you stated?
21  A.      Yes, I did.
22  Q.      Okay.  So my question was, just when you
23  first filed your -- this inquiry in September of
24  2018, did you believe you had been discriminated
25  against based on your gender and having small

Sarah J. Dittmer & Associates
reportingwhereur@yahoo.com

114

1   children?
2   A.      Yes.
3   Q.      And why didn't you include that?
4   A.      Because I just had to, like, go through
5   everything with myself and over all the facts of
6   everything.
7   Q.      Okay.  And then you added that after you
8   talked to somebody with the EEOC?
9   A.      Yes.  Upon explaining what was going on,
10  yes.
11  Q.      Do you recall who that was?
12  A.      I don't.
13  Q.      Okay.  Okay.  So then back to the last page,
14  which has the 187 at the bottom, last page of Exhibit
15  13, under -- what I had you read, under Supplemental
16  Information, it said, What reasons were you given for
17  the actions taken against you.  And you typed this
18  in, correct, the answer?
19  A.      Yes.
20  Q.      Okay.  And it is -- Were you being truthful
21  in Exhibit 13, in your inquiry to the information?
22  A.      Yes.
23  Q.      Okay.  And were you including everything
24  that you felt was important to your claim?
25  A.      Not everything.  Initially, yes.  That's a

Sarah J. Dittmer & Associates
reportingwhereur@yahoo.com

115

1   yes.
2   Q.      So when you initially filed it, you were
3   including everything you thought was important
4   initially?
5   A.      Correct.
6   Q.      Okay.  So under promotions in that
7   paragraph, you say, For promotions, it was, Oh, the
8   other person wants to eventually be a assistant
9   manager, and we didn't think you did, but they never
10  asked me or never was interviewed for another one or
11  gave it to her best friend 'cause she was more
12  qualified.
13          So for promotions, it was, Oh, the other
14  person wants to be -- eventually be an assistant
15  manager, and we didn't think you did, but they never
16  asked me.  Who are -- What are you referring to
17  there?
18  A.      That management never asked if I wanted to
19  become an assistant manager in the future.
20  Q.      But you never included any allegations in
21  your initial report here in Exhibit 13 that you were
22  told it was because you had small children, did you?
23  A.      No.
24  Q.      Okay.  When did you first add that to your
25  claim to the EEOC?

Sarah J. Dittmer & Associates
reportingwhereur@yahoo.com

116

1           MR. SHULTZ:  Objection.  Form.
2           You can answer.
3   A.      I don't remember exactly when.
4   BY MS. GUTTAU:
5   Q.      Okay.  The next line said, or was never
6   interviewed for another one.  Do you know -- What are
7   you referring to there?
8   A.      I'm guessing the interview.
9   Q.      Okay.  Do you know which one you're talking
10  about that you were never interviewed for?
11  A.      No.
12  Q.      Okay.  Besides the ones we've talked about
13  today, are there any other positions that you felt
14  you were discriminated against in regard to?
15  A.      No.
16  Q.      Okay.  And then the last one, part of the
17  sentence says, or gave it to her best friend 'cause
18  she was more qualified.
19          Do you know what you're -- What are you
20  referring to there?
21  A.      Terri.
22  Q.      Okay.  Who is Terri the best friend to?
23  A.      Yes.
24  Q.      No.  I'm sorry.  Who was she --
25  A.      Oh.

Sarah J. Dittmer & Associates
reportingwhereur@yahoo.com

117

1  Q.      -- the best friend to?
2  A.      Patti.
3  Q.      Oh, okay.  And how do you know that?
4  A.      Because I've heard it from multiple
5  employees.
6  Q.      Who did you hear it from?
7  A.      One of the other craft associates that was
8  there.
9  Q.      Okay.  Do you know her name or his name?
10 A.      I don't know her -- I don't remember her
11 name, let me say that.
12 Q.      Okay.  Okay.  Anybody else that told you
13 that?
14 A.      Multiple people told me, but I don't
15 remember exactly who.
16 Q.      Okay.  And then if you want to look at the
17 next paragraph, it says, Was anyone in a similar
18 situation treated the better -- same, better, or
19 worse than you.
20         Yes.  The other people that applied was
21 treated better than me.  I was told I would hear
22 something back by the end of the day or the next.
23 And she didn't get back with me until two weeks
24 later.
25         Can you tell me, what are you referring to

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

118

1  there in that sentence?
2  A.      That would have to be the pharmacy position.
3  Q.      Okay.  Anything else that you're referring
4  to?
5  A.      No.  That would be the pharmacy only.
6  Q.      Okay.  And then it said, Other people of
7  color tried for other positions and was never
8  promoted.  Can you tell me who that -- who those
9  people are?
10 A.      I know -- I don't know the names exactly,
11 but I know it was another girl who tried for a
12 department and was denied the promotion.
13 Q.      Do you know what department?
14 A.      I don't remember exactly.
15 Q.      Okay.  Do you know when that occurred?
16 A.      No, I don't.
17 Q.      And was this person a person of color?
18 A.      Yes.
19 Q.      Okay.  Anybody else besides this person that
20 you're referring to?
21 A.      No.
22 Q.      Okay.  You don't recall her name at all?
23 A.      No.
24 Q.      Was -- Kendra Moulton is African American;
25 correct?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

119

1  A.      Yes.
2  Q.      I'll hand you what's been marked as Exhibit
3  15.  Sorry.  It's kind of small.  Before we look at
4  Exhibit 15, in your complaint, it had referred to
5  having small children.  What does -- To you, what
6  does "small children" mean?
7  A.      I would say children five and under.
8  Q.      Okay.  Okay.  So Exhibit 15, if you want to
9  take a look, I can represent to you that this is from
10 what we produced as an Excel sheet, 20 -- Walmart
11 Johnson 2120 at the tab page called CP-Internal
12 Applicants.  And this requisition ID on the left is
13 for the consumables manager position that Abby Hunt
14 got that we've been talking about.  Okay?
15 A.      Okay.
16 Q.      Okay.  And under -- So this is the internal
17 applicants list for that position.  And it has
18 Chastity McNabb.  And if you look over, if you follow
19 over to the right, it talks about who was selected.
20 Do you see that?  The schedule manager interview?
21 A.      Yes.
22 Q.      Okay.  So it looks like -- If you look at
23 that, it looks like Chastity, and then further down
24 you, and then Abby Hunt were all selected and had the
25 scheduled manager interview.  And then it goes on

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

120

1  down, at the bottom, to indicate that Abby was given
2  the position.  Okay?
3  A.      Yeah.
4  Q.      Do you see that?
5         Okay.  So it looked like the other
6  applicants below Chastity -- And you said you don't
7  know Chastity?
8  A.      I don't remember her, no.
9  Q.      Okay.  Do you know Jack Hayes?
10 A.      No.
11 Q.      Okay.  Do you know any -- Do you know Cody
12 Pool?
13 A.      No.
14 Q.      Do you know Corey Johnson?
15 A.      No.
16 Q.      Did you know Kimberly Scherer?
17 A.      No.
18 Q.      Okay.  Did you happen to know Bryan
19 Schleiger?
20 A.      No.
21 Q.      And did you happen to know James Baker?
22 A.      No.
23 Q.      So if you didn't know them, you didn't know
24 if they had kids or not; is that correct?
25 A.      Yes.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

121

1  Q.     Okay.  Did you know that you had been
2  selected over some males for an interview for the
3  position?
4  A.     No.
5  Q.     Okay.  And if some of -- If the testimony is
6  established that some of the males on this list did
7  not have any children, do you have any information
8  one way or the other to dispute that?
9  A.     No, I don't.
10 Q.     Okay.  If Kendra chose male applicants with
11 no children to interview -- I'm sorry.  If Kendra
12 chose you over male applicants who don't even have
13 children, can you tell me what basis you believe that
14 she discriminated against you based on your status as
15 a female with small children?
16        MR. SHULTZ:  Objection.  Form and
17 foundation.
18        You can answer.
19 A.     Can you repeat the question?  Sorry.
20 BY MS. GUTTAU:
21 Q.     Yeah.  Let me restate it.  I'll try to state
22 it better.
23        So you've claimed that Walmart discriminated
24 against you in this promotion because of your gender
25 and having small children.  If you were chosen by

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

122

1  Walmart to be interviewed for the position over males
2  who don't even have any children, what basis do you
3  have for claiming that you were discriminated against
4  for having children?
5        MR. SHULTZ:  Objection.  Form and
6  foundation.
7        You can answer.
8  A.     Because that's what I was told for the
9  reason why I didn't get the promotion.
10 BY MS. GUTTAU:
11 Q.     And that's the only basis?
12 A.     Yes.
13 Q.     Okay.  Can you identify any other Walmart
14 employees who do not have children, whether male or
15 female, who you claim were treated more favorably
16 than you?
17 A.     Did you say with or without children?
18 Q.     Yeah.  Let's start with without.  So can you
19 identify any other male or female employees of
20 Walmart without children who you claim were treated
21 more favorably than you?
22 A.     Abigail.
23 Q.     Abigail Hunt?
24 A.     Yes.
25 Q.     Anybody else?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

123

1  A.     No.  Not that I can recall.
2  Q.     Okay.  And you're doing your best to recall
3  today; correct?
4  A.     Yes.
5  Q.     Okay.  And then the same question:  Can you
6  identify any male employees with small children or
7  babies who you claim were treated more favorably than
8  you at Walmart?
9  A.     Male with children?
10 Q.     Yeah.  With small children who were treated
11 more favorably than you.
12 A.     I'm just trying to think.
13 Q.     Yep.  Take your time.
14 A.     None that I can think of.  Like more
15 favorable, no.
16 Q.     Okay.  How about any -- Besides Abigail
17 Hunt, any other male or employee -- male or female
18 employees without children who were treated
19 differently than you, besides Abigail Hunt, while at
20 Walmart?
21 A.     Just the -- Just Ashley.
22 Q.     Okay.  And when you say "Ashley," who are
23 you referring to?
24 A.     I believe her last name is Bishop.
25 Q.     Okay.  Anybody else, besides Abigail and

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

124

1  Ashley?
2  A.     Not that I can think of, no.
3  Q.     Okay.  And the same question for male:  Can
4  you identify any male employees with small children
5  who you claim were treated differently than you while
6  employed at Walmart?
7  A.     No.  I can't remember any.
8  Q.     Okay.  All right.  So now I kind of want to
9  turn to the claim that's related to the nursing room
10 or pumping room.  Do you recall that part of the
11 claim?
12 A.     Yes.
13 Q.     Okay.  And when did you first notify Walmart
14 that you would need a space for pumping?
15 A.     The day I returned.
16 Q.     And who did you talk to?
17 A.     Originally I talked to Jodi.  And she
18 suggested I talked to Lisa.
19 Q.     And Jodi was your department manager?
20 A.     Yes.
21 Q.     Okay.  And when you say "Lisa," that would
22 be Lisa Macko or now Elrod?
23 A.     Correct.
24 Q.     And so that was your first day back?
25 A.     Yeah.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**Sarah J. Dittmer, CSR, RPR        reportingwhereur@yahoo.com**

---

157

1  or reckless indifference to your federally protected
2  rights.
3         And do you believe that Lisa or Patti
4  were -- And let's strike that.
5         Do you believe that Lisa was malicious
6  towards you?
7         MR. SHULTZ:  Objection.  Form.
8         You can answer.
9  A.    I don't feel she was malicious, no.
10 BY MS. GUTTAU:
11 Q.    Do you believe she was recklessly
12 indifferent towards your rights?
13        MR. SHULTZ:  Objection.  Form.
14        You can answer.
15 A.    Yes.
16 BY MS. GUTTAU:
17 Q.    How so?
18 A.    Because I feel as if she could have provided
19 something better than what was provided to me.
20 Q.    Okay.  Any other reasons?
21 A.    No.
22 Q.    Did you believe that Patti was malicious to
23 you?
24        MR. SHULTZ:  Objection.  Form.
25        You can answer.  Excuse me.

---

158

1  A.    Yes.
2  BY MS. GUTTAU:
3  Q.    In what way?
4  A.    Due to the fact of being -- not getting the
5  promotions due to me having my babies at home.
6  Q.    Anything else?
7  A.    No.
8  Q.    Do you believe Patti was recklessly
9  indifferent towards you?
10        MR. SHULTZ:  Object to form.
11        You can answer.
12 A.    No.
13 BY MS. GUTTAU:
14 Q.    You said earlier you resigned on May 24th,
15 2018; correct?
16 A.    Sounds about right, yeah.
17 Q.    Had you given a couple weeks' notice or how
18 did that happen?
19 A.    I gave a written notice.
20 Q.    Okay.  Who did you give the written notice
21 to?
22 A.    Cassie.
23 Q.    And who was Cassie to you at that point?
24 A.    The assistant manager.
25 Q.    Okay.  Did you have any conversation with

---

159

1  her at that point about resignation?
2  A.    She asked why was I leaving.
3  Q.    And what did you tell her?
4  A.    Just better job opportunity.
5  Q.    Anything else that you told her?
6  A.    No.
7  Q.    Did you talk to anybody else at Walmart --
8  Actually, let me clarify that.
9         Did you talk to anybody else in management
10 at Walmart regarding the reason you were resigning?
11 A.    John.
12 Q.    Who?
13 A.    John.
14 Q.    And who's John?
15 A.    He's an assistant manager.
16 Q.    Okay.  And do you know his last name?
17 A.    I don't remember.
18 Q.    When did you talk to him?
19 A.    It was after I turned in my two weeks'.
20 Q.    Okay.  And what was that conversation?
21 A.    He asked why was I leaving.  And I said, Due
22 to me not being promoted.  And he said, I wish you
23 would have told me.
24 Q.    Anything else that you discussed in that
25 conversation?

---

160

1  A.    No.
2  Q.    Anybody else in management that you
3  discussed your reasons for resigning?
4  A.    Not that I can remember, no.
5  Q.    Okay.  Room Number 4 on Exhibit 10, back on
6  the blueprint where you said you could have been
7  provided that, you thought, I think somewhere there's
8  mentioned a curtain was used to shield you.  Do you
9  know, how was that set up?
10 A.    Well, I just know when I walked in the room,
11 it was -- the desk and the chair was right to the
12 right.  And then there was curtains blocking the rest
13 of the room.
14 Q.    Do you know if somebody had just set those
15 up or if those were in there permanently?  Do you
16 know either way?
17 A.    I don't know.
18 Q.    Do you know if there's a window on that door
19 or in that -- along the wall of that office?
20 A.    I don't remember, honestly.
21 Q.    Do you know one way or the other whether
22 that -- there was a lock on that door?
23 A.    It is.
24 Q.    Okay.  At the time you resigned, did you --
25 had you told Walmart that you had another job lined

---

161

1   up?
2   A.      I told Cassie.
3   Q.      Besides the lactation space provided to you,
4   is there anything else that makes you believe that
5   Walmart discriminated against you based on your race?
6           MR. SHULTZ:  Object to form.
7           You can answer.
8   A.      Through my entire time at Walmart or from
9   the time --
10  BY MS. GUTTAU:
11  Q.      Through your entire time.
12  A.      Just the few incidents with Brody that I
13  mentioned earlier.
14  Q.      Okay.  Anything else?
15  A.      No.
16  Q.      Okay.  Do you have any witnesses that you
17  asked to testify on your behalf regarding your claim
18  of race discrimination?
19  Q.      Do I have witnesses?
20  A.      Uh-huh.
21  A.      No.
22  Q.      Do you know of anybody or have you
23  identified anybody who would support your claim that
24  you were discriminated against based on your race by
25  Walmart?

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

162

1           MR. SHULTZ:  Object to form.
2           You can answer.
3   A.      Can you repeat the question?
4   BY MS. GUTTAU:
5   Q.      Yeah.
6           MS. GUTTAU:  Can you read it back?
7           (Requested portion was read back.)
8           MR. SHULTZ:  Same objection.
9   A.      Yes.
10  BY MS. GUTTAU:
11  Q.      And who is that?
12  A.      It would be Shantana.
13  Q.      Can you spell her name?
14  A.      I think it's S-H-A-N-T-A-N-A.
15  Q.      Okay.  Do you know her last name?
16  A.      I believe it's Maxwell.
17  Q.      Anybody else besides Shantana?
18  A.      No.
19  Q.      What will -- What do you believe Shantana
20  Maxwell would say or provide to support your claim of
21  race discrimination against Walmart?
22  A.      Well, I guess nothing from my claim.
23  Q.      Nothing regarding your employment at
24  Walmart?
25  A.      No.  Just her personal experiences.  That

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

163

1   would be it.
2   Q.      Okay.
3   A.      But nothing from mine, no.
4   Q.      Okay.  And who is she?  Is she a former
5   employee or --
6   A.      She was employed at Walmart.
7   Q.      At the same time as you?
8   A.      Yes.
9   Q.      Okay.  Do you know when she was employed
10  there?
11  A.      Not exactly, no.
12  Q.      Was she still there in 2018?
13  A.      I'm not a hundred percent sure.
14  Q.      And what has she conveyed to you that she
15  felt was discriminatory?
16  A.      Just the treatment that she's received while
17  she was there.  And didn't get into specifics
18  exactly.
19  Q.      Okay.  So you don't know anything
20  specifically she was claiming was discriminatory?
21  A.      No.
22  Q.      Okay.  And then same question -- or line of
23  questions as far as your claim that Walmart
24  discriminated against you because of your gender and
25  having small children.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

164

1           Besides the not getting the promotion to the
2   consumables department manager position, is there any
3   other actions that you are claiming Walmart engaged
4   in that was discriminatory based on your gender and
5   having small children?
6   A.      No.
7   Q.      And do you have any witnesses who you've
8   asked to testify on your behalf on that claim?
9   A.      No.
10  Q.      And do you have any witnesses who you
11  believe would support your claim that you were
12  discriminated against based on your gender and having
13  small children?
14  A.      No.
15  Q.      I'm going to hand you what I've marked as
16  Exhibit 16.  Take a moment to review that.
17  A.      Okay.
18  Q.      Do you know what Exhibit 16 is?
19  A.      Yes.
20  Q.      And what is Exhibit 16?
21  A.      It's my exit interview.
22  Q.      And it looks like, under -- at the bottom
23  there's the three -- towards the bottom, there's the
24  three lines for signature.  And it has you listed,
25  associate name.  Electronic acknowledge, yes.  Do you

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

165

1  recall doing that?
2  A.    Yes.
3  Q.    Okay.  And the reason you listed is Tiffanee
4  is leaving our company due to a career opportunity
5  outside of Walmart stores.  And is that what you had
6  conveyed to management?
7  A.    Yes.
8  Q.    Okay.  And I think -- So Cassandra Riegel is
9  Cassie.  Is that who you've been referring to?
10  A.   Yes.
11  Q.   And who is Robert Wright, if you know?
12  A.   No clue.
13  Q.   Okay.  Would you agree an employer has a
14  right to hire or promote employees that they believe
15  are the most qualified and have the most experience?
16  A.   Yes.
17  Q.   And do you have any evidence to refute the
18  defendants' reason for choosing Abigail Hunt for the
19  promotion instead of you?
20        MR. SHULTZ:  Object to form.
21        You can answer.
22  A.   Yes.
23  BY MS. GUTTAU:
24  Q.   What's your evidence?
25  A.   Just that I was at the store -- I was there

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

166

1  longer.  And I just knew -- I knew the areas better.
2  Q.    Do you have any documents to -- Besides just
3  the length of your employment there, do you have any
4  documents to refute Defendants' reasoning for
5  choosing Abby?
6  A.    No.
7  Q.    Any witnesses to refute the reason?
8  A.    No.
9  Q.    And if Lisa and Walmart's stated reason for
10  providing Number 3 on Exhibit 10 as the space for
11  your pumping -- if her stated reason is she honestly
12  believed it was a safe, secure place with electricity
13  that would not have interruptions and she personally
14  believed it was the best space for you, do you have
15  any evidence to refute that reason?
16        MR. SHULTZ:  Object to form.
17        You can answer.
18  A.    No.
19  BY MS. GUTTAU:
20  Q.    Besides -- Now, I want to talk a little --
21        MS. GUTTAU:  Well, actually, let's -- Do you
22  care if we take a five-minute break, and I'll get a
23  couple more exhibits ready to go?
24        MR. SHULTZ:  (Indicating by shaking head.)
25        MS. GUTTAU:  Okay.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

167

1        (Recessed 2:53 p.m.; resumed 3:00 p.m.)
2  BY MS. GUTTAU:
3  Q.    All right.  I'm going to go through a few
4  documents, Tiffanee, with you.  And I'll try to make
5  this quick and painless.  I'm going to hand you what
6  we marked as Exhibit 17.
7        If you want to -- I would like you to read
8  through this one, if you would.  It's just a page and
9  a half.
10        Have you had a chance to read Exhibit 17?
11  A.   Yes.
12  Q.   Do you know what it is?
13  A.   No.
14  Q.   Do you know if this is information that you
15  provided in some manner to the EEOC?
16  A.   Some, yes.
17  Q.   Okay.  Does -- What's included in Exhibit
18  17, does it accurately reflect the information that
19  you conveyed to the EEOC?
20        MR. SHULTZ:  Objection.  Form.
21        You can answer.
22  A.   Some, yes, it looks -- Yeah.
23  BY MS. GUTTAU:
24  Q.   Are there places that are not accurate?
25  A.   I don't remember saying everyone called me

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

168

1  the black Tiffanee --
2  Q.    Okay.
3  A.    -- at different times.  I don't remember
4  that at all.
5  Q.    Where's that on here?  Sorry.
6  A.    On the second page.
7  Q.    Okay.  Okay.  Any other things on Exhibit 17
8  that you -- are not what -- accurate as to what you
9  told the EEOC?
10        MR. SHULTZ:  Objection to form.
11        You can answer.
12  A.    I seen on here that it said that Ashley told
13  me where she was placed to pump.  No, it wasn't
14  Ashley.
15  BY MS. GUTTAU:
16  Q.    Okay.  Who was that?
17  A.    Who told me?
18  Q.    Uh-huh.
19  A.    Jodi and Lisa.
20  Q.    Anything else that you believe's inaccurate
21  from what you told the -- or what you told the EEOC?
22        MR. SHULTZ:  Objection to form.
23        You can answer.
24  A.    And I don't recall saying that she was
25  pumping while I was employed at Walmart.  I don't

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**Sarah J. Dittmer, CSR, RPR        reportingwhereur@yahoo.com**

169

1  recall saying that.
2  BY MS. GUTTAU:
3  Q.      And where's that at?  Sorry.  I'm missing
4  that.
5  A.      On the first page.
6  Q.      Okay.
7  A.      It says she was nursing different times --
8  Q.      Oh.
9  A.      -- but it was under the same store manager.
10 Q.      Okay.  And you don't recall telling them
11 that?
12 A.      I know we were nursing at different times,
13 but I don't know if it was under the same store
14 manager or not.
15 Q.      Okay.
16 A.      No.  Hillary had just came there.  So I know
17 it wasn't under Hillary.
18 Q.      Okay.  Anything else that would be
19 inaccurate from what you had conveyed to the EEOC on
20 Exhibit 17?
21         MR. SHULTZ:  Object to form.
22         You can answer.
23 A.      And I seen it said here that they allowed me
24 to pump in the -- pump in the front manager's office
25 for one day.  That's incorrect too.  It's the one in

Sarah J. Dittmer & Associates
reportingwhereur@yahoo.com

170

1  the back room --
2  BY MS. GUTTAU:
3  Q.      Okay.
4  A.      -- not the front.
5  Q.      Okay.  And anything else?
6         MR. SHULTZ:  Same objection.
7         You can answer.
8  A.      Is this saying that he made it feel like it
9  was my responsibility to stay?  Because it says, He
10 made he [sic] feel like -- in the last --
11 BY MS. GUTTAU:
12 Q.      Let's see.
13 A.      This part.
14 Q.      He made he --
15 A.      He made he feel like it was her
16 responsibility --
17 Q.      Okay.
18 A.      -- to stay away.
19 Q.      And you think it was he made her feel?
20 A.      Yes.
21 Q.      Okay.
22 A.      That would be my assumption.
23 Q.      Okay.  Okay.  Anything else that -- on
24 Exhibit 17, that is -- that you believe is different
25 than what you conveyed to the EEOC?

Sarah J. Dittmer & Associates
reportingwhereur@yahoo.com

171

1  A.      No.
2         MR. SHULTZ:  Same objection.
3         You can answer.
4  A.      No.
5  BY MS. GUTTAU:
6  Q.      Okay.  And then I'm going to hand you
7  Exhibit 18, which is really just one page,
8  essentially.  If you want to take a moment to skim
9  that.
10         Have you had a chance to look at Exhibit 18?
11 A.      Yes.
12 Q.      Okay.  And this was produced to us by the
13 EEOC.  And I believe it says at the top, Phone notes
14 with Tiffanee Johnson.  Do you recall a conversation
15 that was reflected in Exhibit 18?
16 A.      Yes.  It looks familiar.  Yes.
17 Q.      Okay.  Is there anything in Exhibit 18 that
18 is not accurate according to what you had told the
19 EEOC?
20         MR. SHULTZ:  Object to form.
21         You can answer.
22 A.      No.  This looks accurate.
23 BY MS. GUTTAU:
24 Q.      Okay.  Had you before -- Besides the one day
25 that, I think you said, Dave Pickens -- you asked

Sarah J. Dittmer & Associates
reportingwhereur@yahoo.com

172

1  him, Hey -- that you needed to pump -- And he put you
2  in Number 4, is that correct, on Exhibit 10?
3  A.      Yes.
4  Q.      Okay.  Had you ever talked to Dave Pickens
5  about pumping space or -- before that day?
6  A.      No.
7  Q.      Okay.  Do you have any knowledge one way or
8  the other if he knew where you'd been pumping?
9  A.      Not that I can recall, no.
10 Q.      Okay.  In Exhibit 18, about halfway down
11 that paragraph that starts with "Not accurate," the
12 sentence -- second sentence of that paragraph says,
13 Then when they found out I was leaving, they put me
14 in a manager office one day.  Who's "they"?
15 A.      Well, there was no "they."  It's just Dave.
16 Yeah.  Dave --
17 Q.      Dave.  Okay.
18 A.      -- Pickens.  Yeah.
19 Q.      And you had asked him if you could just --
20 You just said, I have to pump.
21 A.      I told him that I needed to pump and -- Yes.
22 Q.      Okay.  And then you said, When they found
23 out I was leaving, they put me back in the closet.
24 Who's that "they"?
25 A.      I don't know exactly, like, who the next

Sarah J. Dittmer & Associates
reportingwhereur@yahoo.com

181

1  we talked about all of those interviews?
2  A.      Yes.
3  Q.      And then it says, and discussions on why she
4  was not promoted.
5          And have we talked about all of those
6  discussions?
7  A.      Yes.
8  Q.      Okay.  And then if you want to flip to the
9  third page, Numbers 7 and 8, it says somebody who
10 might have information is Traci, last name unknown.
11 Do you know -- It says she may have information
12 regarding requests for a pumping space and
13 conversations about the space being provided.
14         Do you know anything about who Traci is?
15 A.      No clue.
16 Q.      Okay.  Don't know who she is?
17 A.      Not a Traci.  The name doesn't sound
18 familiar.
19 Q.      Okay.  And then Number 8, Jodi, last name
20 unknown, that was your department manager?
21 A.      Correct.
22 Q.      Okay.  All right.  Next, I'm going to hand
23 you Exhibit 24.  This is also just a question about
24 some people that are listed on here.  The EEOC has
25 represented that these individuals may have

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

182

1  information relevant to your case:  Samantha Finn.
2  And I know these -- I think we'll mark as your texts
3  with her or Facebook messages.
4          Have we talked about all of the information
5  that Samantha had regarding your case?
6  A.      I don't remember talking about Sam too much.
7  Q.      Okay.  You mentioned her a few times as
8  being at a different store or --
9  A.      Yes.
10 Q.      Okay.
11 A.      I remember that.
12 Q.      Okay.  Was there any other --
13 A.      And then --
14 Q.      Oh, go ahead.
15 A.      Sorry.  Go ahead.
16 Q.      No.  You go ahead.  I interrupted you.
17 A.      That she was at another store.  And that she
18 had encouraged me to apply.  So, yes, I remember
19 those.
20 Q.      Okay.  Okay.  I would like to mark -- Let's
21 see.  Where's my pen?  So this will be 26.  I just
22 want to authenticate this.
23         I'm going to hand you what's been marked as
24 Exhibit 26.  And I can represent to you that this was
25 produced to us by the EEOC.  And it appears to be a

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

183

1  conversation, starting back on the last page, in
2  September of 2017 through January of 2019, between
3  you and Samantha Finn.
4          Do you recall providing this to the EEOC?
5          MR. SHULTZ:  Objection.  Form.  Foundation.
6  A.      Yes.
7  BY MS. GUTTAU:
8  Q.      Okay.  And when you provided -- What you
9  provided to the EEOC regarding your Facebook
10 exchanges with Samantha Finn, were those true and
11 correct copies of your messaging on Facebook?
12         MR. SHULTZ:  Objection.  Foundation.
13 A.      Yes.
14 BY MS. GUTTAU:
15 Q.      Okay.  And does that appear to -- Does
16 Exhibit 26 appear to be those messages you provided
17 to the EEOC?  And I understand that they had redacted
18 parts of it, but the other parts that are not
19 redacted.
20 A.      Yes.
21 Q.      Okay.  How long -- When did you first meet
22 Samantha Finn?
23 A.      While working overnights.
24 Q.      Okay.  Didn't know her before that?
25 A.      No.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

184

1  Q.      Okay.  How did you get along with Hillary
2  Elko, the manager?  I may have asked you that.  I
3  apologize if I did.
4  A.      I had no relationship with her whatsoever.
5  Q.      Did you like her or not like her or just
6  indifferent?
7  A.      I had no reason not to.
8  Q.      Okay.  And then back on Exhibit 24, on the
9  second page, it references Patrick Finn.  Is that
10 also -- Is that PJ?
11 A.      Yes.
12 Q.      Okay.  And it says, he had -- he has
13 information on your interest in and submission for
14 management positions and your progress and treatment
15 at Walmart.
16         Have we talked about everything that PJ was
17 involved with regarding your employment at Walmart?
18 A.      I believe so.
19 Q.      Okay.  And then next I'm going to hand you
20 what's been marked as Exhibit 25.  And again, you
21 don't have to read through those.  These are the
22 EEOC's Answers to Interrogatories, which is a fancy
23 legal word for questions.
24 A.      Okay.
25 Q.      And let's see.  I have one question here.

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

**Sarah J. Dittmer, CSR, RPR          reportingwhereur@yahoo.com**

197

1  Q.     Okay.  In 2018, were you ever diagnosed with
2  postpartum depression?
3  A.     No.
4  Q.     Okay.
5         THE WITNESS:  Can I go to the bathroom?
6         MS. GUTTAU:  Absolutely.  We can take a
7  break.
8         (Recess taken 4:02 p.m.; resumed 4:05 p.m.)
9  BY MS. GUTTAU:
10  Q.     All right.  Ready?  When you stepped out, I
11  said, Last page," so -- I think I forgot to ask you
12  regarding Denise Harden, does she -- do you know if
13  she has any firsthand knowledge regarding your
14  promotional claims or applications that you made for
15  promotions?
16  A.     No.
17  Q.     Okay.  Does she have any knowledge --
18  firsthand knowledge of the pumping space issue at
19  Walmart?
20  A.     No.
21  Q.     Okay.  Did you delete any e-mails or
22  Facebook messages or text messages that would relate
23  to your claims against Walmart?
24  A.     No.
25  Q.     Have we covered all the ways in which you

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

198

1  felt you were discriminated against by Walmart?
2  A.     Yes.
3  Q.     As we sit here today, do you feel like
4  you're in a better position regarding your employment
5  or worse than when you left Walmart?
6  A.     Better.
7  Q.     And how so?
8  A.     Well, better pay.  It's more calm,
9  surprisingly.
10  Q.     Anything else?
11  A.     And just the supervisors there where I work
12  is just awesome.  That's all.
13  Q.     Have you shopped at the Walmart in Ottumwa
14  since you quit?
15  A.     Yes.
16  Q.     How often?
17  A.     Weekly.
18  Q.     What are you hoping to get from Walmart as a
19  result of the lawsuit?
20  A.     I trust in the EEOC to take care of all of
21  that.
22  Q.     Okay.  Is there a certain dollar amount that
23  you are seeking?
24  A.     No.
25         MS. GUTTAU:  Okay.  I do not have anything

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

199

1  further at this time.  I'll pass it over.
2         MR. SHULTZ:  Let me pull out my notebook
3  real fast.  Kidding.  A few follow-ups.
4              EXAMINATION
5  BY MR. SHULTZ:
6  Q.     So this is going to be jumping all around.
7  For the last -- You've been testifying for six hours
8  now, so we're going to go to a bunch of various
9  different spots.  Okay?  So bear with me.
10         So back when Heidi was asking you about the
11  interview for the consumables department manager
12  position with Kendra -- Do you remember that?
13  A.     Yes.
14  Q.     And Heidi had asked how long the interview
15  was.  And you said 10 minutes.  Do you remember that?
16  A.     Yes.
17  Q.     Did Kendra ask you more than one question at
18  the interview?
19  A.     I'm sure she did.
20  Q.     Can you estimate how many questions she
21  might have asked you?
22         MS. GUTTAU:  Form.
23  A.     Give or take five.
24  BY MR. SHULTZ:
25  Q.     Okay.  But it was for sure more than one

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

200

1  question?
2  A.     Yes.
3  Q.     Exhibit 13 was the inquiry report -- inquiry
4  information form.  Do you see that?
5  A.     Yes.
6  Q.     And I think Heidi had established this is
7  something you submitted to the EEOC prior to signing
8  your charge; is that right?
9  A.     Yes.
10  Q.     How did you -- Do you remember how you
11  filled this out?
12  A.     On my computer at home.
13  Q.     So you went online to the EEOC and you
14  filled it out on your computer?
15  A.     Yes.
16  Q.     Okay.  Did you use your phone or your
17  computer?
18  A.     My laptop.
19  Q.     Your laptop.  Moving to the pumping space
20  claim.  So if you'd pull out your declaration --
21  Well, I guess Heidi asked you how many times you
22  pumped.  And you said sometimes twice.  Do you
23  remember that?
24  A.     Yes.
25  Q.     Are there -- Were there days when you pumped

*Sarah J. Dittmer & Associates*
*reportingwhereur@yahoo.com*

209

```
 1                        CERTIFICATE
 2          I, Sarah J. Dittmer, a Certified Shorthand
 3    Reporter and Notary Public in and for the State of
 4    Iowa, do hereby certify that at the aforementioned
 5    time and place, there appeared before me said
 6    deponent, who was by me first duly sworn to testify
 7    to the truth, and was then orally examined; that I
 8    took down in shorthand the testimony of said witness
 9    and that the same has been transcribed into
10    typewriting under my supervision and control; that
11    the above and foregoing deposition is a true and
12    correct transcript of my shorthand notes so taken and
13    of the testimony of said witness.
14          I further certify that I am not related to
15    or employed by any of the parties in which this
16    deposition is taken, and further that I am not a
17    relative or employee of any attorney or counsel
18    employed by the parties hereto or financially
19    interested in the action.
20          IN WITNESS WHEREOF, I have hereunto set my
21    hand this 15th day of February, 2023.
22
23
24                       Sarah J. Dittmer
25                       Certified Shorthand Reporter

              Sarah J. Dittmer & Associates
                 reportingwhereur@yahoo.com
```

1/28/2019                          Online Disciplinary Action system

## Disciplinary Action # 14050878 Status is Expired Mode is View

| Win Number | First Name | Middle Name | Last Name | Userid | Country | Division | Facility |
|---|---|---|---|---|---|---|---|
| | TIFFANEE | T | JOHNSON | TTJOHNS | US | 1 | 1285 |

### Type Of Disciplinary Action :

The Level, and Reason(s) displayed below were the original Level and Reason(s) selected for the Disciplinary Action

| Level | Reason(s) |
|---|---|
| First Written | Job Performance |

### Observations of Associate's Behavior and/or Performance

On 1/2/2014 Tiffanee was given 2 grocery aisles to work for the evening one aisle was 1.5 hours and one aisle was a half hour to work . Picks for those aisles were 20 minutes for one aisle and one hour for the other aisle for a total of 3 hours 20 minutes. In the 8 hour shift Tiffanee did not get the picks done for one of the aisle and did not finish the zone before she left for the day.

### Impact of Associate's Behavior :

When Tiffanee does not complete her assignments in a timely manner it causes other associates to have to finish the work she is assigned . Also by not completing her assignments in the time the company sets for a given task to be finished by, she is not fulfilling what is expected of her job performance.

### Behavior Expected Of Associate :

Finish in the time assigned , and communicate if you have issues and are not going to complete an assignment

### Next Level of Action :

The next level of action if behavior continues is: Second Written up to and including Termination

### Action Plan :

### Date, Time, and Place of Disciplinary Action :

Date Given : 01/03/2015   Time : 22:13   Place : office

### Expiration Date :

The expiration date of the disciplinary action may be extended beyond 01/04/2016 date if the Associate spent time on LOA.

### Acknowledgements

Date Acknowledged : 01/03/2015

| Associate Name : | Userid : |
|---|---|
| Manager Name : BRIAN DECKER | Userid : BDECKER |
| Witness Name : JEANNIE M HOUK | Userid : JMHOUK |

Johnson
EXHIBIT NO. 5
SARAH DITTMER
888-388-2723

WM_Johnson_0000438

App. 040

Online Disciplinary Action System - Disserrante Temp - RECR

**Print**

WM_Johnson_0000439

| Disciplinary Action # 15229310 Status is Expired Mode is View | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Win Number** | **First Name** | **Middle Name** | **Last Name** | **Userid** | **Country** | **Division** | **Facility** |
| ▮▮▮ | TIFFANEE | T | JOHNSON | TTJOHNS | US | 1 | 1285 |

**Type Of Disciplinary Action** :

The Level, and Reason(s) displayed below were the original Level, and Reason(s) selected for the Disciplinary Action

| **Level** | **Reason(s)** |
|---|---|
| Second Written | Attendance/Punctuality |

**Observations of Associate's Behavior and/or Performance** :

On 08/01/15/ Tiffanee called in to make her 4th absence in a six month rolling period

**Impact of Associate's Behavior** :

When Tiffanee doesn't make it to work it puts heavier workload on others

**Behavior Expected Of Associate** :

Tiffanee is expected to be at work and on time when scheduled.

**Next Level of Action** :

The next level of action if behavior continues is: Third Written up to and including Termination

**Action Plan** :

i will make sure that i come to work to the best of my ability and on time so that i wont cause anyone else to be at a strain with their work.

**Date, Time, and Place of Disciplinary Action** :

**Date Given** : 08/08/2015   **Time** : 06:45   **Place** : Mgt office

**Expiration Date** :

The expiration date of the disciplinary action may be extended beyond 08/08/2016 date, if the Associate spent time on LOA.

**Acknowledgements**

**Date Acknowledged** : 08/08/2015

| **Associate**<br>Name : TIFFANEE T JOHNSON | Userid : TTJOHNS |
|---|---|
| **Manager**<br>Name : DONALD J BUSBY | Userid : DJBUSBY |
| **Witness**<br>Name : PATRICIA M HEMSLEY | Userid : PMH002D |

Print

WM_Johnson_0000440

App. 042

1/28/2019                                      Online Disciplinary Action System - Coaching Action Details

| **Disciplinary Action # 15307658 Status is Expired Mode is View** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Win Number** | **First Name** | **Middle Name** | **Last Name** | **Userid** | **Country** | **Division** | **Facility** |
| ███ | TIFFANEE | T | JOHNSON | TTJOHNS | US | 1 | 1285 |

**Type Of Disciplinary Action :**

The Level, and Reason(s) displayed below were the original Level and Reason(s) selected for the Disciplinary Action

| **Level** | **Reason(s)** |
|---|---|
| Third Written | Attendance/Punctuality |

**Observations of Associate's Behavior and/or Performance :**

On 08/22/15/ Tiffanee called in to make her 5th absence in a six month rolling period

**Impact of Associate's Behavior :**

When Tiffanee doesn't make it to work it puts heavier workload on others

**Behavior Expected Of Associate :**

Tiffanee is expected to be at work and on time when scheduled

**Next Level of Action :**

The next level of action if behavior continues is: Termination

**Action Plan :**

i will try my best to make it to work on my scheduled work days so that it will not inconvience others.

**Date, Time, and Place of Disciplinary Action :**

**Date Given :** 08/23/2015   **Time :** 06:23   **Place :** Managment office

**Expiration Date :**

The expiration date of the disciplinary action may be extended beyond 08/23/2016 date if the Associate spent time on LOA.

**Acknowledgements**

**Date Acknowledged :** 08/25/2015

| **Associate** Name : TIFFANEE T JOHNSON | **Userid :** TTJOHNS |
|---|---|
| **Manager** Name : DONALD J BUSBY | **Userid :** DJBUSBY |
| **Witness** Name : SAMANTHA L THOMAS | **Userid :** SLTHOMA |

Print

WM_Johnson_0000441

| WIN_NBR | FIRST_NAME | LAST_NAME | COACHING_NBR | COACHING_STATUS | COACHING_LVL_DESC | COACHING_TYPE_DESC | REASON_TYPE_DESC | SUBMIT_TS | COACH_LOCATION_TXT | STORE_NBR | COUNTRY | EXPIRATION_DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 220122960 | TIFFANEE | JOHNSON | 14050878 | Expired | First Written | | Job Performance | 2015-01-03 22:14:41.337 | office | 1285 | US | 2016-01-04 |
| 220122960 | TIFFANEE | JOHNSON | 14410779 | Cancelled | Second Written | | Job Performance | 2015-03-11 01:50:13.517 | | 1285 | US | 2016-03-11 |
| 220122960 | TIFFANEE | JOHNSON | 15229310 | Expired | Second Written | | Attendance/Punctuality | 2015-08-08 06:48:22.933 | Mgt office | 1285 | US | 2016-08-08 |
| 220122960 | TIFFANEE | JOHNSON | 15307658 | Expired | Third Written | | Attendance/Punctuality | 2015-08-25 06:24:29.293 | Managment office | 1285 | US | 2016-08-23 |



WM_Johnson_0000344 – Excel Tab Page labeled "Coaching"

Walmart Inc. Confidential

2/7/2023

1

App. 044

| ASSOC_ACKNL_IND | MBR_MGMT_WIN_NBR | MGR_FIRST_NAME | MGR_LAST_NAME | MANAGER_ACKNL_IND | WITNESS_WIN_NBR | WITNESS_FIRST_NAME | WITNESS_LAST_NAME | WITNESS_ACKNL_IND | MGR_COMMENT |
|---|---|---|---|---|---|---|---|---|---|
| N | | BRIAN | DECKER | Y | | JEANNIE | HOUK | Y | |
| N | | JEANNIE | HOUK | N | | | | N | |
| Y | | DONALD | BUSBY | Y | | PATRICIA | HEMSLEY | Y | |
| Y | | DONALD | BUSBY | Y | | SAMANTHA | THOMAS | Y | |

App. 045

| ASSOC_BEHAVIOR |
|---|
| On 1/2/2014 Tiffanee was given 2 grocery aisles to work for the evening one aisle was 1.5 hours and one aisle was a half hour to work . Picks for those aisles were 20 minutes for one aisle and one hour for the other aisle for a total of 3 hours 20 minutes. In the 8 hour shift Tiffanee did not get the picks done for one of the aisle and did not finish the zone before she left for the day. |
| Tiffanee was given aisle 15/16as well as aisle 18 and N1 on 3/9/15. |
| On 08/01/15/ Tiffanee called in to make her 4th absence in a six month rolling period. |
| On 08/22/15/ Tiffanee called in to make her 5th absence in a six month rolling period. |

App. 046

| BEHAVIOR_IMPACT |
| --- |
| When Tiffanee does not complete her assignments in a timely manner it causes other associates to have to finish the work she is assigned . Also by not completing her assignments in the time the company sets for a given task to be finished by, she is not fulfilling what is expected of her job performance. |
| When Tiffanee does not complete her assigned tasks this adds to other associates work loads. |
| When Tiffanee doesn't make it to work it puts heavier workload on others. |
| When Tiffanee doesn't make it to work it puts heavier workload on others. |

App. 047

| EXPECTED_BEHAVIOR | ASSOC_COMMENT |
| --- | --- |
| Finish in the time assigned , and communicate if you have issues and are not going to complete a assignment | |
| | |
| Tiffanee is expected to complete her assigned tasks in a timely manner. | |
| Tiffanee is expected to be at work and on time when scheduled. | |
| Tiffanee is expected to be at work and on time when scheduled. | |

| ACTION_PLAN | ADMIN_CHANGE_RSN | LVL_CHANGE_RSN | CANCEL_RSN | CHANGE_RSN | EXPIRE_EXTEND_CMT |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| i will make sure that i come to work to the best of my ability and on time so that i wont cause anyone else to be at a strain with their work. | | | | | |
| i will try my best to make it to work on my scheduled work days so that it will not inconvience others. | | | | | |

App. 049

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA, CENTRAL DIVISION

|  |  |
|---|---|
| ) | |
| ) | **EXHIBIT 7** |
| ) | |
| U.S. EQUAL EMPLOYMENT ) | |
| OPPORTUNITY COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | 4:22-cv-00037 |
| ) | |
| WALMART, INC. AND WAL-MART ) | |
| STORES EAST, LP, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |
| ) | |

The Zoom webconference deposition of

KENDRA MOUTON taken before Gina Marie Zangara, C.S.R.,

on January 25th, 2023, at the hour of 9:02 a.m.

Page 2

```
1    APPEARANCES VIA ZOOM:
2
         EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
3        BY MR. MILES SHULTZ
         BY MS. HANNAH HENKEL
4        230 S. Dearborn, Suite 1866
         Chicago, Illinois 60604
5        (312) 872-9744
         Miles.shultz@eeoc.gov
6          Appeared on behalf of the Plaintiff;
7
         LAW OFFICES OF BAIRD HOLM LLP
8        BY MS. HEIDI A. GUTTAU
         1700 Farnam Street, Suite 1500
9        Omaha, Nebraska 68102
         (402) 344-0500
10       Hguttau@bairdholm.com
           Appeared on behalf of the Defendants.
11
              I N D E X
12
     WITNESS:                        PAGE:
13
     Kendra Mouton
14
     Examination by Mr. Shultz            4
15   Examination by Ms. Guttau          137
16   EXHIBITS MARKED:
17   Exhibit 1    WM_Johnson_0001961-62   59
     Exhibit 2    WM_Johnson_0001945-50   63
18   Exhibit 3    WM_Johnson_0001935-39   96
     Exhibit 4    WM_Johnson_0002040-44  104
19   Exhibit 5    WM_Johnson_0001917-25  106
     Exhibit 6    WM_Johnson_0002120     113
20   Exhibit 7    WM_Johnson_1608        122
21
22              (RETAINED BY COUNSEL)
23
24
```

Page 3

```
1        COURT REPORTER:  All parties are
2   aware that the witness will be sworn in remotely.
3   The parties agree not to challenge the validity of
4   any oath administered by the court reporter, even if
5   the court reporter is not physically present with
6   the witness and not a notary public in the state
7   where the witness resides.
8        Here begins the webconference deposition
9   of Kendra Mouton in the matter of EEOC VS. Walmart.
10  Today's date is January 25th, 2023, and the time is
11  9:02 a.m.  My name is Gina Zangara of Thompson Court
12  Reporters.
13       Beginning with the noticing party, will
14  counsel please introduce themselves, state whom they
15  represent, and stipulate to the swearing in of the
16  witness remotely.
17       MR. SHULTZ:  Miles Shultz for the EEOC,
18  and we so stipulate.
19       MS. GUTTAU:  And Heidi Guttau for
20  Defendants, Walmarts, and we also stipulate.  No
21  objection.
22       KENDRA MOUTON,
23  CALLED AS A WITNESS HEREIN, HAVING BEEN FIRST DULY
24  SWORN, WAS EXAMINED UNDER OATH AND TESTIFIED AS
```

Page 4

```
1   FOLLOWS:
2              EXAMINATION
3         BY MR. SHULTZ:
4    Q.  Good morning, Ms. Mouton.  We met just a
5   second ago, but for the record, my name is Miles
6   Shultz, and I represent the EEOC in a lawsuit that
7   the EEOC has filed against Walmart that is currently
8   pending in the Southern District of Iowa.  Your
9   deposition here today is in regards to that matter.
10  So I'm going to go over a few groundrules.  Have you
11  ever been deposed before?
12   A.  No.
13   Q.  Okay.  So hopefully it won't be a painful
14  process.  We will be here for a few hours, I
15  anticipate.  We will start with a few groundrules.
16  Then we will go a little bit about your background,
17  your work history, and then we will move into some
18  questions I have about your time at Walmart.  Okay?
19   A.  Okay.
20   Q.  So the deposition testimony that you are
21  about to give will be subject to the same oath and
22  the same penalties of perjury that would apply if
23  you were in court giving testimony in front of a
24  judge and a jury.  Do you understand that?
```

Page 5

```
1    A.  Yes.
2    Q.  If you answer a question, I'm going to
3   assume you understood the question.  So it's very
4   important that if you don't understand a question,
5   people sometimes say that I ask convoluted questions
6   or I make no sense, I will not be offended if you
7   say hey, I have no clue what you are talking about
8   and can you rephrase that.  Okay?
9    A.  Okay.
10   Q.  I want to make sure you understand the
11  question because if you answer it, I'm going to
12  assume you understood what I was asking.  Okay?
13   A.  Okay.
14   Q.  Likewise, hopefully we won't have any
15  audio or internet issues.  Those do happen
16  occasionally.  If it is hard to hear me, just let me
17  know, and I can try and readjust my equipment or try
18  one of my other 40 headphones I have here.  Let me
19  know if the quality is degrading such that you can't
20  understand what I'm saying.  Okay?
21   A.  Okay.
22   Q.  We are going to be here for a bit, but
23  this isn't a marathon.  If you need to take a break,
24  to stretch your legs, go to the bathroom, just have
```

Page 18

1    Q.  And so each one of these departments that
2  you listed, toys, lawn and garden, household, they
3  would have a Department Manager?
4    A.  Yes.
5    Q.  So as the CAP 1 Supervisor, you would take
6  stuff from the back and put it in any of these
7  departments, or were you specifically assigned to
8  like one department?
9    A.  All the consumable departments.
10   Q.  Okay.  You said you managed a team of 7;
11 is that right?
12   A.  I believe it was like 7 on our team.
13   Q.  Was that considered -- so CAP 1
14 Supervisor, is that considered an hourly supervisor?
15   A.  Yes.
16   Q.  What was your next -- that was in
17 Oskaloosa you said?
18   A.  Yes.
19   Q.  Who was the hiring official when -- for
20 that position who interviewed you?
21   A.  Jay.  I do not know how to pronounce his
22 last name.  I always butchered it.  It is like
23 Schmit.
24   Q.  Can you try spelling it?

Page 19

1    A.  S C H M I T, I believe.  It was different.
2    Q.  What was Jay's title?
3    A.  He was an Assistant Manager.
4    Q.  What was your next job after the CAP 1
5  Supervisor?
6    A.  Same year, 20 -- what year was that?  '16?
7  Same year, that October, I was -- I applied for
8  probably in September for an Assistant Manager
9  position in Ottumwa, and I was hired in October that
10 same year of being the CAP 1 Supervisor.
11   Q.  So that's when you went to the Ottumwa
12 store was October of 2016?
13   A.  Yes.
14   Q.  As an Assistant Manager?
15   A.  As an Assistant Manager.  Sorry.
16 Assistant Manager Trainee, and then official
17 Assistant Manager after I got done with the training
18 in November.
19   Q.  Okay.  So there is a training process?
20 Once you get to Assistant Manager, you have to do
21 some stuff?
22   A.  Yes.
23   Q.  Can you describe what that stuff is?
24   A.  Yes.  So you go to like a training

Page 20

1  facility.  Mine was in Chicago.  And they kind of
2  just -- you had different classes that they had you
3  in.  You walked different stores so you kind of knew
4  what to expect in your roles.  And I believe it was
5  about almost a month long.  And then you came back
6  to your store and then you were an official
7  Assistant Manager.
8    Q.  Wow.  So you were in Chicago for about a
9  month?
10   A.  Like shy of a month.  Maybe 3 weeks to a
11 month.
12   Q.  Okay.  And who hired you in October -- who
13 hired you to be the Assistant Manager?  What was
14 that process like?
15   A.  I applied.  I also followed up with the
16 store manager at the time at Ottumwa.  His name was
17 Dan, but I cannot remember Dan's last name.  I went
18 a few times to see if he had got my application and
19 just expressed how interested I was in there.  I
20 also asked my Assistant Manager to talk to him and
21 just kind of tell him my work ethic.  I talked to
22 our Market Manager Joe that I wanted to move up and
23 if he can talk to him.
24       Then I had the interview and it went

Page 21

1  well, and then they hired me.
2    Q.  What is that interview process like for
3  the Assistant Manager?  Is it just 1 interview or 2
4  interviews?
5    A.  For me it was just 1, and I'm not sure if
6  it is because I worked there, and the Market Manager
7  was the same Market Manager for Ottumwa, so he knew
8  my work ethic as well.
9    Q.  Who is the Market Manager?
10   A.  His name is Joe, and I don't remember
11 Joe's last name.  Sorry.
12   Q.  That's fine.  What does a Market Manager
13 do?
14   A.  He is over store managers and over the
15 whole markets that is in his area to be over.  He is
16 in charge of us being in compliance with everything,
17 and he tells us what he wants done, and he kind of
18 follows up just to make sure that it got done.
19   Q.  Okay.  So he was over both the Oskaloosa
20 and the Ottumwa stores?
21   A.  Yes.
22   Q.  And when I asked what the process was
23 like, you said you had your Assistant Manager also
24 follow up with the Ottumwa Store Manager whose name

Page 26

1  and an application she made for the consumables
2  department.  You understand that, correct?
3      A.  Yes.
4      Q.  That was like in the early 2018 time
5  period.  Do you understand that?
6      A.  Yes.
7      Q.  So that's what I'm kind of interested in.
8  When we are asking about all these people, in my
9  head I am thinking this is what it was like in 2018
10  at the store.  So your memory is that like Kelly,
11  Cassie, Carrie, all those people are in 2018?
12      A.  I'm trying to think when Hillary came on,
13  because Dan was our store manager before Hillary, so
14  there was some realignment where Dave A and Patrick
15  were not there.  Or maybe Patrick was there.  I
16  can't remember who was there, all the managers,
17  because there was a realignment.
18      Q.  Okay.  That was going to be my next
19  question actually.  So when you started in 2016, Dan
20  something was the store manager?  That's right?
21      A.  Yes.
22      Q.  And then Hillary replaced Dan?
23      A.  Yes.
24      Q.  And we are talking Hillary Elko, I assume?

Page 27

1      A.  Yes.
2      Q.  Do you remember when -- how soon after you
3  started in October of 2016 at the Ottumwa store that
4  that happened?
5      A.  I can't remember, but I don't feel like it
6  was that long after.  Like some months, maybe like 5
7  months maybe.  It wasn't a year.
8      Q.  Did Dan go to a different position at
9  Walmart, or did he leave, do you know?
10      A.  Yeah, he just went to a different
11  position.
12      Q.  Okay.  Do you know what position he went
13  to?
14      A.  No.
15      Q.  Then Hillary Elko comes in shortly after
16  you started Ottumwa, and she is there I assume as a
17  Store Manager through May 2018 when you left?
18      A.  Yes.
19      Q.  Do you know what Hillary's role was at
20  Walmart before becoming Store Manager at Ottumwa?
21      A.  She was a Store Manager -- I'm not sure
22  the location, but she was a Store Manager coming in
23  as a Store Manager.
24      Q.  Did you know her before she became the

Page 28

1  Store Manager at Ottumwa?
2      A.  No.
3      Q.  I just want to see if I understand the
4  hierarchy.  So at the store, the highest person at
5  the store is the Store Manager?
6      A.  Yes.
7      Q.  Is that also sometimes called the Facility
8  Manager?
9      A.  I don't know what a Facility Manager is.
10      Q.  Okay.  So under Store Manager, we have
11  Co-Managers?
12      A.  Yes.
13      Q.  Then under Co-Managers, we have Assistant
14  Managers?
15      A.  Yes.  Also I'm not sure where Asset
16  Protection Manager fits in there, but we did have an
17  Asset Protection Manager, but I wouldn't know what
18  he would have been under.
19      Q.  I assume that position is dealing with
20  theft?
21      A.  Yes.
22      Q.  And so the Assistant Manager is a salaried
23  position, correct?
24      A.  Correct.

Page 29

1      Q.  So I take it the Co-Manager and Store
2  Manager positions are also salaried?
3      A.  Correct.
4      Q.  Do you know about the Asset Protection
5  Manager?  Is that hourly or salary?
6      A.  It is salary.
7      Q.  So then under the Assistant Manager, we
8  have the Department Managers?
9      A.  Correct.  I would say -- I'm not sure, but
10  I would say it was Assistant Managers, Support
11  Managers, and then Department Managers.  But I could
12  be wrong.
13      Q.  No worries.  You were the Assistant
14  Manager, and you said you supervised 3 Department
15  Managers, correct, in the consumables, HVA, and
16  pharmacy?
17      A.  Correct.
18      Q.  Did you supervise any Support Managers?
19      A.  No, I don't -- don't really know who is
20  over the Support Managers.
21      Q.  Can you describe the Support Manager
22  position?
23      A.  Yes.  So the times that they worked, I'm
24  not too sure, I think it was 2:00 until 10:00 shift

Page 30

1   I believe.
2       Q.   2:00 a.m. --
3       A.   2:00 p.m. until 11:00 p.m.  So they would
4   come in.  If there was some projects that we didn't
5   get done, like just say like make an end cap to show
6   something that was a high selling item that we
7   wanted out, they would get that done for us.  They
8   would also follow up with our team when we left.  If
9   we left at 5:00 o'clock, let's use an example my CAP
10  2 team, I needed someone to follow up to make sure
11  they were getting stuff done, so they followed up
12  with them to see how much stuff that they were going
13  to get done so they can report it to our night
14  Assistant Manager.
15       If they are like hey, they are not
16  getting done with pets in time because this is the
17  time they got done with this, then they also just
18  went around the store kind of straightening it up,
19  getting returns and putting those up.  If there was
20  stuff out of place, just getting it to where it
21  needed to go to.  They kind of filled in as like
22  managers when they needed to for us.
23      Q.   And are there different types of Support
24  Managers?

Page 31

1       A.   No, they both -- we just had 2 of them,
2   and they did the same job.
3       Q.   One I believe was Abigail Hunt, correct?
4       A.   Yes.
5       Q.   Who was the other?
6       A.   Miles, you make me sound bad because I
7   don't remember anyone's name.  I don't remember his
8   name.
9       Q.   It was a guy though?
10      A.   It was.  I'm sorry.  I think we had a
11  Fresh Support Manager.  Don't quote me on that.  I
12  know someone helped with the Fresh side, just to
13  kind of keep that all together.
14      Q.   This goes back to that distinction between
15  the general merchandise and the fresh side?
16      A.   Fresh is still considered to me
17  consumables, but if it wasn't, I didn't know the
18  difference.
19      Q.   When you say fresh, what are you referring
20  to?
21      A.   Like the fruits and vegetables and like
22  the deli area.
23      Q.   Earlier when I was asking you about the
24  Assistant Managers, you were naming people.  You

Page 32

1   said we had these day people and we had these night
2   people.  When did the night Managers work, night
3   Assistant Managers?
4       A.   They would come in like at 8:00 p.m. until
5   about 8:00 a.m. or 7:00.
6       Q.   So they were overnight?
7       A.   Yep.  So yes, I guess that's different.
8   We had our morning Managers, which our times were
9   7:00 until 5:00.  But then when you were a closing
10  Manager, which was a night Manager at that time, you
11  worked that 12:00 until 10:00 p.m.  Then you had the
12  overnight Managers, that were 8:00 p.m. until like
13  7:00 to 8:00 a.m. the next day.
14      Q.   And so we talked about salaried Managers.
15  So all these other positions, I take it the GM
16  Support Manager is an hourly position?
17      A.   Yes.
18      Q.   The Department Manager would be an hourly
19  position?
20      A.   Correct.
21      Q.   And then under that, we have like Sales
22  Associates?
23      A.   Correct.
24      Q.   And if you are on a CAP team, do you have

Page 33

1   a different job title, or is that still Sales
2   Associate?
3       A.   It is Sales Associate.
4       Q.   I believe I have heard -- well, Tiffanee
5   Johnson started as an overnight stocker?
6       A.   Correct.
7       Q.   What is that position?
8       A.   I believe they come in around the same
9   time as the managers, like 8:00, and they are done
10  like -- it's like 8:00 p.m. until 7:00 a.m.
11      Q.   Department Managers are considered
12  supervisors, right?  They are hourly supervisors?
13      A.   Yes.
14      Q.   Do you know what a GM Support Manager is
15  considered?  Is that also considered an hourly
16  supervisor?
17          MS. GUTTAU:  Form and foundation.  Go
18  ahead.
19          THE WITNESS:  I believe GM Support
20  Managers are just the regular Support Managers.
21  BY MR. SHULTZ:
22      Q.   What distinction are you making?  Is that
23  the position that Abigail and the guy you can't
24  remember his name?

Page 46

1     A.  No.
2     Q.  At the time in early 2018, was the HR
3  person Lisa Elrod?
4     A.  Yes.
5     Q.  Was there another HR person in addition to
6  Lisa?
7     A.  Yes.  Just so you know, because I can't
8  remember, because I'm not sure when she stopped, but
9  we had Tammy there, but I know Tammy had stepped
10  down, and then it was another lady.  I can't
11  remember her name.
12     Q.  Okay.  Do you know, were Lisa and Tammy
13  and this other person, were they responsible for
14  separate things?  Like would you go for certain HR
15  questions to Lisa and certain to Tammy?  Do you know
16  if they were divided up in any way?
17        MS. GUTTAU:  Foundation.
18        THE WITNESS:  That I'm not sure.
19  BY MR. SHULTZ:
20     Q.  Outside of that noon meeting where you
21  remembered Tracy saying -- talking about Tiffanee's
22  complaints about the room that was designated for
23  her to pump in, do you remember having any
24  conversations with Tracy about Tiffanee other than

Page 47

1  that?
2     A.  No.  And Miles, can I give a back story
3  about the pumping situation?
4     Q.  Sure.
5     A.  So I had my son in 2017, and I pumped in
6  the Store Manager's office.  The second time I had
7  pumped in there, I realized there was a camera in
8  there, and I brought it to their attention at a
9  meeting.  Hillary wasn't there during the remodel,
10  nor was I.  Everyone was like there is no camera in
11  there.  I was like there is a camera in there.  So I
12  started pumping in my car because there was a camera
13  in there.
14        If you know Walmart, there is not a lot
15  of spaces really for you to do a lot of things
16  because it is a business, you know.  So when I
17  brought that to their attention, we didn't really
18  think nothing else of it.  So then when Tiffanee
19  expressed like she wanted to pump in that office, it
20  was explained there was a camera in there.  And from
21  my knowledge, that's where other Associates and
22  Managers used to pump because there wasn't a camera
23  in there prior to their remodel.
24        The reason why they told me I could pump

Page 48

1  in there is because it was a Store Manager office,
2  so no one really went in and out.  The only time
3  people did go in and out was during Black Fridays
4  because that's when we have lock up items in there.
5        So then Lisa, and I can't remember what
6  other HR person there was at the time, and
7  maintenance, found a closet for Tiffanee to pump in,
8  but you have to understand it was a storage closet
9  for many years.  You can clean it up, but it is
10  always going to be a storage closet.  They put a
11  chair in there to make it nice for her, but it was
12  still a storage closet, and it was older.
13     Q.  So you said you had your son in 2017.  So
14  that was after the remodel?
15     A.  The remodel I believe happened before I
16  even got to their store because they didn't have a
17  remodel while I was there.  I'm not sure how many
18  years prior to that though.
19     Q.  And was Elko the manager when you had your
20  son in 2017?
21     A.  I don't remember.
22     Q.  Or was it Dan?
23     A.  I don't remember.  I don't remember who
24  was there when I had my son.

Page 49

1     Q.  Did you take any sort of leave when you
2  had your son?
3     A.  I did.
4     Q.  What were the -- like the months of your
5  maternity leave?
6     A.  I can't remember, but I think it was 12
7  weeks.
8     Q.  Do you remember when you came back?  I
9  guess the easiest way would be what is your son's
10  birthday?
11     A.  His birthday is in June, June 9th.  I
12  believe I came back maybe September.
13     Q.  September?
14     A.  Yes.  And I went on maternity leave a week
15  before I was due, I believe.
16     Q.  So you came back some time probably in
17  September 2017 and pumped in that store manager's
18  office like once or twice?
19     A.  Twice.
20     Q.  And then you saw the camera and started
21  pumping in your car.  Okay.  For the consistency of
22  my brain, we will kind of go back to the store
23  stuff.  We will talk more about the pumping thing
24  later, but since right now I have all these people's

Page 54

1 department, and see what notes are there, and check
2 them off when you got them done.
3    Q.  If you added a note to your handheld,
4 would that populate to other people's handhelds?
5         MS. GUTTAU:  Foundation.
6         THE WITNESS:  I can't remember that.
7 BY MR. SHULTZ:
8    Q.  Okay.  Did Department Managers have
9 handhelds?
10   A.  Yes.  None of these are assigned, so
11 associates had handhelds too.
12   Q.  Okay.
13   A.  We all just kind of shared them.
14   Q.  Would you carry it around with you, or are
15 they stationed throughout the store?
16   A.  You carry it around with you.
17   Q.  There is something called The Wire.  Are
18 you familiar with that?
19   A.  Yes, but I don't remember what The Wire
20 is.
21   Q.  I think it is some sort of intranet site
22 or something like that.  Does that ring a bell?
23   A.  No.  I know the word Wire, but I don't
24 remember what The Wire was.

Page 55

1    Q.  That will probably be easiest to deal with
2 through an exhibit later, so let's keep trucking.
3 Can you think of any other duties as an Assistant
4 Manager that you did that we haven't talked about?
5    A.  Hiring.
6    Q.  Yeah.  That would be a good one.  Let's
7 walk through the hiring --
8    A.  And letting people go.
9    Q.  What is that?  Letting people go?
10   A.  Yep.
11   Q.  Did you have the authority to terminate
12 people?
13   A.  Yep.
14   Q.  Would there have to be -- did you have to
15 recommend it to someone or you just could fire
16 people on your own?
17        MS. GUTTAU:  Form, foundation.
18        THE WITNESS:  We spoke about it.  We
19 document.  Like sometimes it was just based off
20 attendance sometimes, and that's in like the system,
21 so sometimes you just have to let people go off of
22 that, and that was already in the system for you to
23 do.
24 BY MR. SHULTZ:

Page 56

1    Q.  And I think when we were talking about
2 coachings, you had made a distinction between just
3 like a verbal coaching.  So there is probably
4 written coachings as well?
5    A.  Correct.
6    Q.  Is there a progressive discipline policy
7 at Walmart?  Would it take multiple coachings --
8         MS. GUTTAU:  Form, foundation.
9         THE WITNESS:  Yes.
10 BY MR. SHULTZ:
11   Q.  -- for a person to get fired?
12        MS. GUTTAU:  Form and foundation.
13        THE WITNESS:  Yes.
14 BY MR. SHULTZ:
15   Q.  Can you sort of describe that?
16   A.  I don't know how many points you get.  I
17 didn't really run into that too much to let people
18 go.
19   Q.  Okay.
20   A.  But it is a certain number a person can
21 reach with doing something after having a
22 conversation.  It can range from being late.  It can
23 range to just like your appearance, like the way you
24 smell and things like that, just the cleanliness of

Page 57

1 you.  It is a big range.
2    Q.  Let's move on to the hiring piece.
3    A.  Okay.
4    Q.  So can you describe what the -- for you as
5 an Assistant Manager, what the hiring process was
6 like from opening up a requisition through offering
7 the job to somebody?
8         MS. GUTTAU:  Form, foundation.
9         THE WITNESS:  Opening the rec, I don't
10 believe we did that.  I think that was HR.  To hire
11 someone, you had to have 3 people in the rec to do
12 interviews in general.  You select -- you conduct
13 the interviews, but it is kind of different from
14 people on the outside coming in and then people who
15 just want to move up that is already there.  I won't
16 say different, but I say different because you don't
17 know the people who is coming in and you do know --
18 you work side by side with the people that are
19 already there.
20   Q.  So after interviews, what would be the
21 next step in getting -- actually making a job offer
22 to somebody?
23   A.  So after the interviews, just go over --
24 and if I remember right, you went over it with like

Page 58

1  the Store Manager, I believe, or Co-Manager, just as
2  to why you want to hire them and why you didn't hire
3  the other people.
4      Q.  After that, you would get the go ahead to
5  make a job offer?
6      A.  Correct.
7      Q.  How -- what was that process like, do you
8  remember?
9          MS. GUTTAU:  We lost you there for a
10 second, Miles.  Can you repeat that?
11         MR. SHULTZ:  Did my internet cut out?
12         MS. GUTTAU:  Yeah, I think there was a
13 gap.
14 BY MR. SHULTZ:
15     Q.  What was the process for actually making
16 the job offer?
17         MS. GUTTAU:  Form, foundation.
18         THE WITNESS:  I guess I'm not sure what
19 you mean by that.
20 BY MR. SHULTZ:
21     Q.  Well, one, would you communicate with the
22 people who you interviewed who didn't get the
23 promotion or didn't get the job?
24     A.  Yes, I believe we did talk to them if they

Page 59

1  didn't get it.
2      Q.  And then let's take the consumables
3  Department Manager for instance.  Do you remember
4  like did you communicate the offer to Abigail Hunt?
5      A.  I believe I did.
6      Q.  Let's actually pull up our first exhibit.
7  It is WM1961.  It is that hiring chart, Heidi.
8          MS. GUTTAU:  It's an Excel?
9          MR. SHULTZ:  I'll show it on the screen.
10 It's a PDF so it is probably easiest to just look at
11 it.  I'm sharing it on the screen.
12         MS. GUTTAU:  Gotcha.  One second.  I know
13 I have that.
14         MR. SHULTZ:  No worries.
15         MS. GUTTAU:  Here we go.  I think we
16 previously marked it as Exhibit 15.
17         MR. SHULTZ:  Here comes the question
18 between Heidi and I.  Let's go off the record for
19 one second.
20     (Off the record at 10:24 to 10:25)
21         MR. SHULTZ:  Back on the record.
22     Q.  I am going to -- well, Heidi is going to
23 show you what we are going to mark as Mouton Exhibit
24 1.  For the record, it's a 2 page document, bates

Page 60

1  stamped WM_Johnson_0001961 through 1962.  If you can
2  take as long as you need, Kendra, to review that and
3  kind of look up when you are done so I know you have
4  had an opportunity to look at it.
5      A.  Okay, Miles.  I read it.
6      Q.  Excellent.  Have you ever seen this
7  document before?
8      A.  I don't remember seeing it, but I probably
9  did.
10     Q.  Okay.  So it looks like there are -- it is
11 2 pages.  The first page is process for filling an
12 hourly supervisor, lead, office, asset protection,
13 or professional position.  Do you see that?
14     A.  Yes.
15     Q.  The second one is process for filling an
16 hourly position.  Do you see that?
17     A.  Yes.
18     Q.  I take it there are kind of 2 different
19 processes at Walmart for hiring a hourly supervisor
20 and those other positions versus just an hourly
21 position?
22     A.  Yes, it looks that way.
23     Q.  Okay.  We are going to focus on the
24 process for the consumables Department Manager

Page 61

1  position in like February, March of 2018.  So I
2  believe that's a Department Manager position.  So
3  you already said that's an hourly supervisor
4  position?
5          MS. GUTTAU:  Form, foundation.
6          THE WITNESS:  Yes.
7  BY MR. SHULTZ:
8      Q.  So let's use this Exhibit 1 to kind of
9  walk through this flowchart and talk about the
10 various steps, okay?
11     A.  Okay.
12     Q.  So for the top, we have opening
13 requisition opportunities which is the first thing
14 that you had mentioned in the hiring process.  So
15 your memory is that an Assistant Manager couldn't do
16 that.  Someone else would open the requisition
17 position?
18     A.  Yes.  I believe that was HR personnel.
19     Q.  What would the process be like for
20 deciding you needed to open the requisition?  Would
21 you recommend it?  Would someone else come up with
22 the idea?  How would that work?
23         MS. GUTTAU:  Form, foundation.
24         THE WITNESS:  So this first page down is

Page 66

BY MR. SHULTZ:
1  BY MR. SHULTZ:
2    Q.  Right now we are focusing on Exhibit 2.
3    A.  I don't remember.  I'm pretty sure that's
4  what we did, but I don't remember.  I'm sorry.
5    Q.  That's okay.  Let's go through some things
6  on -- go through the pages on Exhibit 2 to see if
7  you remember following them or doing these steps for
8  the requisition for the consumables project --
9  consumables Department Manager position, okay?
10   A.  Okay.
11   Q.  So the first paragraph under requisitions,
12  it says "the system generates a list of qualified
13  and interested external applicants from the hiring
14  center and internal applicants from career
15  preferences".  Does that sound familiar to you?
16   A.  Yes.
17   Q.  What sort of list is generated for
18  internal applicants from career preferences?
19       MS. GUTTAU:  Form, foundation.
20       THE WITNESS:  Internal is things that we
21  are looking for, someone who is already in the
22  store, so it generates when a position is opened up,
23  I believe, but I'm not sure if HR is the one that is
24  putting it in there.

Page 67

1  BY MR. SHULTZ:
2    Q.  Okay.  My understanding of this process is
3  that an internal employee can go into career
4  preferences and say I'm interested in this sort of
5  job; is that correct?
6    A.  Correct.
7    Q.  And then when a requisition is opened for
8  that sort of job, some list would be generated for
9  employees who have expressed interest in that sort
10  of job; is that right?
11       MS. GUTTAU:  Form, foundation.
12       THE WITNESS:  Yes.
13  BY MR. SHULTZ:
14   Q.  And for the consumables Department Manager
15  position, I believe you only interviewed 3 internal
16  employees.  Does that sound familiar?
17   A.  That sounds right.
18   Q.  I think it was Chastity McNabb, Tiffanee
19  Johnson, and Abigail Hunt.  Does that sound right?
20   A.  Yes.
21   Q.  I'm going to ignore the external applicant
22  portion of all this because for the consumables --
23  scratch that.  When you made the decision for the
24  consumables Department Manager position, you only

Page 68

1  considered internal applicants?
2    A.  Yes.
3    Q.  Okay.  Sorry.  That was a very --
4  consumables Department Manager is a tongue twister
5  for me for some reason.
6    A.  I guess it is not consumable Department
7  Manager.  If you are talking about that position, it
8  was paper, pets, and chem.
9    Q.  So when you hired Ms. Hunt in February,
10  March of 2018, it was for the paper, pets, chemicals
11  department?
12   A.  Correct.
13   Q.  Okay.  So I'm now back on Exhibit 2, just
14  kind of walking through that, okay?
15   A.  Okay.
16   Q.  You still have that in front of you I take
17  it?
18   A.  No, I got off of that one.
19   Q.  Why don't you pull it back up?  If you are
20  on my screen, I can walk us through it.  This is
21  creating the requisition, which you don't remember
22  or think that you did that.  But here is this Wire
23  thing again.  Does this refresh your recollection as
24  to what The Wire is?

Page 69

1    A.  Not really.  When I was reading it, I
2  thought oh, that sounds like where you go to to
3  apply for the job, but I don't remember.
4    Q.  So I'm going to scroll forward through all
5  this because this is still creating a requisition.
6  Let's go to the application evaluation section.
7    A.  Okay.
8    Q.  This is large enough for you to -- do I
9  need to blow it up anymore?
10   A.  No, this is fine.
11   Q.  Okay.  So according to -- well, Exhibit 1
12  and Exhibit 2, so if you look at Exhibit 1, which I
13  think you have it on paper in front of you?
14   A.  Yes.
15   Q.  Perfect.  So we have gone through that
16  first box, opening requisition manager.  You didn't
17  think you had responsibility for that or did that
18  for this position.  The second one is opening is
19  posted on job opportunities for 3 days.  That
20  actually refers to CPG1207, not 1208.  My apologies.
21  Now we are in that third box, "reviewing
22  applications from the qualified applicant listing,
23  both external and internal".  Do you see that?
24   A.  Yes.

Page 74

1 were creating a schedule through some sort of
2 system?
3    A.  I would make them up to that point, but I
4 did try to do it like every 2 weeks maybe.
5    Q.  You don't remember how you got into there?
6    A.  No.  I just know it was a computer.
7    Q.  Would that computer have been in that.
8 Store Manager's office?
9    A.  Yes.
10    Q.  So you can remember like physically being
11 in that office using that computer to make
12 schedules?
13    A.  Yes.
14    Q.  Do you remember being in that office to
15 look up anything about a requisition ever?
16    A.  No.  I'm pretty sure I would go to Lisa
17 for things like that.
18    Q.  Okay.  I asked this, but I didn't write it
19 down, so I'm going to re-ask it.  Do you remember
20 was it just -- I think you said it was just you who
21 selected the 3 to interview for the pets, paper --
22 paper, pets, and chemical position?
23    A.  I think so because there was just 3 people
24 in there, but we probably talked about it at our

Page 75

1 meeting.  You know, I probably got the approval to
2 go ahead with all the interviews, but I don't
3 remember that necessarily.
4    Q.  By meeting you are referring to that noon
5 meeting?
6    A.  Correct.
7    Q.  So you remember in that daily noon meeting
8 sometimes you would talk about the hiring process
9 for various positions at Walmart?
10    A.  The need for the positions, yes.
11    Q.  Do you remember if other Assistant
12 Managers were -- do you remember having
13 conversations about applicants?
14       MS. GUTTAU:  Form, foundation.
15       THE WITNESS:  That I'm not sure of.  Most
16 of the Assistant Managers had been there longer than
17 I was.  I don't remember hearing them too much.
18 They knew what they were looking for too.  That
19 could have been a one on one with the Store Manager
20 or Co-Manager.
21 BY MR. SHULTZ:
22    Q.  Do you remember -- so like Tiffanee
23 Johnson, for instance, is in the fabrics department,
24 which is not over you.  Is that the sort of thing in

Page 76

1 a noon meeting that would be like hey, does anybody
2 have an opinion on Tiffanee?  I'm just using
3 Tiffanee as an example.  Do you remember that in
4 general?
5    A.  Yes, yes.
6    Q.  So in general you could discuss internal
7 applicants, if people have more experience with a
8 certain employee for whatever reason?
9    A.  Correct.
10    Q.  Do you remember having any discussions
11 about any either Chastity, Abby, or Tiffanee for the
12 paper, pets, chemical position in those meetings?
13    A.  Not that I remember.  I'm not saying it
14 didn't happen, but I don't remember if it did or
15 what the conversation was about.
16    Q.  Okay.  I know a little bit about Abby.
17 She was the GM Support Manager prior to becoming the
18 paper, pets, chemical Department Manager.  Does that
19 sound correct?
20    A.  Correct.
21    Q.  Did you have any interaction with Abby in
22 that role?
23    A.  In the Support Manager role?
24    Q.  Yeah.

Page 77

1    A.  Very little because I was on maternity
2 leave when she became the Support Manager.
3    Q.  Okay.  And then you returned from
4 maternity leave in like September of 2017, and I
5 believe you hired -- or Abby was hired for the
6 paper, pets, chemical department like March of 2018.
7 Does that sound about right?
8    A.  Yes.
9    Q.  So it would have been September, October,
10 November, December -- like 6 months in there when
11 you came back that Abby was in that role; is that
12 correct?
13    A.  Correct.
14    Q.  But during that 6 months you didn't have
15 much interaction with her?
16    A.  I know she was an Associate.  I can't
17 remember what she was an Associate for, but she was
18 real impressive in her role, so I wasn't surprised
19 when I came back that she was a support manager.
20    Q.  So looking at --
21    A.  Miles, before you start, I do have to go
22 to the bathroom again.
23    Q.  Oh, no problem.  Let's go off the record.
24       (Off the record at 10:58 to 11:02)

Page 78

1    MR. SHULTZ:  Let's go back on the record
2  then.
3    Q.  Kendra, I just remind you you are still
4  under oath.  You remember that?
5    A.  Yes.
6    Q.  What were you going to say?
7    A.  So I forgot, you asked about other
8  interactions with Abby.  So as Assistant Manager,
9  you have to be someone's mentor, and Abby was my
10  mentor before I went on maternity leave, so I did
11  work with her before I went on maternity leave.
12    Q.  You were Abby's mentor or she was your
13  mentor?
14    A.  I'm sorry.  I was her mentor.
15    Q.  Well, that might answer some of my next
16  questions, which was going to be how did you know
17  that Abby was a good Sales Associate?
18    A.  I can't remember what she did in the store
19  at that time, but she was just a regular Sales
20  Associate, I remember.  But I was just letting her
21  know the ropes around Walmart, expectations, what to
22  do to move up, how quickly you can move up within
23  the company.  I told her how I moved up quickly in
24  the company.  Gave her a few tasks to see if she was

Page 79

1  able to get them done.  Just little things like
2  that.
3    Q.  This would have been in that 6 month
4  period after you came back from maternity leave and
5  before you hired her for the paper, pets, chemical
6  department?
7    A.  It is before I went on maternity leave.  I
8  was her mentor before I went on maternity leave.
9    Q.  When you came back, did you still consider
10  yourself to be her mentor?
11    A.  Not really since she was already in the
12  supervisor position.  I really didn't see her too
13  much.  I would see her around the store, but she was
14  kind of doing her thing.
15    Q.  I thought the -- you had said earlier that
16  the Support Management position wasn't a supervisory
17  position.  You think it is a supervisory position?
18    A.  Support Manager, they were hourly, but
19  they -- like other Associates would have to like
20  answer to them if they had questions or concerns.
21    Q.  Okay.  Do you remember when that mentor,
22  mentee relationship started with Abby?
23    A.  I think probably a few weeks after she was
24  hired maybe.  I don't remember when she was hired.

Page 80

1    Q.  According to some chart that Walmart gave
2  us, it looks like she was hired as a Sales Associate
3  in April -- April 5th of 2017.  Does April of 2017
4  sound about right?
5    A.  Yeah, maybe.
6    Q.  Then you go on maternity leave in June of
7  2017, right?
8    A.  Yes.  If it wasn't June, it could have
9  been like the very end of May.
10    Q.  So you would have been in this mentor,
11  mentee relationship for maybe about 2 months before
12  you went to maternity leave?
13    A.  Yes.
14    Q.  Can you just describe a little bit, did
15  you approach her to become her mentor, or did she
16  approach you?
17    A.  I approached her.
18    Q.  Is this something that Walmart encourages
19  Managers to become mentors of Sales Associates?
20    A.  Yes.
21    MS. GUTTAU:  Form, foundation.
22    THE WITNESS:  So as Assistant Manager, you
23  have to have a mentee.  You have to mentor someone
24  because we are always looking to get people moved up

Page 81

1  within the company.
2  BY MR. SHULTZ:
3    Q.  Would you just have to have one at a time
4  or multiple?  Like how would that work?
5    A.  That I'm not sure.  I just had one.  I'm
6  not sure if you could have multiples.  I'm not sure.
7    Q.  Did you have a mentee after Abby?
8    A.  No.
9    Q.  Was that any -- were you ever encouraged
10  or asked to have a mentee after Abby?
11    A.  I don't think like necessarily Abby ever
12  dropped off.  It could have been -- I can't
13  remember.  It could have been she was my mentee
14  until she went on to be an Assistant Manager, but
15  I'm not sure.
16    Q.  And how often would you communicate with
17  Abby as her mentor?
18    A.  I can't remember, but I was always on the
19  sales floor helping.  So it could have probably been
20  daily.  I can't really remember.  Even if it wasn't
21  talking about what she wanted to do, but kind of to
22  see how she worked and work alongside of her.
23    Q.  Would you have told her that you were
24  going to be hiring a replacement for the paper,

Page 86

1  like we all kind of probably discussed at the
2  meetings, because like I said everyone knew when
3  someone was let go or walked out and that position
4  needed to be filled.
5  BY MR. SHULTZ:
6      Q.  Okay.  And do you have any specific
7  memories of talking about wanting to interview Abby,
8  Chastity, or Tiffanee for the paper, pets, chemical
9  position?
10     A.  Chastity, I don't remember at all
11  unfortunately.
12     Q.  Like you don't even remember interviewing
13  her?
14     A.  I'm still trying to think of who Chastity
15  is.  I'm sorry.
16     Q.  Got it.
17     A.  But I know Tiffanee and Abby.  I did want
18  to interview both of them because I thought they
19  would be good fits.  I can't remember when Tiffanee
20  came off the night part, but she was spoken highly
21  about at that time before she came to days.  Then
22  I'm kind of like oh, I wouldn't mind interviewing
23  them.  But I do like to work with people to see who
24  I would hire if they were internal.

Page 87

1      Q.  Did you ever have the ability to work with
2  Tiffanee?
3      A.  Yes.
4      Q.  Can you describe what that entailed?
5      A.  I can't remember what season it was, but
6  it was dealing with a lot of candy.  I'm just going
7  to say Easter.  I asked her to -- we had a shelf,
8  like maybe like 4 different shelves like on a main
9  end cap that just needed to be filled with candy.
10  And I'm talking about just picking up the boxes that
11  is already prefilled and put them on the shelf and
12  put the prices on them, and then go back to the
13  back, get another bunch of candy, and just bring
14  them out.
15         I asked her to get that done.  I said
16  I'll be back.  As Assistant Manager, of course you
17  are never coming right back.  I came back like maybe
18  30 minutes later, and she was just waiting there.  I
19  said hey, what is going on?  She was like I was
20  waiting for you to get back to know what I needed to
21  do.  So I was confused as to why nothing got done.
22  She also had a walkie and could have walkied me and
23  asked me if I couldn't remember what needed to be
24  done.

Page 88

1      It was a pretty simple task to do, so at
2  that point I kind of questioned her work ethic and
3  her productivity in getting things done in a timely
4  manner.  She would have been over 3 departments if
5  she was under me.  And if it was something small
6  like that and kept needing me to help, I kind of
7  just questioned the work ethic.  And I worked with
8  her another time.  I had to radio to see where she
9  was at because it seemed like she kept going missing
10  for a little bit and no one would know where she
11  was.
12         Another time I worked with her, this is
13  when she was in apparel still, and she was having a
14  full on conversation, I'm not sure with a friend or
15  family member, instead of working.  That made me
16  question a few things too.
17     Q.  Let's unpack each of those 3 instances.
18     A.  Okay.
19     Q.  Well, first you said walkie and radio.
20  Are you referring to the same thing?
21     A.  That's the same thing.
22     Q.  So like a walkie talkie that you had that
23  you could communicate with?
24     A.  Yes.

Page 89

1      Q.  And would every employee on the floor have
2  a walkie talkie?
3      A.  Not everyone.
4      Q.  How do you know that Tiffanee had a
5  walkie?
6      A.  I believe she had one because we were
7  working side by side that day together.
8      Q.  And let's take the candy incident first.
9  I think you were just saying Easter as like an
10  example.  Do you remember when in relation to the
11  hiring for the paper, pets, chemical position that
12  was?
13     A.  No.
14     Q.  Would it have been -- you know that
15  Tiffanee took maternity leave?
16     A.  Yes.
17     Q.  Do you -- so she took maternity leave from
18  roughly October 2017 to January 2018.  Does that
19  sound right?
20     A.  I guess.  I wasn't over her.  So if that's
21  what it says, then yeah.
22     Q.  Okay.  Do you know would that -- the candy
23  incident have been before her maternity leave or
24  after?

Page 90

1    MS. GUTTAU:  Form, foundation.
2         THE WITNESS:  I don't remember.  It could
3  have been before or after, but I'm thinking it was
4  after.
5  BY MR. SHULTZ:
6    Q.  So it would have been pretty close in time
7  to the paper, pets, chemical management position?
8    A.  Correct.
9    Q.  The next one was she kept going missing?
10    A.  Yes.
11    Q.  Do you remember when you would have
12  noticed that?
13    A.  I think that's when she came back.  She
14  would just be gone for periods of time.  Sometimes
15  she would say she was pumping but never got with
16  anyone so you wouldn't know where she was.  So it
17  just seems like job abandonment at that time because
18  of the no communication, and other times I'm not
19  sure where she was.
20    Q.  So you did know she was pumping during
21  that period.  How do you know she never got with
22  anyone if you weren't in her chain of command?
23    A.  If I was working side by side with her, I
24  was with her that day.

Page 91

1    Q.  You would have expected her to say hey, I
2  got to take a little bit of a break to go pump or
3  something like that?
4    A.  Not to pump.  That wouldn't be my
5  business.  Just hey, I'm taking a break, just so I
6  knew she was going to be gone for a little bit.
7    Q.  How often would you work side by side with
8  her?
9    A.  I just did it those 3 times.  Since I was
10  heavily on the sales floor, the incident with seeing
11  her talking to people, I saw that a lot.
12    Q.  With Abby, what interactions did you have
13  with her working side by side?
14    A.  The same.  Give a task.  If it was hey, I
15  need you to pull this pallet down and brought to the
16  sales floor and make an end cap, she would follow up
17  with me, I wouldn't have to follow up with her, to
18  let me know it was done and show me to see if it was
19  up to my standards, what I was looking for.
20         Sometimes if she couldn't find me, she
21  moved on to another task that she saw that needed to
22  be done that I wouldn't see, which was nice, because
23  I didn't have to follow up so much.
24    Q.  This would have been when she was in the

Page 92

1  GM Support Management position?
2    A.  I think -- I believe so, yes.
3    Q.  How often -- so you said you worked with
4  Tiffanee, side by side with Tiffanee those 2 times,
5  then you would see her on the floor talking to
6  people.  How often were you working with Abby?
7    A.  It wasn't like daily.  I don't know how
8  much I was working with her, but prior to going on
9  maternity leave, I think I touched base with her a
10  lot of times just to kind of get a feel for her, see
11  what she was up to, and what she wanted to do within
12  the company.
13    Q.  Which kind of makes sense because you were
14  her mentor?
15    A.  Yes.
16    Q.  That is what you were meant to be doing
17  was mentoring, right?
18    A.  Correct.
19    Q.  So when you were working with Associates
20  or other people, it was your expectation if they
21  were going to take a break, to give you a heads up?
22    A.  Yes.
23    Q.  What is the break policy?  Not -- like
24  pumping aside, like what is -- what are allowed

Page 93

1  breaks at Walmart?
2         MS. GUTTAU:  Form, foundation.
3         THE WITNESS:  You get 2, 15 minute breaks
4  and your 30 or hour lunch.
5  BY MR. SHULTZ:
6    Q.  And how -- I assume those have to be
7  coordinated so not everybody goes on their lunch or
8  breaks at the same time, right?
9    A.  Yes and no.  With my team, my CAP teams,
10  they all can go at the same time so they are all
11  back at the same time to just get their work done.
12  But I know other departments, they did the 15 and
13  stuff different times.  Typically the Managers all
14  took lunch around the same time though.
15    Q.  I guess I'm making an assumption in my
16  head that I should ask.  So like I assume that the
17  CAP teams didn't have customer interaction as part
18  of their duties?
19    A.  They kind of did because they were on the
20  sales floor too, putting merchandise on the sales
21  floor.  So if the customers like stopped them, they
22  would help.
23    Q.  Yeah, but I guess in my head there is a
24  distinction between a Sales Associate who is like

Page 106

1    Q.  Do you remember for the various hiring
2  processes that you were involved in, would it be
3  the same questions you asked or would it vary by
4  position?
5    A.  I think it varied by positions, but you
6  had those different questions you can ask.  And I
7  think internal questions were different from
8  external questions.
9    Q.  Here in this step 1, it appears from the
10  system there is an option to like print or email
11  this form.  Do you remember ever like getting an
12  email of an interview form?
13    A.  No.  I feel like it had to have been
14  printed.
15    Q.  Okay.  Let's do CPG1213, which is making
16  the hiring decision.  I'm putting it in the chat.
17  If you can review that?  This is a 9 page document.
18  We will mark it as Mouton Exhibit 5.  This is bates
19  stamped WM_Johnson_0001917 through 1925.  You can
20  see my screen still?
21    A.  Yes.
22    Q.  This is another -- first, do you recognize
23  this one?
24    A.  I recognize the stuff that it is in there.

Page 107

1    Q.  It is similar to the other ones.  You
2  don't specifically recognize this document?
3    A.  No.
4    Q.  But the stuff in here is how you remember
5  going through the process?
6    A.  Yes.
7    Q.  If we look at our handy dandy flowchart
8  from Exhibit 1, we are down to "selecting applicants
9  for recommendations for job offers, approve offers
10  for job offers to approve, and conducting the job
11  offers".  So we are getting close to the end of the
12  process it looks like.  So on the third page of
13  Exhibit 5, so it looks like according to this
14  document "when the Hiring Manager, any Salaried
15  Manager selects the applicant to whom they would
16  like to extend an offer, their recommendation must
17  be approved by the Facility Manager or Co-Manager
18  before the job offer is conducted".  Do you see
19  that?
20    A.  Yes.
21    Q.  Which I think is consistent with what you
22  remember about the process for the pets, paper,
23  chemicals department.  You had to run your decision
24  to hire -- to want to offer Abby a job offer to

Page 108

1  someone above you?
2    A.  Yes.
3    Q.  They had to approve that?
4    A.  Yes.
5    Q.  So here, I remember when we were first
6  talking about positions at the store, I asked if
7  Store Manager is the same as Facility Manager.  Here
8  it looks like -- my assumption is that Facility
9  Manager in this instance refers to Store Manager.
10  Does that make sense?
11    A.  Yes, that makes sense.
12    Q.  You think that Patty was involved.  So I
13  take it Patty -- you would have gone to the
14  Co-Manager Patty to get approval?
15    A.  Yes.
16    Q.  Do you remember that process or any
17  conversations you had with her?
18    A.  I don't.  The only thing I can think of is
19  it had to happen at one of those 12:00 o'clock
20  meetings.
21    Q.  So it could have been -- it might not have
22  been an individual conversation you had with her?
23  You could have brought it up in a noon meeting?
24    A.  Yes.

Page 109

1    Q.  And that's -- do you remember if that's
2  what happened or that is what could have happened?
3    A.  That could have happened.
4    Q.  Do you remember getting any feedback from
5  her on your decision?
6    A.  I just remember she just saying she trusts
7  my decision.
8    Q.  Okay.  I think the last thing I want to
9  ask is on page 7 of this.  "The Salaried Manager
10  notifies all internal and transfer applicants who
11  were interviewed but not selected that they will not
12  be offered the position.  This must be done prior to
13  the job offer being conducted".  Do you see that?
14    A.  Yes.
15    Q.  And this is consistent with what you
16  testified earlier.  Like you remember having a
17  meeting to both tell people they weren't getting the
18  job and to tell Abby she was getting the job?
19    A.  Correct.
20    Q.  Do you remember the specifics of what was
21  said in any of those meetings?
22    A.  Not specifically.
23    Q.  Would this have happened in that same
24  Assistant Manager office?

Page 110

1    A.  Yes.
2    Q.  And Patty might have been at those
3  meetings?
4    A.  Yes, I'm pretty sure she was at the one
5  for sure when we had to let the person know they
6  were hired or weren't hired.
7    Q.  You don't even remember Chastity so it's
8  really like --
9    A.  Yeah.
10    Q.  -- remembering either the meeting with
11  Tiffanee that she was not getting the job or the
12  meeting with Abby that she was getting the job?
13    A.  Yes.
14    Q.  So if Tiffanee said that at this meeting
15  you told her she wasn't getting the job because
16  Patty thought that since she had small children at
17  home, that she didn't want to advance in the company
18  to become an Assistant Manager, do you remember that
19  occurring?
20      MS. GUTTAU:  Form, foundation.
21      THE WITNESS:  I don't remember that being
22  the conversation.
23  BY MR. SHULTZ:
24    Q.  Could that have been, or it did not

Page 111

1  happen?
2      MS. GUTTAU:  Form, foundation.
3      THE WITNESS:  I don't know.
4  BY MR. SHULTZ:
5    Q.  So it is possible that Patty told you that
6  she didn't want to hire Tiffanee for this position
7  because she had small kids at home?
8      MS. GUTTAU:  Form, foundation.
9      THE WITNESS:  I don't remember having a
10  one on one with just Patty saying something like
11  that, especially because I had a small kid too.
12  BY MR. SHULTZ:
13    Q.  Do you remember being interviewed by an
14  EEOC investigator during the charge process?
15    A.  Yes.  That was a while ago too.
16    Q.  Do you remember, that was probably over
17  the phone?
18    A.  Yes, I believe so.
19    Q.  Did you -- do you remember telling her on
20  why Tiffanee didn't get the job is because she
21  recently had a baby and a lot of stuff was taking
22  control of her.  I, meaning you, would have to go
23  with someone else at the time that could be more
24  hard working.  Her work ethic changed a lot.  Is

Page 112

1  that something you would have told the EEOC
2  investigator?
3      MS. GUTTAU:  Form, foundation.
4      THE WITNESS:  I don't remember that
5  either.
6  BY MR. SHULTZ:
7    Q.  Do you think that companies should make
8  assumptions on women based on the fact that they
9  have kids?
10      MS. GUTTAU:  Form, foundation.
11      THE WITNESS:  No.
12  BY MR. SHULTZ:
13    Q.  In other words, like it is important for
14  companies not to make assumptions about women if
15  they have young kids?
16      MS. GUTTAU:  Form, foundation.
17      THE WITNESS:  Yes, they should not do
18  that.
19  BY MR. SHULTZ:
20    Q.  I think one more Exhibit, and this is
21  going to be a spreadsheet, so hopefully we can make
22  this work, and then we will be on track to take a 10
23  or 15 minute break.
24    A.  Okay.

Page 113

1    Q.  I'm getting tired.  I don't know about
2  you.  Hold on here.  It is now in the chat.  We will
3  mark this as Exhibit 6, which for the record --
4    A.  Miles, I'm waiting for it to load up on
5  our end.  It is just blank.
6    Q.  Has Excel opened, and there is nothing on
7  it, or you are waiting for Excel to open?
8      MS. GUTTAU:  Excel is open but nothing on
9  it.  Oh, here, it's coming.  It is just loading.
10  BY MR. SHULTZ:
11    Q.  While we are waiting on it to load, I'll
12  say for the record this is an Excel file with the
13  bates stamp of WM_Johnson_0002120, which has several
14  worksheets.  I'm not sure how comfortable you are
15  with Excel, and there is a lot of data in here.  I
16  want to give you an appropriate enough time that you
17  are comfortable enough with what is in here, but I
18  am only going to be focusing on --
19      MS. GUTTAU:  It is still not loading, so
20  one second.
21  BY MR. SHULTZ:
22    Q.  Especially if you are on a small computer,
23  it is going to be kind of a pain.
24      MS. GUTTAU:  I'll see if I can pull it up

Page 114

1  on my computer here.  Okay.  Which tab do you want
2  her to start with?
3          MR. SHULTZ:  I think the CP Internal
4  Applicants.  It is towards the back.
5      Q.  I know you haven't had a chance to fully
6  digest this, but I will represent that this is like
7  some report out of some human resource information
8  system.  So I'm assuming that you have never like
9  seen an Excel file like this while you were at
10  Walmart?
11      A.  No.
12      Q.  I can make my screen a little bigger.  Is
13  it too small on my screen?
14          MS. GUTTAU:  Yeah.
15  BY MR. SHULTZ:
16      Q.  Is that better?
17      A.  Yeah, that's good.
18      Q.  This is labeled CP Internal Applicants,
19  and we have a bunch of stuff.  I will just represent
20  to you that this requisition ID 24924329 is the
21  requisition ID for the paper, pets, chemical
22  department, or what we have also been referring to
23  as the consumables department in other depositions.
24  This is a report that shows a status for all these

Page 115

1  internal candidates.
2          So here we can see that Chastity,
3  according to this file had a schedule manager
4  interview, which is marked as completed.  Tiffanee
5  had the same thing -- also the enter rating for
6  management interview is pending.  For Abigail Hunt,
7  we have schedule manager interview.  So it appears
8  from this you interviewed Tiffanee, Chastity, and
9  Abby.
10          We have been talking about Tiffanee and
11  Abby a lot.  You said you don't remember Chastity.
12  Does this at all refresh your recollection about
13  Chastity.
14      A.  No.  The name sounds familiar, but I just
15  cannot picture her.
16      Q.  That's fine.  I guess the question I have
17  is you don't have any knowledge to think that this
18  is incorrect, right?  It is more like you just don't
19  remember Chastity whatsoever?
20      A.  Yeah, I just don't remember.
21      Q.  Then we will move to this tab.  CP
22  internal interview ratings.  All right.  This one is
23  going to be a little bit funkier to look at.  You
24  see here we have Abby's info.  The only info on

Page 116

1  this, the internal interview ratings, is for Abby.
2  You see interviewer name, you, Kendra.  Interview
3  date, March 1st.  Then we have this section here, it
4  is called section description?
5      A.  Uh-huh.
6      Q.  This appears to be a question you would
7  have asked at the interview.  It says "outstanding
8  service to our Walmart customers is extremely
9  important.  Provide an example of a time when you
10  went above and beyond the customer service you
11  provided to an external customer, a fellow
12  associate, or another individual outside the
13  workplace".  Do you see that?
14      A.  Yes.
15      Q.  After that, we have a ratings column.
16  This comes right after what I just read.  It says
17  solid performer.  Does this at all refresh your
18  recollection as to whether or not you asked this
19  question in the interview or not?
20      A.  No, but I'm pretty sure since it is there
21  I asked it.
22      Q.  So similar to the thing about the Chastity
23  interview.  You don't have anything to say no, I
24  never asked that.  You just don't remember?

Page 117

1      A.  Correct.
2      Q.  So from all the records, that -- this is
3  the only thing we have from Walmart about what
4  happened during the interview is this one question
5  and this one rating.  I take it at the interview you
6  would have asked more than this question, right?
7      A.  I'm not sure.  I can't remember if your
8  internals, you only have to answer one of the
9  following questions, and external is like 2 or 3.  I
10  can't remember.
11      Q.  Do you remember specifically with Tiffanee
12  or Abby how long those interviews took?
13      A.  I don't think they took that long since
14  they were internal.  If you need a time frame, maybe
15  like 10 to 15 minutes maybe.
16      Q.  So this could have been the only question
17  you asked?  You just don't remember?
18      A.  It could have been.
19      Q.  Okay.  Do you remember -- so it looks like
20  you as the salaried manager interviewer selected
21  solid performer for Abby for this question.  Do you
22  remember making that rating?
23      A.  No, but I'm pretty sure I did.
24      Q.  Do you remember making any rating for

Page 138

1    Q.  And do you, as you sit here today, do you
2  actually have any independent recollection of taking
3  written notes on any interview packet?
4    A.  No.
5    Q.  Right before we took a break, you
6  mentioned you had considered going back to Walmart
7  when your kids were older.  Is that just because a
8  personal decision based on your own scheduling?
9    A.  Yes.  If my kids were older -- I have a 5
10  and 2 year old just for the record.  They can't be
11  at home by themselves.  If they were older, yes, I
12  loved Walmart.  It is a real good company to work
13  for.  They were real good to me while I was there.
14  I loved it.
15    Q.  You were pregnant when you were there?
16    A.  Yes.
17    Q.  Were they good to you during the time you
18  were pregnant and had small children?
19    A.  They were good to me my whole pregnancy,
20  even after the pregnancy.  I was considered what
21  people would consider an over achiever.  People were
22  like Kendra, stop pulling the water pallets, don't
23  go up the ladder.  They always made sure I was safe,
24  and wasn't pushing myself too far.

Page 139

1        They did cut down my hours sometimes too
2  if they felt I was overdoing it a little bit so I
3  could leave like an hour before my shift is over.
4  They treated me really good.
5    Q.  You appreciated it?
6    A.  Truly appreciated it.  That was my work
7  family.
8    MS. GUTTAU:  Nothing further.
9    MR. SHULTZ:  Neither do I.  Thanks,
10  Kendra.  I appreciate it.
11    MS. GUTTAU:  You have the right to read
12  your deposition.  You can't change anything.  But if
13  you don't want to, you can waive that.  Most people
14  waive it.
15    THE WITNESS:  We can waive it.
16    COURT REPORTER:  Are you ordering, Miles?
17    MR. SHULTZ:  We will.  I have -- I can't
18  do that now because I work for the government, but
19  I'll have one of my assistants reach out to Thompson
20  to get an estimate, but we will be ordering.
21    COURT REPORTER:  Are you going to send
22  the exhibits?
23    MR. SHULTZ:  Yeah.
24    COURT REPORTER:  And Heidi, did you want

Page 140

1  a copy?
2    MS. GUTTAU:  Yes.  I'll send you an email
3  too, or have my assistant, as to what we will want.
4    MR. SHULTZ:  Oh, yeah.  Let's get your
5  -- I don't think I have your -- Gina, do you want me
6  to send the exhibits directly to you?
7    COURT REPORTER:  No.  You can send them
8  directly to Thompson at that
9  TCRPRO@Thompsonreporters.com.
10    MR. SHULTZ:  Got it.
11
12  (Off the record at 1:16 p.m.)

Page 141

1
2              CERTIFICATE PAGE
3
4
5      I, GINA MARIE ZANGARA, C.S.R., do hereby
   certify that KENDRA MOUTON was by me first duly
6  sworn, to testify the truth, the whole truth, and
   nothing but the truth, and that the above
7  deposition, pages 3 through 140, inclusive, was
   recorded by me and reduced to typewriting by me.
8      I FURTHER CERTIFY that the foregoing
   transcript of the said deposition is a true and
9  correct transcript of the testimony given by the
   said witness at the time and place specified
10  hereinbefore.
11      I FURTHER CERTIFY that I am not a relative or
   employee or attorney or counsel of any of the
12  parties, nor a relative or employee of such attorney
   or counsel, or financially interested directly or
13  indirectly in this action.
14      IN WITNESS WHEREOF, I have hereunto set my
   hand at Crystal Lake, Illinois, this 25th day of
15  January, 2023.
16
17
18  GINA MARIE ZANGARA
   Certified Shorthand Reporter
19  CSR License No. 084-002636
   Thompson Court Reporters, Inc.
20
21
22
23
24

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA, CENTRAL DIVISION


EQUAL EMPLOYMENT OPPORTUNITY    )

COMMISSION,                     )

                                )

    Plaintiff,                  )

                                )

       v.                      )No.4:22-cv-00037-SMR-SBJ

                                )

WALMART INC., AND               )

WALMART STORES EAST, LP,        )

                                )

    Defendants.                 )

```
┌─────────────────┐
│    EXHIBIT      │
│       8         │
└─────────────────┘
```

      The deposition of PATRICIA HEMSLEY,

taken under oath on March 7, 2023, at 10:15 a.m., via

Zoom videoconference, before Lindsay Welbers, in and

for the Southern District of Iowa.

Page 32

APPEARANCES:

    EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, by

    MR. MILES SCHULTZ

    MS. HANNAH HENKEL

    230 South Dearborn Street, Suite 1866

    Chicago, IL 60604

    appeared on behalf of the plaintiff;

    BAIRD HOLM, by

    MS. HEIDI GUTTAU

    170 Farnam Street, Suite 1500

    Omaha, Nebraska 68102

    appeared on behalf of the defendant;

ALSO PRESENT:

    Lindsay Welbers, videographer

---

Page 4

I N D E X

                                 PAGE

Examination by Mr. Schultz                          6

Examination by Ms. Guttau                          98

E X H I B I T S

DEPOSITION EXHIBIT                                  PAGE

Exhibit 1           Walmart 1961                    36

Exhibit 2           Walmart 2120                    48

Exhibit 3           Walmart 1608                    84

Exhibit 4           Video                           89

                (not attached)

---

Page 5

1       P R O C E E D I N G S
2    THE COURT REPORTER:  Here begins the web
3 conference deposition of Ms. Patricia Hemsley in the
4 matter of EEOC versus Walmart Inc., and Walmart Stores
5 East, LP.  Today's date is March 7th, 2023, and the
6 time is 10:13 a.m. Central.  My name is Lindsay Welbers
7 of Thompson Court Reporters.  Beginning with noting
8 party, will counsel please introduce themselves, state
9 whom they -- state whom you represent, and stipulate to
10 the swearing in of the witness remotely?
11    MR. SCHULTZ:  Miles Schultz for the EEOC.  We so
12 stipulate.
13    MS. GUTTAU:  Heidi Guttau for the defendant, both
14 Walmart defendants, and we also so stipulate.
15    MR. SCHULTZ:  Good morning, Ms. Hemsley.  We
16 met --
17    THE COURT REPORTER:  Do you want to swear in the
18 witness?
19    MR. SCHULTZ:  Oh, yes, please.
20    THE COURT REPORTER:  All right.  Ms. Hemsley,
21 would you please raise your right hand for me?
22        PATRICIA HEMSLEY
23    the deponent herein, called as a witness, after
24 having been first duly sworn, was examined and

---

Page 6

1 testified as follows:
2    THE COURT REPORTER:  Thank you.  You may proceed.
3    MR. SCHULTZ:  Thank you.  Thank you.  And with
4 that, good morning, Ms. Hemsley.  My name is Miles
5 Schultz.  We met just briefly a couple minutes ago.
6 But I represent the EEOC in a lawsuit that the EEOC
7 filed against Walmart, that's pending in the Southern
8 District of Iowa.  And your deposition today is in
9 regards to that lawsuit.  Okay?
10    THE WITNESS:  Okay.
11       EXAMINATION
12 BY MR. SCHULTZ:
13    Q.  Have you ever been deposed before?
14    A.  No.
15    Q.  Okay.  So I'll just -- the structure will
16 start off with a few ground rules for making the day go
17 smoothly.  This isn't a marathon, so if you need to
18 take a break, just let us know.  I don't anticipate
19 we'll be here all day, but we'll probably be here for
20 at least a few hours, I assume.  So if you need to take
21 a break to stretch your legs, get a drink of water,
22 just let me know.  Okay?
23    A.  Okay.
24    Q.  I myself like to take a break probably every

Page 11

1 bunch of car dealerships?
2    A.   Yes.
3    Q.   All right.  I'm familiar with that Walmart.
4 What's the store number there?
5    A.   1721.
6    Q.   And how long have you been the fresh food and
7 consumables coach there?
8    A.   Since August of last year.
9    Q.   August 2022?
10   A.   '22.  Yes.
11   Q.   And just briefly describe your duties and
12 role as the fresh food and consumables coach.
13   A.   Well, basically, I'm in charge of running the
14 entire fresh food and consumables side of the store.
15 The grocery side, or the necessities side, is what I
16 like to call it.
17   Q.   So that exists, like, above a department
18 manager?
19   A.   Correct.
20   Q.   That position, is it a salaried manager
21 position?
22   A.   Yes.
23   Q.   Where does it exist in relation to the store
24 management?  Like, can you start with the facility or

Page 12

1 store manager and then walk down to you?
2    A.   So -- yes.  So it would be a store manager, a
3 store lead, and then myself.
4    Q.   When did you first start working at Walmart?
5    A.   Well, the very first time would've been 1997.
6 And then I left Walmart in 2004, but I came back to
7 Walmart in 2004, and I've been here ever since.
8    Q.   Okay.  How long was your break in 2004?
9    A.   About four months.
10   Q.   And what were you doing for those four
11 months?
12   A.   I opened my own daycare, and I hated it, so I
13 went back to Walmart.
14   Q.   Interesting.  When you first started at
15 Walmart in '97, what was your position, and where was
16 that?
17   A.   When I first started, I was a jewelry
18 parttime associate, and that was in Deland, Florida.
19   Q.   Can you spell that city?
20   A.   Yeah, D-E-L-A-N-D.
21   Q.   Let's just walk through -- I assume you've
22 held a lot of positions at Walmart.
23   A.   Yes.
24   Q.   Okay.  Let's just walk through locations

Page 13

1 you've worked.  So after Deland, where'd you work after
2 that?
3    A.   Okay.  Indianola, Iowa.
4       THE COURT REPORTER:  What was the name of that
5 city?
6       THE WITNESS:  Indianola.
7       THE COURT REPORTER:  Thank you.
8 BY MR. SCHULTZ:
9    Q.   I went to college at Simpson College, so I'm
10 also very familiar with Indianola, Iowa, that Walmart.
11 That's funny.  And when did you transfer from Deland,
12 Florida, to Indianola, Iowa?
13   A.   It would've been back in 2000.
14   Q.   And how long did you work at the Indianola,
15 Iowa, store?
16   A.   I honestly can't give you an exact amount of
17 time.  I honestly can't, because I know I left
18 Indianola and went to -- I was hired as an assistant
19 manager, and went into a training program.  But I, I
20 can't remember what year that was.
21   Q.   Okay.  Were you at the Indianola, Iowa, store
22 for at least a few years?
23   A.   Yeah.  Yeah, I would -- I would say probably
24 a couple years, maybe.

Page 14

1    Q.   Okay.  And then you became an assistant
2 manager.  Were you in management at the Indianola
3 store?
4    A.   No.
5    Q.   Okay.
6    A.   Well, I was a department manager.  I guess --
7 I take that back.  I was a department manager.  I ran
8 lawn and garden.
9    Q.   Okay.  So you were the lawn and garden
10 department manager, and then you got promoted to
11 assistant manager.
12   A.   Yes.  Correct.
13   Q.   So lawn and garden, that's just an hourly
14 management position?
15   A.   Yes.  Yes.
16   Q.   And assistant manager is salaried management
17 -- a salary supervisor position?
18   A.   Yes.
19   Q.   Could you describe what the training program
20 is that you just mentioned for that?
21   A.   At that point in time, the training program
22 was, I believe, like a 12-week program.  They sent me
23 to the Ottumwa store for part of my training.  I worked
24 with the management team in that store.

Page 15

1    And then I also went for -- I believe we had a
2  training outside of the store for, like, a couple
3  weeks, where they sent me to a training where they went
4  over, like, some reports and things, and then sent me
5  back to Ottumwa, and then I started my role as an
6  assistant manager in the Oskaloosa store.  After, I
7  think it was, 12 weeks.  It was either eight or 12
8  weeks, if I remember correctly.  I just -- I don't
9  remember, exact.
10    Q.  No worries.  And do you remember when you
11  started as the assistant manager in the Oskaloosa
12  store?
13    A.  I don't remember the exact date, no.
14    Q.  Was it before or after your break in 2004?
15    A.  That would've been before.
16    Q.  Okay.  When you took the break to open up the
17  daycare, what store were you working at?
18    A.  I was still in the Oskaloosa store.
19    Q.  As the assistant manager?
20    A.  Yes.
21    Q.  Okay.  And then, when you came back in 2004,
22  what was your location and title then?
23    A.  I was in the Ottumwa Walmart when I came
24  back, and I came back as an automotive associate, just

Page 16

1  a sales associate, at the time.
2    Q.  And then, what was your next position at the
3  Ottumwa store, after sales associate?
4    A.  I was the lawn and garden department manager.
5    Q.  Do you remember about how long after you came
6  back that you became the lawn and garden department
7  manager?
8    A.  I want to say between three and six months.
9    Q.  And then after the lawn and garden department
10  manager, what was your next position?
11    A.  I would've been the hardlines -- I can't
12  remember what they called it.  But it was hardlines or
13  seasonal ZMS, Zone Merchandise Supervisor.
14    Q.  And how long did you hold that position?
15    A.  I want to say up to a year, because then I
16  was promoted to an assistant manager position in the
17  Coralville, Iowa, store.
18    THE COURT REPORTER:  What was the name of that
19  city?
20    THE WITNESS:  Coralville, C-O-R-A-L-V-I-L-L-E.
21    THE COURT REPORTER:  Thank you.
22  BY MR. SCHULTZ:
23    Q.  And when was that promotion?  Do you
24  remember?

Page 17

1    A.  I want to -- I, I don't remember exact dates.
2  I'm sorry.
3    Q.  It's all right.  It would've been, just
4  adding up, if you came back in 2004, and then you
5  were --
6    A.  It was, I would say, probably between 2006
7  and 2007, maybe.
8    Q.  Okay.  And then what was your next position
9  or store, after the assistant manager at Coralville?
10    A.  That was when I would've been the comanager
11  in Ottumwa.
12    Q.  Okay.  So you went from assistant manager in
13  Coralville to the comanager in Ottumwa.
14    A.  Yes.
15    Q.  And you remember when that promotion would've
16  happened?
17    A.  I don't know if it was a year or two years
18  after I went to Coralville.  I think it was about two
19  years.  So maybe 2009.
20    Q.  2009-ish.  Did you have to do -- when you
21  became the assistant manager in Coralville, did you
22  have to redo that training program?
23    A.  Yes.  Yes.  But on that, they sent me to -- I
24  did a two-week training, in Indiana, I think it was.

Page 18

1  They sent us for a training over there.  And total
2  training for that would've been eight weeks, I believe.
3    And again, you were in a store for those amount of
4  times and -- or for, like, the first couple weeks,
5  you're in a store.  Then you went to a class, and then
6  you came back to the store.  And then you started in on
7  your -- in your store, once you got through with the
8  training.
9    Q.  Okay.
10    A.  And -- yeah, at that point in time, training
11  was, you know, we'll send you where we think you need
12  to go, and then back and forth, so --
13    Q.  And so then you were comanager in the Ottumwa
14  store.  And what was your next position after that?
15    A.  After comanager at Ottumwa, I actually
16  stepped down and became an assistant manager in
17  Fairfield, Iowa.  And that's been three years ago, I
18  want to say.
19    Q.  Like, 2020-ish?
20    A.  Yeah.
21    Q.  Before or after the pandemic started?
22    A.  It would've been before.
23    Q.  Okay.
24    A.  Because I was here when the pandemic kind of

Page 31

1 Sorry.
2    Q.  Kayley.  Could you spell that?
3    A.  K-A-Y-L-E-Y, I believe.  But she was only
4 there for a few months, and then she was out on
5 maternity leave, so -- I think.
6    Q.  So back, again, during this period of time in
7 2018, you were comanager.  Under you, I take it, there
8 was assistant managers.
9    A.  Yes.
10    Q.  And then who would've been under assistant
11 managers in the hierarchy?
12    A   Department managers would've been underneath
13 the assistant managers.
14    Q.  And I think asset protection manager also
15 kind of exists kind of outside of that hierarchy a
16 little bit.  Is that right?
17    A.  A little bit.  The asset protection manager
18 basically is kind of the same level as an assistant
19 manager.  However, they answer strictly to, like, the
20 store manager, most generally, because they do
21 investigations on managers if, if need be.
22    Q.  Got you.  And then under department managers,
23 there are just sales associates?
24    A.  Yes.

Page 32

1    Q.  And then where would you put the GM support
2 position in that hierarchy?
3    A.  It would be right around the same level as a
4 department manager.
5    Q.  So in -- well, do you remember when you
6 became the only -- the one comanager, instead of just
7 one of four?
8    A.  It was shortly after Hillary came to this
9 store.  I don't remember exact timeline.  But I know it
10 was shortly after she came to this store.
11    Q.  And that -- Hillary came to the store about a
12 year after you started, was your memory?
13    A.  I think so.  I'm sorry, I'm horrible with
14 timelines.
15    Q.  You're doing fine.  How did your job duties
16 change as comanager from being one of four to being the
17 only comanager?
18    A.  Well, instead of having a fourth of the
19 store, I had the entire store to manage.  You know,
20 when there was four of us, each person took, like, the
21 -- two of them did, like, overnights, and then two of
22 us did during the day.
23    So during the day, I believe it was Dave Armstrong
24 that was with me, and he took -- he had basically the

Page 33

1 grocery side of the store, where I handled the GM side
2 of the store.  So on days he wasn't there, I would
3 cover his side.  On days I wasn't there, he would cover
4 my side.  But when we were both there, we were able to
5 space that out, and both run each side.
6    Q.  Okay.  So then --
7    A.  And then --
8    Q.  Go ahead.  Sorry.
9    A.  And then after it went down to one, then I
10 had to basically cover the entire store as the
11 comanager, making sure that processes and things were
12 done, along with making sure the overnights were doing
13 what needed to be done there, as well.
14    Q.  Did you have to start working overnight
15 shifts when you became the sole comanager?
16    A.  No.  I did not.
17    Q.  Do you remember an employee by the name of
18 Kendra Mouton?
19    A.  Yes.
20    Q.  Am I saying that right?  Mou-tahn?
21    A.  Mout-n, maybe.  I don't know how she
22 pronounced it, specifically.
23    Q.  Okay.  And do you remember what her position
24 was?

Page 34

1    A.  She was an assistant manager.
2    Q.  And did she report to you as comanager?
3    A.  Yes.  She would've reported to me at times,
4 yes.
5    Q.  And so earlier, I had asked if you remembered
6 Tiffanee Johnson, and you said you didn't have any
7 memory of her.  So one of the claims in the lawsuit is
8 about the consumables department manager position for
9 the consumables department.  Am I -- does that ring a
10 bell?  Consumables?  Is that -- am I saying that
11 department right?
12    A.  Well, usually, it would've been, like,
13 consumables is anything from pets, chemicals, paper.  I
14 don't know if those were all tied together at that
15 point in time.
16    Q.  Okay.
17    A.  I don't know.
18    Q.  Do you remember an employee by the name of
19 Abigail Hunt?
20    A.  Yes.
21    Q.  Do you remember her getting a promotion to
22 consumables department manager?
23    A.  Yes.
24    Q.  What is your memory, if any, regarding your

Page 35

1 involvement in that hiring process for that position?
2    A.   The only memory I have of the hiring for that
3 is having a conversation with Kendra about who she
4 interviewed, and what made her selection.  So when we
5 talked about it, she's like, I have these applicants,
6 this is who I'm looking at.
7      And then we talked about -- she asked me what I
8 thought, and I said, okay, well, you're going to look
9 at their attendance.  You're going to look at their
10 work ethic, including, like, if, if they have any
11 manager experience.  And then you're going to look at
12 how the interview process goes, and then select the
13 best one, based off of those three things.
14    Q.   And do you remember, when Kendra said that
15 she was looking at these applicants, do you remember
16 who those applicants were?
17    A.   No.  No.  I remember, there was three.  But I
18 don't remember who.
19    Q.   I take it one of them would've been Abigail,
20 since she got the position.
21    A.   Yes.  I would assume so.
22    Q.   Okay.  But you don't have any specific memory
23 about discussing anything about the three of them?
24    A.   No.

Page 36

1    Q.   And what is your memory -- at that time, in
2 2018, what was your role as comanager in selections for
3 department manager positions?
4    A.   Honestly, I really wouldn't have had a role,
5 other than seeing who was in the requisition.  And
6 then, you know, discussing with the assistant, who do
7 you think you should interview?
8    MR. SCHULTZ:  Okay.  Let's -- Heidi, I'm going to
9 mark Walmart 1961 as Exhibit 1.  I'll put it in the
10 chat and share it on the screen.
11    MS. GUTTAU:  Okay.
12    MR. SCHULTZ:  It's that flowchart thing.  I'll
13 mark it Hemsley Exhibit 1.
14          (Whereupon Hemsley Exhibit No.
15           1 was marked for
16           identification by the court
17           reporter.)
18    MS. GUTTAU:  Okay.
19 BY MR. SCHULTZ:
20    Q.   So do you have a copy with you?
21    A.   Yeah.  Just give me one second here.
22    Q.   I'll share it on the -- I'll share it in the
23 chat, Patty, and on my screen.  But it might be easiest
24 just to look at this copy.

Page 37

1    A.   Give me one sec.  Yeah, here we go, I think.
2 1951?
3    Q.   Yeah.
4    A.   And '52?
5    Q.   Yeah.
6    A.   Yeah, here we go.  I do have it.
7    Q.   And I think I just shared it on my screen, as
8 well.
9    A.   Okay.
10    Q.   All right.  If you could just review this
11 document?  And I have a few questions about it.  Let me
12 know when you've had a chance to review it.
13    A.   Okay.
14    Q.   All right.  For the record, we're marking
15 Hemsley Exhibit 1.  It's a two-page document, Bates
16 stamped Walmart_Johnson_0001961 through 1962.  Do you
17 recognize this document, Patty?
18    A.   It's familiar from, like, a long, long time
19 ago.
20    Q.   Okay.  The title of the first page is Process
21 for Filing -- Filling, sorry -- Process for Filling an
22 Hourly Supervisor, Lead Office, Asset Protection or
23 Professional Position.  Do you see that?
24    A.   Yeah.

Page 38

1    Q.   And it's kind of a flowchart sort of thing.
2 Looks like there's some common things, four steps,
3 before it branches off into internal and external
4 applicants.  Do you see that?
5    A.   Yeah.
6    Q.   Does this look like the process in 2018 for
7 hiring a department manager position?
8    MS. GUTTAU:  Form and foundation.  Go ahead.
9    THE COURT REPORTER:  Form and foundation?
10    MS. GUTTAU:  Yeah, form and foundation.  Sorry.
11 I'll try to be louder.
12    THE COURT REPORTER:  Thank you.
13    THE WITNESS:  Yeah, it looks definitely like it
14 could be what we would do, yes.
15 BY MR. SCHULTZ:
16    Q.   Okay.  I just kind of want to walk through
17 this flowchart to see -- specifically with keeping in
18 mind what your role as comanager would've been in 2018,
19 for filling a department manager position.  Okay?
20    A.   Okay.
21    Q.   So the first box here is, opening requisition
22 opportunities.  And it looks like in parentheticals, it
23 says, facility manager, comanager, personnel associate.
24 Do you see that?

Page 39

1    A.  Yes.
2    Q.  And when you were the comanager at the
3  Ottumwa store, did you ever open requisitions yourself?
4    A.  No, our personnel associate always did it.
5    Q.  Okay.  And I believe in 2018, that would've
6  been --
7    A.  It would've been Lisa.
8    Q.  Lisa Elrod?
9    A.  Yeah.
10    Q.  Then the second box is opening (inaudible) on
11  job opportunities for three business days.  Next box,
12  review applicants from the qualified applicant listing.
13  Do you see that?
14    A.  Yes.
15    Q.  And then it has, in parentheticals, salaried
16  manager.
17    A.  Yes.
18    Q.  And so at this time in 2018, the salaried
19  managers would've been the store manager, the
20  comanager, or managers, and the assistant managers.  Is
21  that right?
22    A.  Yes.
23    Q.  I take it you don't remember reviewing
24  applicants from the qualified applicant listing for the

Page 40

1  consumables department manager position that Ms. Hunt
2  got?
3    A.  No.
4    Q.  Was there ever an occasion that you did
5  review applicants from the qualified applicant listing?
6    A.  For any --
7    MS. GUTTAU:  Form and foundation.  Go ahead.
8  Sorry, form and foundation.
9    THE COURT REPORTER:  What was that?
10    MS. GUTTAU:  Form and foundation.
11    THE COURT REPORTER:  Thank you.
12    THE WITNESS:  No, not for any hourly position.  I
13  don't recall doing any of that, reviewing who was
14  applied for it.
15  BY MR. SCHULTZ:
16    Q.  Okay.  That typically, I guess, would've been
17  the assistant managers under you doing that?
18    A.  Yes, typically that's an assistant manager
19  that reviews those and selects who they want to
20  interview.
21    Q.  I'll just wait for the announcement to stop.
22    A.  Okay.
23    MR. SCHULTZ:  Off the record.
24    (Whereupon, a short break was

Page 41

1    taken.)
2    MR. SCHULTZ:  Back on the record.  So looking at
3  that fourth box in Exhibit 1, select applicants for
4  consideration, and then in parentheticals, salaried
5  manager.  Do you see that?
6    THE WITNESS:  Yeah.
7  BY MR. SCHULTZ:
8    Q.  I take it, consistent with the previous box
9  --
10    A.  That would be the assistant.
11    Q.  For department manager positions, the
12  assistant manager would select the applicants for
13  consideration?
14    A.  Yes.  The only time they would get with a
15  comanager or a salaried manager is -- or the store
16  manager, is if, you know, they were questioning between
17  applicants, or they were a newer assistant and didn't
18  feel confident in, in their decision-making.
19    Q.  And then we're going to branch off to the
20  left side, the internal applicants.  Okay?
21    A.  Okay.
22    Q.  So the first box is, schedule salaried
23  manager interview.  I take it that would've been the
24  assistant manager scheduling that?

Page 42

1    A.  Correct.
2    Q.  Then conduct salaried manager interview.  I
3  also take it that the assistant manager would've been
4  responsible for conducting those for the department
5  manager positions?
6    A.  Yes.
7    Q.  Would you ever -- similar to how you answered
8  a previous question, I take it, if an assistant manager
9  was newer, they might ask you to also be in the
10  interview.  Did that ever happen?
11    A.  Correct.  In, in Ottumwa, I don't recall
12  sitting in on any interviews with any applicants during
13  that process, no.  In other stores, I have, but not --
14  I don't recall doing it in Ottumwa.
15    Q.  Then the next box, interview a minimum of
16  three internal associates.  Next box, select applicant
17  for recommendation for job offer.  I take it that would
18  still be the assistant manager selecting the applicants
19  for recommendations for job offer?
20    A.  Yes.  Correct.
21    Q.  And then the next box, I think, is where you
22  likely came into the picture.  It says, approve offers
23  from job offers to approve.  Do you see that?
24    A.  Yes.

Page 43

1    Q.  And then it says, facility manager or
2  comanager.
3    A.  Yeah.
4    Q.  And before, when you said you do have one
5  memory of talking to Kendra about the position, the
6  consumables department manager position that Ms. Hunt
7  got, and you listed some things that you told her to
8  consider in selecting the applicant for a job offer,
9  would that have been at this stage?
10   A.  Yes.
11   Q.  Okay.  And do you have specific memories of
12 that conversation?  Or when you listed those four or
13 five things, is that generally just what you told the
14 assistant managers at that stage?
15   A.  That would be what I told them at that stage.
16 I don't -- I don't recall exact words that were said in
17 those conversations, other than those four main things.
18   Q.  And those four things --
19   A.  Are -- you want me to repeat them?
20   Q.  Yeah, that'd be great.
21   A.  Okay.  So you look at attendance.  Okay?
22 Then work at -- look at their work ethic, if they have
23 any experience, and then the interview process.  Like,
24 who had the best interview?  Who do you think is going

Page 44

1  to do the best job, based off of your interview?
2    Q.  So in general, the advice you gave to
3  assistant managers in hiring department managers is to
4  look at attendance, work ethic, experience, and
5  interview performance?  Those are the four things?
6    A.  Yeah.
7    Q.  Okay.  Let's break each one of those down.
8  Okay?  As far as attendance, what did you mean by, look
9  at their attendance?
10   A.  So in attendance, you want to make sure that
11 whoever you're hiring is not going to be calling in
12 consistently, or late consistently.  So we, we have
13 what we call -- it's called GTA.  So we can look at
14 where their attendance is at, how many points they
15 have, how many times they've called in, things like
16 that.
17   I guess that breaks attendance down.  I mean, I
18 don't know what else to say, other than, you know, what
19 they -- how they come in.  Like, if they're coming in
20 when they're scheduled, if they're calling in a lot,
21 thigs like that.
22   Q.  Okay.
23   A.  Work ethic, so --
24   Q.  Sorry, let's take on attendance for a little

Page 45

1  bit.
2    A.  Okay.
3    Q.  So what was -- GTA?
4    A.  Yeah.  We call it GTA.  It's a system that we
5  have, that we can look up how many call-in points a
6  person has, how many times the person is late, how many
7  times the person leaves early.
8    Q.  And how would you look someone up in that
9  system in 2018?
10   MS. GUTTAU:  Form and foundation.  Form and
11 foundation.  Sorry.
12   THE COURT REPORTER:  Thank you.
13   THE WITNESS:  At that point in time, I don't
14 remember if that was on the SMART system or if it was
15 on our Wire by that time.  But it would've been in one
16 of our computer systems, that we could look it up.  I
17 can't be specific on it, because I, I don't know when
18 it switched from one system to the other.
19 BY MR. SCHULTZ:
20   Q.  And it sounds like the two systems you're
21 thinking of are called SMART and the Wire?
22   A.  Yes.
23   Q.  Could you just describe what those -- your
24 memory of those two systems?

Page 46

1    A.  So they both kind of work -- generally, they
2  both work the same way.  You look the applicant up,
3  either by name or -- I think we could look it up by
4  their ID number or their Social Security number.  Like,
5  their Walmart ID or Social Security number is how we
6  could look them up.
7    Q.  Okay.  And I think when I deposed Ms. Elrod,
8  she did a lot of -- it seems like she did a lot of,
9  like, the processing of paperwork and pulling reports
10 and stuff.
11   A.  Yes.
12   Q.  Is this something you would have her do?  Did
13 you have access to this sort of thing?
14   A.  I would have access to it, but a lot of
15 times, I would've probably assigned it to Lisa.
16   Q.  Okay.  But I take it you had some sort of
17 access to a computer, where you could actually run
18 these reports yourself, too?
19   A.  Yeah.  Any salaried member of management
20 could do it, along with our personnel associate.
21   Q.  And if you yourself wanted to do that, like,
22 where would that computer be that you would access it?
23   A.  Probably in the assistant manager's office,
24 the store manager office, the personnel room.

Page 55

1 service desk and throughout the store are put away.
2    Q.   What is -- I take it zoned means something
3 about looking proper?
4    A.   Yes.
5    Q.   Could you describe --
6    A.   Like, the -- like, the counters having the
7 merchandise pulled to the front of the counters, the
8 merchandise being in the right spot on the counters.
9    Q.   And what counters are you referring to?
10    A.   All the side counters in the store.  All the
11 shelves in the store.
12    Q.   So, like, the actual -- where all the
13 products are?  That's what a counter is?
14    A.   Yes.  Where all the product is.
15    Q.   I would refer to that, as a customer, as,
16 like, the aisle.  Like --
17    A.   Yeah.  It could be the aisles.  Yeah.
18    Q.   Okay.  I just want to make sure I have in my
19 mind -- it's not like -- I think maybe in the fabric
20 department there's, like, probably a counter, where you
21 might be able to, like, cut up fabric.
22    A.   Yes.
23    Q.   But when you're using the word counter,
24 you're referring to the huge pieces of, like, bookshelf

Page 56

1 stuff that all the merchandise is on?
2    A.   Yes.  Correct.
3    Q.   So it's basically like, I guess -- I worked
4 at a grocery store, and we called that facing.  So it's
5 basically just, like --
6    A.   Yeah.  Yeah, that's exactly what it is.
7 Yeah.
8    Q.   Okay.
9    A.   And I'm sorry.  Maybe I'm trying to break it
10 down too, too much.
11    Q.   No, no.  You're doing great, and I mean,
12 Walmart is large enough that it has its own vernacular
13 and lingo, so I just want to make sure that I'm
14 translating Walmart-speak into Miles-speak for my
15 brain.
16    A.   Sure.
17    Q.   So it sounds like the two main duties for the
18 support manager position is the zoning, and then you
19 also said the returned items?
20    A.   Yes.
21    MS. GUTTAU:  Form.
22 BY MR. SCHULTZ:
23    Q.   Could you walk me through the returned items
24 thing?

Page 57

1    A.   So any returns that come to the service desk,
2 whether it be a customer bringing something in that
3 they no longer want, or, or we pick up items from the
4 sales floor that aren't in the right spot, we take them
5 up to the service desk.  They sort them, separate them
6 by department or aisle.  And then the evening
7 associates put them away at night.  They put them back
8 onto the counters, so they can be sold, if there's no
9 damages, or nothing that's wrong with them, the items.
10    Q.   And as the -- does the support manager -- are
11 they responsible for supervising any other employees at
12 the store?
13    A.   Yes.  They would be responsible for
14 supervising all of the evening associates that are
15 there to zone, and make the store look good.
16    Q.   And do you know how they would -- how they
17 would do that?  Supervise the associates to make the
18 store look good?
19    A.   They, they would walk, walk around the store.
20 We, we both called it scrape.
21    Q.   Scrape?
22    A.   Scrape.  That's where we take a shopping cart
23 and we go through and we zone all of the features in
24 the main aisle of the store, and, like, the outside

Page 58

1 counters of the store.  We pick up any merchandise that
2 doesn't belong there.
3    That's the part -- that's where, like, the support
4 manager or the closing salaried manager would go, and
5 they would review the areas as they're doing their
6 scrape, to see what area still needs some attention,
7 what associates that need to be talked to, to make sure
8 that they're going to meet the deadline of having the
9 store zoned before they leave for the night.  And what
10 a support manager would do -- they would go -- they
11 would be there for that scrape.  And then they would
12 talk to the associates, and then they would jump in and
13 help where needed.
14    Q.   And did you ever -- so there was some overlap
15 with you and Ms. Hunt, when you were closing on days,
16 and when she was starting on evenings.  Did you ever do
17 that -- I'm sorry, was it straight or scrape?
18    A.   Scrape.  S-C-R-A-P-E.
19    Q.   Scrape.  Okay.  Did you ever do the scrape
20 with her?
21    A.   Yes.
22    Q.   So then Ms. Hunt becomes the consumables --
23 well, she becomes the department manager from this
24 requisition, and then at some point you said you were

Page 67

1   A.  You still have to go through the process.
2 Right.  Sorry.
3   Q.  Still have to go through the application
4 process.  Correct?
5   MS. GUTTAU:  Form and foundation.  Sorry.  Go
6 ahead.
7   THE WITNESS:  Yes, they would still have to go
8 through the interview process.
9 BY MR. SCHULTZ:
10   Q.  And I think I already asked this.  In case I
11 didn't, you don't remember having any specific
12 conversations with Kendra about the management
13 experience of Chastity, Tiffanee, or Abigail for this
14 requisition?
15   A.  No.
16   Q.  In general, where would you have these
17 conversations with an assistant manager, where you went
18 over these four various items?
19   A.  We would typically have it in the management
20 office or the store manager office.  They would be
21 behind closed doors, basically.
22   Q.  Okay.  Would the store manager sometimes be
23 involved in those conversations, as well?
24   A.  Yes.

Page 68

1   Q.  Would they always be involved?
2   A.  Not always, no.
3   Q.  But with this requisition, you don't have any
4 memory of who else might've been in that meeting with
5 you and Kendra?
6   A  No.
7   Q.  Would it be your practice to, you know, take
8 notes or record anything during these meetings?
9   A.  During a meeting or the interview?
10   Q.  During, like, this meeting with the assistant
11 manager about the interviews.
12   A.  No.
13   Q.  But I take it by your question to my question
14 that it would've been your practice to take notes
15 during an interview?
16   A.  No.
17   MS. GUTTAU:  Form and foundation.
18   THE COURT REPORTER:  Sorry.  Sorry, what was that?
19 What was that objection?
20   MS. GUTTAU:  Form and foundation.
21   THE COURT REPORTER:  Thank you.
22 BY MR. SCHULTZ:
23   Q.  Sorry.  What was your answer, Patty?
24   A.  No, it would -- it would not be typical of us

Page 69

1 to take notes during an interview.
2   Q.  When it says -- actually, let's --
3   A.  The only note you would take -- and, and I'm
4 just going to throw this in there -- when, when we did
5 interviews back then, there was a packet you printed
6 out.  You followed those questions.  Below the
7 questions was three things.  Solid performer, below,
8 and then the above.
9   And then so when we do the interview, we'd ask the
10 questions, and then you would circle or -- I think I
11 circled at that point.  Well, we -- I would've circled,
12 at that point in time, because it just had the three
13 things at the bottom, beneath the questions.  And
14 whoever the manager was would have circled or check-
15 marked whichever one they felt was the best answer,
16 during, during their interview process.
17   Q.  Okay.  You anticipated where I was going.  So
18 in this -- looking back at this Exhibit 2, that
19 spreadsheet, there's a tab called CP-Internal Interview
20 Ratings.  And if we look through it, it looks like --
21 can you see my screen okay?
22   A.  Yeah.  Yeah, I can see it.
23   Q.  So this looks like it's information about Ms.
24 Hunt's interview with Kendra.  And if we scroll

Page 70

1 through, there's a section description.  And I'll just
2 read it.  It says, outstanding service to our Walmart
3 customers is extremely important.  Provide an example
4 of a time when you went above and beyond in the
5 customer service you provide to an external customer, a
6 fellow associate, or another individual outside the
7 workplace.  Do you see that?
8   A.  Yes.
9   Q.  And it looks like the next column, there's a
10 title, Answer_Rate_DEC.  So I assume that's Answer Rate
11 Description.  And it says solid performer.  So I would
12 read this that Kendra selected solid performer for that
13 question about outstanding service to a Walmart
14 customer.  Is that how you would read it?
15   A.  Yes.
16   Q.  So back in 2018, the process as you
17 understand it, there would be an interview packet, and
18 you would either circle or checkmark.  Kendra would've
19 either circled or check-marked this solid performer for
20 that interview question on the paper interview packet?
21   MS. GUTTAU:  Form and foundation.
22   THE WITNESS:  Yes.  That is my assumption.
23 BY MR. SCHULTZ:
24   Q.  Okay.  And I think you said there was just

Hemsley, Patricia - 03/07/2023

Page 71

1 more than one -- typically more than one question asked
2 in an interview.  Is that right?
3     A.  Yes.
4     Q.  Do you know what other questions would've
5 been asked?  Like, are they stock questions?  Could you
6 deviate from them?  Could you choose your own
7 questions?
8     A.  It's a guide, so you could deviate a little
9 bit, but you'd want the same kind of process to go
10 through.  I don't remember what specific questions
11 would've been back then.  I know a lot of it is about
12 either serving the customer or what, what you would
13 typically do in a situation.
14     Q.  And I take it the process would've been -- so
15 it looks like there were three people who were selected
16 for interviews for this requisition.  Chastity,
17 Tiffanee and Abigail.  Would it have been the process
18 of the salaried manager who was conducting the
19 interview to rate each of the three on the interview
20 questions?  Or would you only rate the interview
21 question for the person who was selected for the
22 position?
23     MS. GUTTAU:  Form and foundation.  Go ahead.
24     MR. SCHULTZ:  Yeah, let me -- that was very long

Page 72

1 and bad.  Can we redo that?  So it looks here, in this
2 spreadsheet we got from Walmart, there's one question
3 that has solid performer for Ms. Hunt.  Do you know why
4 there isn't any information for other questions asked
5 of Ms. Hunt?
6     MS. GUTTAU:  Form and foundation.
7     THE WITNESS:  I honestly don't know, no.
8     MR. SCHULTZ:  And do you know why there wouldn't
9 be any information for Chastity or Tiffanee's
10 interview?
11     MS. GUTTAU:  Form and foundation.
12     THE WITNESS:  So the only thing I can tell you on
13 this is, this comes off of our system.  When we select
14 an applicant, that applicant's answers are the only
15 ones that we would put in, because if we interview
16 three people, and all three of them are solid, but we
17 decided to go with a certain one, then if you put all
18 of their answers in, it would try to job-offer all
19 three of them.  And you only have one position.
20 BY MR. SCHULTZ:
21     Q.  Well, that would be problematic.
22     A.  Yes.
23     Q.  So the way that I'm understanding the process
24 as you just kind of described it is, you would have the

Page 73

1 three paper packets, but then you would only put into
2 the system the ratings for the person you wanted,
3 because the system would -- if you put in more, the
4 system would offer everyone a job?
5     A.  The way I understood it, when I first started
6 doing -- as a salaried manager, when I first started
7 doing interview process, that's how I was taught.  You
8 only put in answers of the one you selected
9     Q.  Got you.  And Kendra couldn't remember if she
10 had input the ratings, or she had Lisa input the
11 ratings.  How did you typically do it when you were the
12 salaried manager?  Would you do it -- could you do it
13 yourself?  Or would you rely on the personnel associate
14 to do it?
15     A.  It could be -- it could be both, honestly.
16 If I -- if I did the interview, and I was like, okay, I
17 want this person, I -- sometimes I would go to Lisa and
18 say, hey, we're going to select this person.  And then
19 she would put it in.  And sometimes I'd be like, okay,
20 Lisa's not here, so I'm going to input it.  It, it kind
21 of -- it kind of depended on if Lisa was there or not.
22     Q.  Okay.  Okay, yeah.  If Lisa was there, you
23 would let her do it, but if she wasn't, you could also
24 do it.

Page 74

1     A.  Yeah.  Yeah.
2     Q.  Understood.  Well, I guess I kind of jumped
3 the gun, because the fourth thing you said was who had
4 the best interview.  And we've already kind of started
5 asking about that.  So outside of this rating thing,
6 how else would you determine who had the best
7 interview?
8     A.  I would say based off of their answers of the
9 questions that were asked.  Like, who had -- who had
10 the -- now, the answers, we look for, what was the
11 circumstance?  What was the situation?  What steps did
12 the interviewee take to fix the situation?  And then
13 what was the ending result?
14     MR. SCHULTZ:  We've been going for a little bit
15 now, actually.  Let's take, like, a five- or ten-minute
16 break.  Which would you prefer, Patty and Heidi?
17     MS. GUTTAU:  Whatever you want.
18     THE WITNESS:  Let's go five.  I don't know.  I
19 just need to use the restroom, so --
20     MS. GUTTAU:  Yeah.  Me, too.
21     MR. SCHULTZ:  Great.  Let's take a five-minute
22 break and come back on the record, let's just say, at
23 noon.  That's eight minutes, but --
24     MS. GUTTAU:  Okay.

Page 91

1 schematic. Give me a moment to go through my outline
2 here. I think I'm wrapping up. I just have a
3 question, since you worked at a bunch of different
4 locations. At any other location, are you aware of the
5 places that women have pumped breast milk at work?
6    MS. GUTTAU: Form and foundation.
7    THE COURT REPORTER: That was foundation?
8    THE WITNESS: I'm aware --
9    MS. GUTTAU: Sorry, form and foundation.
10    THE COURT REPORTER: Thank you.
11    THE WITNESS: I am aware of where they can breast
12 -- or where they can pump, yes.
13 BY MR. SCHULTZ:
14    Q.   Okay. And how are you aware of that?
15    A.   They are clearly marked rooms.
16    Q.   And can you describe what rooms are clearly
17 marked?
18    A.   Well, the store I'm in right now, you have to
19 go through our manager's office, into another room,
20 through the manager's office. That is our breast-
21 pumping room. I don't believe we have anybody in the
22 store that pumps right now. But if somebody needed to
23 pump, we would be able to make the room accessible to
24 them.

Page 92

1    Q.   Do you know -- and this is at the Iowa City
2 store?
3    A.   Yes.
4    Q.   Do you know if that room has always been
5 designated as a pumping room? Or --
6    MS. GUTTAU: Sorry. Foundation. Go ahead.
7    THE WITNESS: Well, I do not know if it has always
8 been a breast-pumping room, no.
9 BY MR. SCHULTZ:
10    Q.   Did you have any role in identifying that
11 spot as a pumping room?
12    A.   No.
13    Q.   And that's a room -- you have to go through
14 the store manager's office to get to that room?
15    A.   You have to go through the assistant's office
16 to get to that room. But it's a locked room with no
17 camera, so --
18    Q.   There is a Walmart policy called support for
19 breastfeeding mothers, or something like that. Are you
20 aware of that policy?
21    A.   Yes. Yes, I am.
22    Q.   And do you have any role in implementing or
23 abiding by that policy in the store?
24    A.   Yes. Yes, I have to make sure that if

Page 93

1 somebody needs to pump, they have a place to do it,
2 yes.
3    Q.   But as the comanager at the Ottumwa store,
4 you don't -- no one ever came to you, in your memory,
5 and asked for a spot to pump?
6    A.   No.
7    Q.   I guess, pull that schematic back out, the
8 Hemsley 3. So I take it the Iowa City store is a bit
9 different than -- the office setup, from the Ottumwa
10 store?
11    A.   Yes, it is a little different.
12    Q.   Okay. So like, that Number 4, I believe, on
13 Exhibit 3, that's circled, that's the assistant
14 manager's office at the Ottumwa store?
15    A.   No, Number 4 is the UPC office on the
16 schematic. Number 2 would be the management office.
17    Q.   Is there a separate store manager and
18 assistant manager office at the Ottumwa store?
19    A.   When I was there, there was not. However,
20 the store manager would park herself in the UPC office,
21 because we didn't -- that was the time where they took
22 out a UPC clerk, so we technically didn't have a UPC
23 clerk, so the store manager used that office.
24    Q.   What does UPC stand for?

Page 94

1    A.   It's the -- honestly, the acronym, I, I don't
2 -- I don't know anymore, because it used to be for
3 merchandise, if something came in and it wasn't on
4 file, you would take it to the UPC clerk, and they
5 would fix it.
6    Q.   Understood. But it sounds like the Iowa City
7 store has some separate room that's attached to the
8 manager's office.
9    A.   Yeah. The room that's here in the Iowa City
10 store, it is basically a room with a bunch of
11 computers. It's attached to the manager office. And
12 it has a nice open space before you get to the
13 computers that we've turned into the breastfeeding
14 room. Or breast pumping.
15    Q.   Were you involved in -- I think I asked you
16 that. You weren't involved in making that a pumping
17 room?
18    A.   No. No.
19    Q.   Well, that music's coming through loud and
20 clear, though.
21    A.   Yeah.
22    Q.   Oh, coming back to the promotion claim -- so
23 if Ms. Johnson says that Kendra said that you told
24 Kendra not to promote Ms. Johnson because she had young

Page 95

1 kids at home, do you have any memory of that?
2    A.   No, I do not have any memory of that, but I
3 can definitely tell you I would not say that.
4    Q.   And why do you say that?
5    A.   Well, because I have four children of my own,
6 and I was a -- when I was a department manager, two of
7 my children were -- I mean, when I first became a
8 department manager, my kids were small.  So why would I
9 tell anybody else they couldn't do it?
10    Q.   So when you -- let's walk back through your
11 timeline here.  So I think, according to my notes from
12 a couple hours ago, you became the lawn and garden
13 department manager in Indianola.  Is that right?
14    A.   Correct.
15    Q.   Okay.  And you had small kids at home, when
16 you became department manager?
17    A.   Yes.
18    Q.   Okay.  What ages were they?
19    A.   If I remember the timeline correctly, in
20 Indianola, I would've been a department manager in
21 2000, 2001, 2002.  My oldest son would've been a year
22 to two years old, and my daughter would've been three
23 to four years old.
24    Q.   Did you ever pump at Walmart?

Page 96

1    A.   No, I did not breastfeed.
2    Q.   During your lengthy tenure at Walmart, I
3 assume you've been involved in a few requisitions.
4    A.   Yes.
5    Q.   Meaning a lot.
6    A.   Yes.
7    Q.   Do you remember ever promoting or approving
8 the promotion of any woman that was breast pumping at
9 work?
10    A.   Not that I recall.  But it doesn't mean it
11 didn't happen, either.  So not that I recall.
12    Q.   It's one of those no's where it could've
13 happened.  You just don't remember.
14    A.   Yes.  It could've happened.  I just either
15 don't know or don't remember.  Because not everyone
16 breastfeeds.
17    Q.   Right.  And then if Ms. Johnson says that you
18 had interviewed her subsequently for another management
19 position after this requisition for the department
20 management position that Ms. Hunt had, and she asked
21 you about the comment that Kendra told her, you don't
22 have any memory of that, either, I take it?
23    A.   No.
24    MS. GUTTAU:  Form and foundation.  Did you get

Page 97

1 that, Lindsay?  Sorry.
2    THE COURT REPORTER:  Yes.  Thank you.
3    MS. GUTTAU:  Okay.  Thanks.
4    MR. SCHULTZ:  All right.  Let's take a quick break
5 so I can stand up and stretch my break, and also call
6 Hannah real fast to see if she has anything further for
7 me.  But I think I'm pretty much done.  I think five
8 minutes would be enough for me.
9    MS. GUTTAU:  Okay, great.
10    MR. SCHULTZ:  All right.
11    THE COURT REPORTER:  We are off the record at
12 12:39 p.m.
13        (Whereupon, a short break was
14        taken.)
15    THE COURT REPORTER:  We are back on the record at
16 12:44 p.m.
17    MR. SCHULTZ:  Okay.  I don't have anything
18 further.  I'll pass the witness to you, Heidi.
19    MS. GUTTAU:  Okay.  Just a couple questions.  I'll
20 scootch in so you can hear me.  Couple just clarifying
21 questions.  When you were looking at that video earlier
22 -- I think it was Exhibit 4 -- of the pumping room,
23 just to clarify, you don't know, timewise, when you
24 helped clean out that room.

Page 98

1    THE WITNESS:  No.  No, I don't know.
2        CROSS-EXAMINATION
3 BY MS. GUTTAU:
4    Q.   Okay.  In regard to the promotion that we've
5 been talking about, that Abby Hunt got -- so just to
6 make sure I understand, ultimately, was it Kendra's
7 decision on who to choose to promote to the department
8 manager?
9    A.   Yes.
10    Q.   Okay.  If Ms. Johnson testified in her
11 deposition something to the effect that she asked you
12 -- or she thought she had said something to you that
13 Kendra said, you know, don't -- that you said not to
14 promote her, due to having small children, and that you
15 replied, she shouldn't -- Kendra shouldn't have told
16 you that, would you have said -- knowing yourself, do
17 you believe you would've said that to Tiffanee?
18    A.   It's possible I could've said that, and then
19 right after said that, I would've said, because I would
20 never say that.  I would've said, well, she shouldn't
21 have told you that, because I would never say that,
22 based on my personal experience.  And then I would've
23 probably went into my own personal experience of having
24 kids and being a single mother, and then having to

apply for positions to get promoted myself.

Q.   So would you ever discriminate against somebody based on having small children?

A.   Absolutely not.

Q.   Was Walmart good to you while you were raising your children, and when they were small?

A.   Yes.  They did a lot for me.

Q.   And did you receive promotions while you had children?

A.   Yeah.  Yes, I did.

Q.   And how many children do you have, total?

A.   Four.

Q.   Okay.  And just -- can you give us the age range, for the record?

A.   As of right now, I have a daughter that's 25, a son that's 21, another daughter that's 17, and another son that's 13.

MS. GUTTAU:  Okay.  Just a second.  And I'm going to hand you -- what's the requisition mark?  Is that Exhibit 2?

MR. SCHULTZ:  The Excel thing?

MS. GUTTAU:  I think it's 2, yeah.

BY MS. GUTTAU:

Q.   Okay.  So I'm going to hand you that.  So

just looking at names -- and so I'm looking at Walmart Johnson 2120, Excel tab page labeled CP Internal Applicant.  And this is what was marked as Exhibit 2 in your deposition earlier.  So just -- I wanted to know if you're familiar with the other individuals who are in the requisition and applying for the department manager position that Abigail Hunt received, and also if you know one way or the other if they had small children at that time period.  So I'll go through the round.  Do you know -- did you know Chastity M████?

A.   I did know her, and yes, I believe she did have small children.

Q.   Okay.  How about Jack H███?

A.   Yes, I knew him.  And I believe he had small children, but I am not 100 percent sure on that.

Q.   Okay.  How about Cody P███?

A.   He did not have kids.

Q.   Corey J███?

A.   Corey J██████ I'm not very familiar with.

Q.   Okay.  Kimberly S████?

A.   And I'm not familiar with her, either.

Q.   Okay.  How about Bryan S█████?

A.   Bryan did not have kids.

Q.   And James B████?

A.   I'm not sure on that one either.

Q.   Okay.  And Abby Hunt?

A.   She did not have kids.

MS. GUTTAU:  Okay.  Nothing further.

MR. SCHULTZ:  Nothing further, as well.  Thanks, Patty.

MS. HEMSLEY:  All right.  Thank you both.

MS. GUTTAU:  Thank you both.  See you tomorrow.

MR. SCHULTZ:  I suppose you have to go back to work.

THE COURT REPORTER:  Before we all hop off --

MS. GUTTAU:  Yes.

THE COURT REPORTER:  Could I get a -- could I get a few things?  How do you want to handle Ms. Hemsley's signature?

MS. GUTTAU:  Oh, I'm sorry.  Yeah, you have the right to review the deposition transcript.  You can't change anything substantive, but you can review it.  Most people waive that.

MS. HEMSLEY:  Yeah, I'll totally waive that.

THE COURT REPORTER:  Sounds good.  Mr. Schultz, would you like a copy of the transcript?

MR. SCHULTZ:  Maybe.  I cannot tell --

THE COURT REPORTER:  Maybe's fine by me.

MR. SCHULTZ:  I cannot tell you yes.  We will be ordering, but I have to -- we'll have to get an estimate first, so we can do a bunch of government paperwork.

THE COURT REPORTER:  Sounds good.

MR. SCHULTZ:  So my office will be reaching out to you or Thompson.  Actually, what is your -- what's a good email for you?

THE COURT REPORTER:  Actually, for this, I would just recommend reaching out to Thompson.

MR. SCHULTZ:  Okay.

THE COURT REPORTER:  Mr. Guttau -- Ms. Guttau, would you like a copy of the transcript?

MS. GUTTAU:  Yeah, I'll take a condensed.

THE COURT REPORTER:  Sounds good.  I apologize for misgendering you a moment ago.

MS. GUTTAU:  Oh, that's all right.

THE COURT REPORTER:  We are off the record, but I'm hoping you can help me out with some spellings before we all leave.

MS. HEMSLEY:  Sure.

(Whereupon the deposition adjourned.)

Page 103

. Digitally signed by Madison Wagaman

DIGITALLY SIGNED CERTIFICATE

THOMPSON REPORTERS hereby certifies that the

attached pages represent an accurate transcript of the

electronic sound recording of the proceedings in the

United States District Court for the Southern District

of Iowa, Central Division, in the matter of:

No.4:22-cv-00037-SMR-SBJ

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

v.

WALMART INC., AND WALMART STORES EAST, LP

By:

_____

MADISON WAGAMAN

| WIN_NBR | JOB_CLASS_DESC | EFFECTIVE_TS | OBSOLETE_TS | PREF_TYPE_DESC | PREF_ELECT_DESC | PREF_CHG_RSN_DESC | PREF_ELECT_DSC |
|---------|----------------|--------------|-------------|----------------|-----------------|-------------------|----------------|
| 220122960 | Apparel/Home Sales Associate | 2018-01-16 08:09:43.913 | 2018-01-16 08:30:46.027 | Interest | Associate | Personal change in Preferences | Associate |
| 220122960 | Celebration Sales Associate | 2018-01-16 08:30:46.037 | 2018-01-16 08:59:18.900 | Interest | Associate | Your current interests have been moved to goals due to accepting a Job Offer. | System |
| 220122960 | Cashier | 2018-01-16 08:59:18.910 | 2500-01-01 00:00:00.000 | Goal | System | | |
| 220122960 | Celebration Sales Associate | 2018-01-16 08:59:18.910 | 2500-01-01 00:00:00.000 | Goal | System | | |
| 220122960 | Courtesy Desk | 2018-01-16 08:59:18.910 | 2500-01-01 00:00:00.000 | Goal | System | | |
| 220122960 | Consumables Department Manager | 2018-02-21 19:22:21.810 | 2500-01-01 00:00:00.000 | Interest | Associate | | |
| 220122960 | Hardware Dept Manager | 2018-03-06 08:33:31.383 | 2500-01-01 00:00:00.000 | Interest | Associate | | |
| 220122960 | Apparel/Home Department Manager | 2018-03-08 17:04:31.680 | 2500-01-01 00:00:00.000 | Interest | Associate | | |
| 220122960 | Pharmacy Dept Manager | 2018-04-14 17:01:00.000 | 2500-01-01 00:00:00.000 | Interest | Associate | | |
| 220122960 | Food Dept Manager | 2018-04-26 19:59:18.333 | 2500-01-01 00:00:00.000 | Interest | Associate | | |
| 220122960 | Hardware Dept Manager | 2018-04-26 19:59:18.333 | 2500-01-01 00:00:00.000 | Interest | Associate | | |



*Johnson*
EXHIBIT NO. 9
SARAH DITTMER
888-388-2723

WM_Johnson_0000353 – Excel Tab Page labeled "CP-Historical Preferences"

Walmart Inc. Confidential

2/7/2023

1

App. 082

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA

CENTRAL DIVISION

```
                                 ┌─────────────┐
                                 │  EXHIBIT    │
                                 │    10       │
                                 └─────────────┘
```

U.S. EQUAL EMPLOYMENT            )

OPPORTUNITY COMMISSION           )

   Plaintiff,       )   CIVIL ACTION

   v.                )   NO. 4:22-cv-00037

WALMART, INC., and               )

WAL-MART STORES EAST, LP         )

   Defendant.       )


  The deposition of Lisa Elrod, taken under oath on February 2, 2023, at 10:16 a.m. CST, via a Zoom videoconference, under Title VII of the Civil Rights Act of 1964, before Colleen Callahan-Poley, CER #1250, in and for the United States District Court for the Southern District of Iowa.

Page 2

```
 1  APPEARANCES:
 2      EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, by
 3      MILES SHULTZ
 4      230 S. Dearborn, Suite 1866
 5      Chicago, IL 60604
 6      Appeared on behalf of the plaintiff;
 7
 8      BAIRD HOLM LLP, by
 9      HEIDI A. GUTTAU
10      1700 Farnam St, Ste 1500
11      Omaha, NE 68102-2068
12      Appeared on behalf of the defendant.
13
14  ALSO PRESENT:
15      Colleen Callahan-Poley, Court Reporter
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1               I N D E X
 2                                        PAGE
 3  Examination by Mr. Shultz            5, 137
 4  Examination by Ms. Guttau               132
 5
 6
 7            E X H I B I T S
 8                                        PAGE
 9  Exhibit 1 -  Excel spreadsheet          33
                 (not attached)
10  Exhibit 2 -  Store Blueprint            37
11  Exhibit 3 -  Hiring Chart               51
12  Exhibit 4 -  Salaried Manager Interview 62
13  Exhibit 5 -  Interview Builder          68
14  Exhibit 6 -  Consumables Hiring Packet  81
                 (not attached)
15  Exhibit 7 -  Breastfeeding Mother Support Policy 103
16  Exhibit 8 -  Breastfeeding Mother Support Policy
17               Management Guidelines     116
18  Exhibit 9 -  4/25/19 Position Statement 125
19  Exhibit 10 - Video                     129
                 (not attached)
20
21
22
23
24
```

Page 4

```
 1               P R O C E E D I N G S
 2      THE COURT REPORTER:  I just have a couple of
 3  things to mention prior to going on the record.  Remote
 4  depositions are more challenging, so I'd kindly ask all
 5  participants to speak clearly and one at a time.
 6      The witness will be sworn in remotely.  The
 7  parties agree not to challenge the validity of the
 8  oath, even if the court reporter is not physically
 9  present with the witness and not a notary public in the
10  state where the witness resides.
11      Here begins the web conference deposition of Lisa
12  Elrod in the matter of EEOC versus Walmart, Inc. and
13  Wal-Mart Stores East, LP.   Today's date is February
14  2nd, 2023, and the time is 10:16 a.m. Central time.
15      My name is Colleen Callahan of Thompson Court
16  Reporters.  Beginning with the noticing party, will
17  counsel please introduce themselves, state whom they
18  represent, and stipulate to the swearing-in of the
19  witness remotely?
20      MR SHULTZ:  Miles Shultz for the EEOC, and we so
21  stipulate.
22      MS. GUTTAU:  (Indiscernible).
23      THE COURT REPORTER:  I can't hear.
24      MR. SHULTZ:  It's pretty directional, so you'll
```

Page 5

```
 1  have to -- there you go.
 2      MS. GUTTAU:  Okay.  Heidi Guttau for both of the
 3  Walmart defendants, and we -- I also so stipulate.
 4      THE COURT REPORTER:  Thank you.
 5      All right.  Ms. Elrod, can you please raise your
 6  right hand?
 7                LISA ELROD
 8      the deponent herein, called as a witness, after
 9  having been first duly sworn, was examined and
10  testified as follows:
11      THE COURT REPORTER:  Okay.  You may proceed.
12                EXAMINATION
13  BY MR SHULTZ:
14      Q.   Good morning, Ms. Elrod.  We met briefly a
15  second ago, but for the record, I'm Miles Shultz, and I
16  represent the EEOC in a lawsuit that the EEOC filed
17  against Walmart that's pending in the Northern District
18  of Iowa.  You're here this morning to give deposition
19  testimony in regards to that lawsuit.
20      So the structure for today, we'll go over a few
21  background rules -- a few ground rules, then a little
22  bit about your background, education, work history, and
23  then we'll get into the Walmart stuff.  Okay?
24      A.   (No audible response).
```

Page 78

1    Q.   So my understanding then is there's a box in
2  the claims room in storage labeled retention or labeled
3  interview packets, and you just put in interview
4  packets from various requisitions in there, and they
5  would stay there until the home office told you to ship
6  all of that box to Iron Mountain?
7    A.   Correct.
8    Q.   Do you have any specific memories of what
9  happened to the interview packets for the Consumables
10 Department manager position in 2018?
11   MS. GUTTAU:  Form and foundation.
12   THE WITNESS:  I'm assuming they're in the box.
13 BY MR SHULTZ:
14   Q.   Okay.  And that was the standard operating
15 procedure?
16   A.   Yes.
17   MS. GUTTAU:  Form and foundation.
18 BY MR SHULTZ:
19   Q.   Any memory of sending that box that
20 contained that interview packet to Iron Mountain?
21   A.   No.
22   Q.   I asked a bit ago now, at this point, if you
23 ever had to retrieve -- if you ever had to request a
24 personnel file from Iron Mountain, and you said there

Page 79

1  was a process to do that through The Wire.  Do you
2  remember that?
3    A.   Yeah, I believe it was through The Wire, or
4  it might have been a form.  I can't remember
5  specifically.
6    Q.   Okay.  Did you ever have to request --
7    A.   The process has changed.
8    Q.   The process has changed?
9    A.   Yeah, it's changed several times.  I
10 remember having to send a form, but then I remember
11 sometimes I'd have to -- yeah, there were times where I
12 had to request it in the computer also.
13   Q.   Did you ever have to request an interview
14 packet be retrieved from Iron Mountain?
15   A.   I don't recall.
16   Q.   Okay.  I'm curious -- so let's say I'm an
17 associate who worked at Walmart in 2004.  I left in
18 2005.  My personnel file gets transferred first in your
19 office to that terminated file, then goes to the claim
20 storage area, then makes it to Iron Mountain.  Let's
21 say that all happens in, like, 2008.  Now that
22 personnel file is in Iron Mountain.  Are you following
23 me?
24   A.   Yes.

Page 80

1    Q.   If I returned to work at Walmart in 2009,
2  would my personnel file start anew with just my 2009
3  stuff, or would you have to --
4    A.   Yes.
5    Q.   -- go back and get it?
6    A.   No, it would start new.
7    Q.   Okay.
8    MS. GUTTAU:  I'm going to object.  Form and
9  foundation.  I'll try to be faster.
10 BY MR SHULTZ:
11   Q.   How would they make it to Iron Mountain?
12 Would they ride on a Walmart truck?  Would UPS come and
13 pick them up?
14   MS. GUTTAU:  Form and foundation.
15   THE WITNESS:  I don't recall who comes and gets
16 it.  I almost want to say it was a Walmart truck, but I
17 can't be for sure.  I would put the boxes on a pallet,
18 shrink wrap it, and then somebody would come and get
19 it.
20 BY MR SHULTZ:
21   Q.   All right.  I think one last exhibit on the
22 Consumables Department manager stuff, and then we can
23 move on to the pumping room.
24   MR. SHULTZ:  So we're moving along, which it is

Page 81

1  12:30.  I think after we go through this spreadsheet,
2  we'll be in a good spot to either take a small break or
3  take a lunch break.  So just give some thoughts on what
4  you prefer.
5    MS. GUTTAU:  Yeah, so ours is coming about one,
6  but we can still break whenever.  So yeah, let's see
7  where you're at when done with this, and we'll see what
8  time it is.
9    MR. SHULTZ:  Who's coming at one?
10   MS. GUTTAU:  Our lunch.
11   MR. SHULTZ:  Oh, got you.  Then it sounds like we
12 should take a lunch break.
13   All right.  This is the spreadsheet 626, Heidi.
14 And this will be Exhibit 6.  Wait, this isn't what I
15 want.  I'm looking for 2120 actually.
16   MS. GUTTAU:  Okay.
17   MR. SHULTZ:  I'm not sure what will be easiest for
18 you, but I'll post it in the chat and I'll also have it
19 on my screen.  There's quite a few worksheets in this
20 workbook though.
21         (Whereupon Elrod Exhibit No. 6
22         was marked for identification
23         by the court reporter.)
24   MS. GUTTAU:  You said you put it in the chat?

Page 82

1      MR. SHULTZ:  Yeah, I will eventually.
2      MS. GUTTAU:  Okay.
3      MR. SHULTZ:  I'm saving it to a new naming
4  convention to keep it straight on my end.  Okay.  And
5  now I'm pasting it in the chat.  It's probably best to
6  open up this one.
7      MS. GUTTAU:  In the chat?
8      MR. SHULTZ:  Yeah.
9      MS. GUTTAU:  Okay.
10      MR. SHULTZ:  Just take a look at it if you can.
11  If you can't, let me know, and we can make do, but --
12      MS. GUTTAU:  Okay.  One second.  It's just slow to
13  open here.
14      MR. SHULTZ:  No worries.
15      THE WITNESS:  What in the world?
16      MS. GUTTAU:  Did I hit too many times?  I got
17  impatient.  Okay.
18      MR. SHULTZ:  I think we'll probably --
19      MS. GUTTAU:  It's working.
20      MR. SHULTZ:  Okay.
21      MS. GUTTAU:  It's working now.  We're good.
22      MR. SHULTZ:  Excellent.  For the record, exhibit
23  -- Elrod Exhibit 6 is an Excel file, file named
24  Walmart_Johnson_0002120.

Page 83

1  BY MR SHULTZ:
2      Q.   So there's quite a lot of information in
3  here, Lisa.  I'm not going to ask you much about -- I'm
4  going to focus on the "CP-Internal Interview Ratings"
5  worksheet, but I'll let you play around with the
6  spreadsheet as well.
7      MS. GUTTAU:  Internal -- which one is it again?
8  Internal Applicants Interviews?
9      MR. SHULTZ:  Ratings.  Yes.
10      MS. GUTTAU:  Internal Interview Data?  Oh,
11  ratings.
12      MR. SHULTZ:  There you go.
13      MS. GUTTAU:  Okay.  There we go.  All right.
14  We're there now.
15      MR. SHULTZ:  Am I still sharing as well?
16      MS. GUTTAU:  Let me look.
17      MR. SHULTZ:  Oh, you're using up all the real
18  estate for the Excel thing.  Okay.  Got you.
19      MS. GUTTAU:  Yeah, but you're sharing, too, so
20  that's fine.
21      MR. SHULTZ:  Okay.
22      MS. GUTTAU:  It's a little bit smaller.
23  BY MR SHULTZ:
24      Q.   So this says that Kendra Mouton interviewed

Page 84

1  Abigail Hunt on March 1st, 2018.  Do you see that?
2      A.   I do.
3      Q.   I'll just represent that this requisition ID
4  is 24924329.  There's the requisite deposition ID for
5  the Consumables Department manager position we've been
6  talking about.  Okay?
7      A.   Okay.
8      Q.   So we can see that this is the hourly
9  salaried manager interview.  And there's -- this column
10  appears to be a question that was asked.  It says,
11  "Outstanding service to our Walmart customers is
12  extremely important.  Provide an example of a time when
13  you went above and beyond in the customer service you
14  provided to an external customer, a fellow associate,
15  or another individual outside the workplace."  Do you
16  see that?
17      A.   I do.
18      Q.   And then the "Answer Rate Description" is
19  "Solid Performer."  Do you see that?
20      A.   Yes.
21      Q.   So, from this, it appears that Kendra rated
22  Abigail Hunt as a solid performer on that question that
23  I just read.  Is that right?
24      A.   Correct.

Page 85

1      MS. GUTTAU:  Form and foundation.
2  BY MR SHULTZ:
3      Q.   And obviously, you weren't in this
4  interview, right?
5      A.   Correct.
6      Q.   Okay.  But that's how you would read this
7  file?
8      A.   Yes.
9      Q.   And this tab is labeled "CP - Internal
10  Applicant," that I want to look at next.
11      MS. GUTTAU:  CP internal?  Okay.
12      MR. SHULTZ:  Yup.
13      MS. GUTTAU:  Okay.  There we go.  Okay.
14  BY MR SHULTZ:
15      Q.   This one file appears to be a list of
16  internal applicants with various data recorded for
17  where they made it in the process in columns U and V.
18  Do you see that?
19      A.   Uh-huh.  Yes.
20      Q.   So, like Chastity McNabb, which is the first
21  person, her "Candidate Selection from Pool" was
22  completed, yes?
23      A.   Yes.
24      Q.   And then "Schedule Manager Interview" for

position statement, which I know you haven't reviewed
because it talks about Elko.  And I think Hillary had
said that those weren't things she had discussed with
Tiffanee.  At the time this was occurring, was your
last name Macko?

    A.   Yes.
    Q.   Okay.
    A.   Yes.
    Q.   Okay.  Similar.
    A.   Yes.  That was my maiden name.
    Q.   Okay.  You said you didn't have a lot of
notice about getting a pumping room lined up.  When did
Tiffanee first mention needing a pumping room?
    A.   I don't recall a specific date or time, but
I know she was coming from being an overnight associate
to a day associate.
    Q.   After she came back from maternity leave?
    A.   Yes, I believe so.
    Q.   Talking about on exhibit -- the map, the
blueprint -- and I'm not sure what we marked that for
this depo.
    MS. GUTTAU:  Was it 2?
    MR. SHULTZ:  Yes.
BY MS. GUTTAU:

    Q.   Okay.  Looking at Exhibit 2, so the offices
we talked about -- or that you talked about with Miles
are assistant manager's office, and store manager's
office are two and four.  So just to make sure I'm
clear, so managers would keep personal items, purses,
keys, that type of thing in those offices?
    A.   Yes.
    Q.   So if somebody is in there pumping, and a
manager just came off their shift and needs to go home,
if somebody's using it, they would have to wait 30 to
40 minutes to get in there to get their stuff and go
home?
    A.   Correct.
    MR. SHULTZ:  Object to form.
    THE WITNESS:  According to policy, they have to be
uninterrupted.
BY MS. GUTTAU:
    Q.   Okay.  Yeah.  And when you say they, nursing
moms?
    A.   Yes.
    Q.   And so, is that the kind of traffic that was
a consideration for you?
    A.   Yes.
    Q.   The policy, the mother support policy talks

about providing a secure private location with
electricity.  And did you believe that you were doing
that for Tiffanee?
    A.   Yes.
    Q.   Then I want to just switch gears back to the
promotion involving the promotion that Abby Hunt got.
Just a couple of follow-up questions.  As far as the
interview rating packets, the assistant manager or
managers did not have to write notes on the packets,
did they?
    A.   No.
    Q.   Do you have a recollection of if they
usually did or did not?
    A.   I would say most of the time, they did not.
    Q.   When we looked at the requisition of -- I
think Miles covered with you in detail the requisition
that -- or, I'm sorry -- the CP interview data that
showed who all was in the running and then selected for
interviews and interviewed.  Do you recall that?
    A.   Yes.
    Q.   And I wrote down a couple of the names who
were not selected for interview, and one was Cody █.
Is Cody a male?
    A.   Yes.

    Q.   Does Cody have any children?
    A.   No, he's never been married.
    Q.   And then Brian S██████.  Do you know
Brian?
    A.   Yes.
    Q.   Also male?
    A.   Yes.
    Q.   Does he have children?
    A.   No.
    Q.   One second.  If Tiffanee quit at the end of
May in 2018 -- and I can represent to you that she
filed her charge in December of 2018 with the EEOC --
so it would be about seven months' time period in 2018
-- is it likely that you would have still had her
personal records at the store?
    A.   Yes.
    Q.   Okay.
    MS. GUTTAU:  Nothing further.
    MR. SHULTZ:  A few follow ups.
                    EXAMINATION
BY MR SHULTZ:
    Q.   Out of thousands of hiring events you were a
part of, I believe you testified most of the times that
you don't specifically remember anything about the

Page 138

interview packet for the Consumables Product Manager
job requisition that we were talking about?  You don't
remember one way or the other whether or not the
interview questionnaire form had been filled out for
the other two interviewees, right?

    A.   I don't recall.

    Q.   So, going back to that list of names, I
think Heidi asked you about Cody and Brian.  What about
Jack H████?  Do you remember him?

    A.   I do.

    Q.   And does he -- did he have small kids at the
time?

    A.   I don't -- I don't recall.  I think he might
have had some kids through his marriage.  Through his
-- when he got married, I think she had kids, the wife,
but I don't recall if they were little or not.

    Q.   And how about Kimberly S████?  Do you
remember her?

    A.   I don't.  The name sounds familiar, but I
don't recall her.

    Q.   And you do recall Chastity M████?  Did she
have small kids in early 2018?

    MS. GUTTAU:  Foundation.

    THE WITNESS:  She did have children, but I don't

Page 139

recall the age.

BY MR SHULTZ:

    Q.   And Abigail Hunt didn't have any children in
2018, correct?

    A.   Correct.

    MR. SHULTZ:  That is all I have.  Thank you, Lisa.

    THE WITNESS:  You're very welcome.

    MS. GUTTAU:  Nothing further.  And you do have the
right to read your deposition transcript.  You can't
make any substantive changes, but you can waive that
right.  Most people waive it because you can't change
anything anyway.  And the court reporter has it on
recording until she gets it transcribed.  It's up to
you, though.

    THE WITNESS:  I'll waive.

    THE COURT REPORTER:  Okay.  I'm going to go off
the record, but I just have a couple more spelling
questions before you --

    MS. GUTTAU:  Sure.

    THE COURT REPORTER:  Okay.  So off the record at
2:57.

                    (Whereupon the deposition
                    adjourned.)

Page 140

SIGNED CERTIFICATE

    THOMPSON REPORTERS hereby certify that the
attached pages represent an accurate transcript of the
electronic sound recording of the remote
videoconference proceedings in the Circuit Court for
Cook County in the matter of:


        CIVIL ACTION NO. 4:22-cv-00037
    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                        v.
    WALMART INC., and WAL-MART STORES EAST, LP


    By:


            *Colleen Callahan-Poley*

    COLLEEN CALLAHAN-POLEY, CET #1250
    Thompson Court Reporters, Inc.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 443-2018-02537 |

| Wisconsin Equal Rights Division | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone | Year of Birth |
|---|---|---|
| Ms. Tiffanee Johnson | PII | |

| Street Address | City, State and ZIP Code |
|---|---|
| PII | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| WALMART | 501+ | (641) 683-1040 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1940 Venture Drive,  SOUTH OTTUMWA, IA 52501 | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

| | | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|---|
| ☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | | Earliest: 01-01-2018   Latest: 05-24-2018 |
| ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION | | |
| ☐ OTHER (Specify) | | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began employment with the above Respondent in June 2014, as an Overnight Stocker. My most recent position was Service and Sales Associate. Throughout my employment, I was referred to as the Black Tiffanee. Between January and May 24, 2018, I applied for three different Department Manager positions and was not selected. Around January 16, 2018, Respondent provided an unsanitary utility closet for my nursing break unlike my White coworker who was previously provided a managers office. On May 24, 2018, I was forced to quit.

I believe that the Respondent discriminated against me when I was denied promotions, subjected to different terms and conditions of employment and constructively discharged because of my race (Black) and sex (female-pregnancy) in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Digitally signed by Tiffanee Johnson on 12-19-2018 03:44 PM EST | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

*Johnson*

EXHIBIT NO. 11
SARAH DITTMER
888-388-2723

EEOC_0000172

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA, CENTRAL DIVISION

|  |  |  |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 4:22-cv-00037 |
| v. | ) ) ) | C O M P L A I N T |
| WALMART INC., AND WAL-MART STORES EAST, LP | ) ) ) | JURY TRIAL DEMAND |
| Defendants. | ) ) ) | |

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 to correct unlawful

employment practices on the bases of sex and race and to provide appropriate relief to Tiffanee

Johnson ("Johnson"). As alleged with greater particularity below, Defendants Walmart Inc. and

Wal-Mart Stores East, LP (collectively "Walmart") discriminated against Johnson on the basis of

sex by failing to promote her because of her sex, specifically her recent childbirth and/or based

on stereotypes about women with small children at home. Walmart also discriminated against

Johnson, who is Black, on the basis of her race when it provided her an unsanitary storage closet

in which to express breast milk, a space that was inferior to the clean office space it provided to a

white employee for the same purpose.

## JURISDICTION AND VENUE

1.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337,

1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3) ("Title

VII") and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

1

Johnson
EXHIBIT NO. 12
SARAH DITTMER
888-388-2723

2.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Southern District of Iowa.

PARTIES

3.      Plaintiff Equal Employment Opportunity Commission (the "Commission") is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1).

4.      At all relevant times, Walmart Inc. has continuously been a Delaware corporation doing business in the State of Iowa and the City of Ottumwa.

5.      At all relevant times, Walmart Inc. has continuously had at least 15 employees.

6.      At all relevant times, Walmart Inc. has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

7.      At all relevant times, Wal-Mart Stores East, LP has continuously been a Delaware limited partnership doing business in the State of Iowa and the City of Ottumwa.

8.      At all relevant times, Wal-Mart Stores East, LP has continuously had at least 15 employees.

9.      At all relevant times, Wal-Mart Stores East, LP has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

ADMINISTRATIVE PROCEDURES

10.     More than thirty days prior to the institution of this lawsuit, a charge was filed with the Commission alleging violations of Title VII by Walmart.

2

11.     On August 20, 2019, the Commission issued to Walmart a Letter of Determination finding reasonable cause to believe that Walmart violated Title VII by denying her promotion based on sex, and subjecting her to different terms and conditions of employment when she was provided an inferior space for expressing breastmilk based on race.

12.     The Commission invited Walmart to engage in informal conciliation efforts to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

13.     The Commission engaged in communications with Walmart to provide Walmart the opportunity to remedy the discriminatory acts described in the Letter of Determination.

14.     The Commission was unable to secure from Walmart a conciliation agreement acceptable to the Commission.

15.     On July 26, 2021, the Commission issued to Walmart a Notice of Failure of Conciliation.

16.     All conditions precedent to the institution of this lawsuit have been fulfilled.

STATEMENT OF CLAIMS

17.     Beginning on or about January 2018, Walmart engaged in unlawful employment practices at its Ottumwa, Iowa store, in violation of Section 703 of Title VII, 42 U.S.C. § 2000e-2(a), by failing to promote Johnson on the basis of sex:

(a)     Johnson was an employee of Walmart starting in 2014.

(b)     From October 2017 through January 2018, Johnson was on maternity leave after the birth of her child.

(c)     Johnson applied for a pet department manager position in February 2018 after she passed the manager's test and Walmart managers encouraged her to apply for a department manager position.

3

(d)    Johnson was interviewed for the pet department manager position by assistant manager Kendra Moulton.

(e)    Defendant did not select Johnson for the promotion to pet department manager.

(f)    When Johnson asked Moulton why she was not selected for the promotion, Moulton told her that the decisionmakers wanted to promote someone who they thought would stay with the company long-term and eventually seek a further promotion to assistant manager, and that the decisionmakers did not think Johnson wanted those things because she had small children at home.

(g)    Johnson had at least three more years of experience working at Walmart than the person who was promoted to the pet department manager position.

(h)    The person who was promoted did not have small children at home.

(i)    Walmart's decision not to promote Johnson was based on her recent childbirth and/or an assumption that working women with small children will not stay in the workforce long-term and/or seek further promotion.

18.    Beginning on or about January 2018, Walmart engaged in unlawful employment practices at its Ottumwa, Iowa store, in violation of Section 703 of Title VII, 42 U.S.C. § 2000e-2(a), by subjecting Johnson to different terms and conditions of employment based on race:

(a)    When Johnson returned to work after her maternity leave, she asked Walmart to provide her a place to express breast milk.

(b)    Walmart provided her a storage closet in which to express breast milk,

4

which was a cluttered and dirty closet that had dead bugs on the floor.

    (c)    The storage closet Walmart provided Johnson was inferior to the clean management office that Walmart previously provided to a white employee for the same purpose.

    (d)    The reasons Walmart offered for assigning Johnson an inferior pumping space are pretextual because they are contradicted by Walmart's own policies on support for breastfeeding mothers.

    19.    The effect of the practices complained of above has been to deprive Johnson of equal employment opportunities and otherwise adversely affect her status as an employee, because of her race and sex.

    20.    The unlawful employment practices complained of above were intentional.

    21.    The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Johnson.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

    A.    Grant a permanent injunction enjoining Walmart, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from engaging in any employment practice that discriminates based on race or sex;

    B.    Order Walmart to institute and carry out policies, practices, and programs which provide equal employment opportunities for its employees regardless of sex or race, and which eradicate the effects of its past and present unlawful employment practices;

5

     C.     Order Walmart to make whole Johnson, by providing appropriate backpay and prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices;

     D.     Order Walmart to make Johnson whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, in amounts to be determined at trial.

     E.     Order Walmart to make whole Johnson by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above, including (but not limited to) emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

     F.     Order Walmart to pay Johnson punitive damages for its malicious and reckless conduct, as described above, in amounts to be determined at trial.

     G.     Grant such further relief as the Court deems necessary and proper in the public interest.

     H.     Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its complaint that do not relate solely to equitable relief.

CHRISTOPHER LAGE
Deputy General Counsel

GWENDOLYN REAMS
Associate General Counsel
U.S. Equal Employment Opportunity
Commission
131 M. Street, N.E.
Washington, D.C. 20507

6

Gregory Gochanour
Regional Attorney

Justin Mulaire
Supervisory Trial Attorney

*s/Kelly Bunch*
Kelly Bunch (IL # 6323195)
Trial Attorney

U.S. Equal Employment Opportunity
Commission
Chicago District Office
230 S. Dearborn Street - Suite 2920
Chicago, IL  60604
*Telephone*:   (312) 872-9704
*E-mail*:       justin.mulaire@eeoc.gov
*E-mail*:       kelly.bunch@eeoc.gov


*s/Hannah Henkel*
Hannah Henkel (# 6324037)
Trial Attorney
U.S. Equal Employment Opportunity
Commission
Reuss Federal Plaza
310 West Wisconsin Avenue, Suite 500
Milwaukee, WI 53203
*Telephone*:   (414) 662-3680
*E-mail*:       hannah.henkel@eeoc.gov

7

830

## EEOC (INQUIRY) NUMBER: 443-2018-02537

### Inquiry Information

**REASON(S) FOR CLAIM**

Date of Incident (Approximate): 06/06/2018

Reason for Complaint: Race, Color

Pay Disparity:

Location of Incident: Iowa

Submission (initial inquiry) Date: 09/27/2018

Claim previously filed as charge with EEOC? No

Approximate Date of Filing: N/A

Charge Number: N/A

Claim previously filed as complaint with another Agency? No

Agency Name: N/A

Approximate Date of Filing: N/A

Nature of Complaint: N/A

**INQUIRY OFFICE**

Receiving: Milwaukee Area Office

Accountable: Milwaukee Area Office

**APPOINTMENT**

Appointment Date and time: 10/01/2018 08:30 AM US/Central

Interview Type: Phone

**APPROXMATE DEADLINE FOR FILING A CHARGE:** 04/02/2019

**POTENTIAL CHARGING PARTY**

First Name, Middle Initial: Tiffanee

Last Name: Johnson

Street or Mailing Address: PII

Address Line 2: 5

Johnson
EXHIBIT NO. L3
SARAH DITTMER
888-388-2723

EEOC_0000185

City, State, Zip:  [ PII ]

Country:  UNITED STATES OF AMERICA

Year of Birth:

Email Address:  [ PII ]

Home Phone Number:

Cell Phone Number:  [ PII ]

## RESPONDENT

Organization Name:  WALMART

Type of Employer:  Business or non-profit organization that I applied to, work for, or worked for

Number of Employees:  20 or more employees

Street or Mailing Address:  1940 venture drive

Address Line 2:

City, State, Zip Code:  SOUTH OTTUMWA,IA, 52501

County:  wapello

Phone Number:  (641) 683-1040

## RESPONDENT CONTACT

First and Last Name:  lisa macko

Email Address:

Phone Number:

Title:  Human Resources Director or Owner

## LOCATION OF POTENTIAL CHARGING PARTY'S EMPLOYMENT

Street or Mailing Address:

Address Line 2:

City, State, Zip Code:

County:

## POTENTIAL CHARGING PARTY'S DEMOGRAPHICS

Gender:  F

EEOC_0000186

**Disabled:** I do not have a disability

**Are you Hispanic or Latino?** not hispanic or latino

**Ethnicity:** Black or African American,

**National Origin:** American(U.S.)

**Adverse Action(s)**

hurt myself at work was told if i left i would get fired. they never filed a accident report until they had to pay for physical therapy months later im being billed for it, several times was given the run around or excuses about promotions, had me pumping breast milk in a disgusting closet, was sexually assaulted by a customer and was told they have to make sure i didnt basically do anything to protect myself and nothing was done about the situation, was being called the black tiffanee

## Supplemental Information

**What Reason(s) were you given for the action taken against you?**

when i hurt myself it was he shouldve filed a report and let you go to the hospital so i dont know why he didnt. when i was assaulted i was told it would be taken care of and never heard anything from him again. when i approached him he didnt even know who i was. when i was pumping milk it was oh id didnt think it was a problem for promotions it was oh the other person wants to eventually be a assistant manager and we didnt think you did but yet never asked me or never weas interviewed for another 1 or gave it to her best friend cause she was more qualified

**Was anyone in a similar situation treated the same, better, or worse than you?**

yes the other people that applied was treated better than me. i was told i would hear something back by the end of that day or the next and she didnt get back with me until 2 weeks later. other people of color tried for other positions and was never promoted

**Please provide name(s) and email and/or phone number of anyone who will support your claim, and briefly describe the information this person will provide.**

tiffany shafer,6417770977, will confirm i was denied going to the hospital and will confirm me being called the black tiffanee.

**Please tell us any other information about your experience?**

i have a video of being being assaulted and of the closet i was pumping in. i have text and the bill saying workers comp wont pay because i didnt inform a manager when i in fact did

EEOC_0000187

**Job Description**

**Department Manager**



This position is responsible for assisting in the operation of a department.  An individual in this position will be expected to perform additional job related responsibilities and duties throughout the facility as assigned and/or as necessary.

## Essential Functions

*An individual must be able to successfully perform the essential functions of this position with or without a reasonable accommodation.*

Maintains area of responsibility in accordance with company policies and procedures by properly handling claims and returns, zoning the area, arranging and organizing merchandise/supplies, identifying shrink and damages, and ensuring a safe work environment.

Maintains merchandise presentation by stocking and rotating merchandise, removing damaged or out-of-date goods, setting up, cleaning, and organizing product displays, signing and pricing merchandise appropriately, and securing fragile and high-shrink merchandise.

Provides customer service by acknowledging the customer, identifying customer needs, assisting with purchasing decisions, locating merchandise, resolving customer issues and concerns, promoting products and services, maintaining a safe shopping environment, and appropriately representing and supporting the company's mission.

Receives and stocks merchandise/supplies from distribution centers and suppliers throughout the facility and organizes and maintains facility by following company procedures, utilizing equipment appropriately, merchandising, and completing and retaining required paperwork, logs, and other documentation.

Supervises associates in the area of responsibility by assigning duties, communicating goals, providing feedback and follow-up, monitoring performance, teaching and supporting company policies and procedures, ensuring compliance, and participating in the hiring, promotion, coaching, teaching, and evaluation of associates.

Performs competition shopping in accordance with company and legal policies and procedures by utilizing appropriate equipment and tools, completing and maintaining lists and reports, and communicating changes and issues to management.

Drives the achievement of financial goals by managing Customer Inventory Flow Process and SWAS planning.

## Competencies

*An individual must be proficient in each of the competencies listed below to successfully perform the responsibilities of this position.*

Leads Inventory Operations - Helps associates understand and apply safe and correct ways to handle, move, and display goods, and does the same in own work. Carries out the inventory process to help improve replenishment and receiving and to reduce shrinkage. Identifies poor inventory practices and low in-stock levels in assigned area, and reports them with ideas for corrective action. Demonstrates and helps others with the safe and proper use and maintenance of inventory tools and equipment.

Enhance Experience in the Store - Supports the store of the community merchandising concept and suggests merchandise to management that meets the needs of local customers. Plans for customer service and sales based on events outside the store (for example, weather, gas prices, local events). Stays current on competitors' prices, products, and displays to suggest to management ways to improve the store. Recommends ways to provide a convenient, safe, and pleasant shopping experience for customers. Shows associates how to address customer, merchandise, and store issues.

Leads Merchandising Operations - Proactively identifies Customers who need help and provides accurate information on products and services. Models and helps others with how to identify and meet Customer needs in a timely manner. Identifies problems with products, services, and work areas, and takes steps to fix the problem. Helps others with safe and proper use and maintenance of equipment and supplies, and does the same in own work.

Customer/Member Centered: Satisfy the Customer/Member - Uses information and feedback to determine customer/member expectations. Works with others to exceed customer/member expectations. Seeks out ways to improve customer/member service. Teaches others how to find and use resources to respond to customer/member requests.

Planning and Improvement: Plan for and Improve Team Performance - Plans work based on business priorities and explains to others what is needed to get work done. Identifies and oversees the tasks needed to reach goals. Looks for and suggests ways to improve performance and results.

Influence and Communicate: Communicate and Promote Commitment - Gives the information needed to gain support for ideas or plans. Builds trusting relationships and works with others to reach goals. Shares clear priorities and work practices with others. Prepares written work that is accurate and complete. Communicates in a respectful and professional manner.

Adaptability: Adapt to Requirements - Adapts to changing demands and business needs. Encourages and embraces change, even when others hesitate. Builds the knowledge and skills to handle challenges and tasks. Sets an example for others when implementing changes (for example, readily carries out improvement efforts, handles change-related issues). Shows support for, commitment to, and trust in changes.



*Johnson*
**EXHIBIT NO. 14**
**SARAH DITTMER**
**888-388-2723**

WM_Johnson_0001763

App. 100

**Job Description**  Walmart

**Department Manager**

Judgment: Make Informed Choices - Makes timely and effective decisions, even when information is not clear. Identifies and uses policies, procedures, and guides to make the right choices. Uses resources, data, tools, and facts to set priorities and make informed decisions. Identifies what might be a problem and corrects it or clearly describes it to those who can correct it.

Execution and Results: Oversee Work and Get Results - Makes sure work is completed to expectations. Executes plans and manages own and others' time so that priorities are met. Gives others the support and information they need to get results. Organizes tasks and makes sure they are completed on time.

Ethics and Compliance: Oversee Performance to Ethical Standards - Clearly explains policies and procedures and teaches others how to act in accordance with them. Guides associates on how to use the highest standards of integrity and ethics in their work. Helps managers find and correct ethical and legal problems. Treats all associates fairly and with respect.

Talent: Provide Information and Feedback - Guides and teaches associates on how to perform their work. Assigns tasks to associates and provides the tools they need to carry them out. Gives clear, constructive feedback on performance to associates and leaders. Recognizes associates for their positive contributions. Shows concern for associates and is available to meet with them. Looks for and follows up on developmental opportunities.

## Physical Activities
*The following physical activities are necessary to perform one or more essential functions of this position.*

Observes associate, customer, or supplier behavior.

Enters and locates information on computer.

Creates documents, reports, etc., using a writing instrument (such as a pencil or pen) or computer.

Grasps, turns, and manipulates objects of varying size and weight, requiring fine motor skills and hand-eye coordination.

Visually verifies information, often in small print.

Reads information, often in small print.

Visually locates merchandise and other objects.

Reaches overhead and below the knees, including bending, twisting, pulling, and stooping.

Moves, lifts, carries, and places merchandise and supplies weighing up to 25 pounds without assistance.

## Work Environment
*Working in the following environment is necessary to perform one or more of the essential functions of this position.*

Works overnight and on varying shifts as required.

## Entry Requirements
### Minimum Qualifications
- Will successfully complete all job required trainings and assessments.

WM_Johnson_0001764

App. 101

**Job Description**

**Department Manager**

Walmart ⁑

**Signature**

I have read and understand the essential functions for this position and certify that:

_____  I have the ability to perform the essential functions of this position either with or without a reasonable accommodation.

_____  I do not have the ability to perform the essential functions of this position either with or without a reasonable accommodation.

_____        _____        _____
Associate/Applicant Printed Name              Associate/Applicant Signature                              Date

WM_Johnson_0001765

App. 102

Johnson
EXHIBIT NO. 15
SARAH DITTMER
888-388-2723

| REQUISITION_ID | REQOPENDT | STORE_NBR | REQ_MOSE | REQ_DEPT | TIER_GROUP_NBR | REQ_JOB | WIN_NBR | FIRST_NAME | LAST_NAME | DOH | GENDER_CODE | IS_EXCEPTION | ASC_REQSN_STATUS | EEOC_CODE | RACE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | CHASTITY | █ | 3/20/2014 | F | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | CHASTITY | █ | 3/20/2014 | F | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | CHASTITY | █ | 3/20/2014 | F | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | JACK | █ | 9/20/2005 | M | N | ApplStatus - Default | | 3 HISPANIC OR LATINO |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | CODY | █ | 4/11/2006 | M | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | COREY | █ | 12/2/2017 | M | N | ApplStatus - Default | | 2 AFRICAN AMERICAN OR BLACK (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | KIMBERLY | █ | 5/12/2018 | F | N | ApplStatus - Default | | 8 TWO OR MORE RACES (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | TIFFANEE | █ | 6/27/2014 | F | N | ApplStatus - Default | | 2 AFRICAN AMERICAN OR BLACK (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | TIFFANEE | █ | 6/27/2014 | F | N | ApplStatus - Default | | 2 AFRICAN AMERICAN OR BLACK (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | TIFFANEE | █ | 6/27/2014 | F | N | ApplStatus - Default | | 2 AFRICAN AMERICAN OR BLACK (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | BRYAN | █ | 9/19/2014 | M | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | JAMES | █ | 4/24/2015 | M | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | ABIGAIL | █ | 4/5/2017 | F | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | ABIGAIL | █ | 4/5/2017 | F | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | ABIGAIL | █ | 4/5/2017 | F | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | ABIGAIL | █ | 4/5/2017 | F | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | ABIGAIL | █ | 4/5/2017 | F | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |
| 24924329 | 2018-02-16 00:00:00.000 | 1285 | 1 | 2 | 1 | 101 | | ABIGAIL | █ | 4/5/2017 | F | N | ApplStatus - Default | | 1 WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) |

| TASK_NBR | TASK_STATUS | TASK_TIME | UPDATE_WIN_NBR | TASK_DESC | TASK_STATUS_DESC |
|---|---|---|---|---|---|
| 11 | 3 | 2018-02-26 15:36:16.927 | | Candidate Selection from Pool | Completed |
| 18 | 3 | 2018-02-26 15:37:27.770 | | Schedule Manager Interview | Completed |
| 19 | 1 | 2018-02-26 15:37:27.797 | | Enter rating for Mgr Int. | Pending |
| NULL | NULL | NULL | | N/A | Not Selected |
| NULL | NULL | NULL | | N/A | Not Selected |
| NULL | NULL | NULL | | N/A | Not Selected |
| 11 | 3 | 2018-02-26 15:36:17.027 | | Candidate Selection from Pool | Completed |
| 18 | 3 | 2018-02-26 15:39:32.827 | | Schedule Manager Interview | Completed |
| 19 | 1 | 2018-02-26 15:39:32.837 | | Enter rating for Mgr Int. | Pending |
| NULL | NULL | NULL | | N/A | Not Selected |
| NULL | NULL | NULL | | N/A | Not Selected |
| 11 | 3 | 2018-02-26 15:36:16.990 | | Candidate Selection from Pool | Completed |
| 18 | 3 | 2018-02-26 15:38:06.010 | | Schedule Manager Interview | Completed |
| 19 | 3 | 2018-03-01 17:23:43.420 | | Enter rating for Mgr Int. | Completed |
| 35 | 3 | 2018-03-01 17:29:16.703 | | Accept Associate | Completed |
| 51 | 3 | 2018-03-01 17:24:05.193 | | Submit Job Offer Request | Completed |
| 52 | 3 | 2018-03-01 17:24:40.233 | | Approve Job Offer Request | Completed |
| 53 | 3 | 2018-03-01 17:29:15.593 | | Conduct Job Offer | Completed |

App. 103

WM_Johnson_002120 – Excel Tab Page labeled "CP-Internal Applicants"

## Wal-Mart Stores, Inc.
### EXIT INTERVIEW

**Printed From GAIN - GAIN # 12406709**

**Associate Name :** TIFFANEE JOHNSON   **WIN :** 220122960   **SSN # :** xxx-xx-1810

**Address :** 1800 SCHWORM STREET APT 5, OTTUMWA, IA - 52501  US    **Phone:** 6419549074

**Facility #:** 1285   **Division # : 1**   **Associate Type:** Hourly

**Last Worked Date:** 05/24/2018   **Effective Date:** 05/24/2018

**Last Position Held:-**   **Last Rate of Pay:**

**The following applicable Wal-Mart property must be collected at the time of Exit Interview.**

  Badge    Discount Card    Membership Card    Company Issued Clothings    Weight Belt

  Box Cutter    Freezer Gear

**Note :** To be considered for re-employment, you must re-apply. Your previous work record with Wal*Mart Stores, Inc. will be reviewed.
The Company assumes no obligation to contact you for possible re-employment. Where state laws allow, a Neutral Reference will be provided to external employers seeking information regarding your employment with Wal*Mart Stores, Inc. Dates of employment and last position held is the only information that will be released.

**Termination Type:** Voluntary Termination

**Termination Reason:** Career Opportunities

**Eligible for Rehire Status:** Rehirable

**Last Day Worked:** 05/24/2018

Tiffanee is leaving our company due to a career opportunity outside of Walmart stores.

| | | | | |
|---|---|---|---|---|
| **Associate Name :** TIFFANEE JOHNSON | **Date:** | **05/24/2018** | Electronic Acknowledge: | Yes |
| **Supervisor Name :** CASSANDRA RIEGEL | **Date:** | **05/24/2018** | Electronic Acknowledge: | Yes |
| **Witness Name :** ROBERT WRIGHT | **Date:** | **05/24/2018** | Electronic Acknowledge: | Yes |

**Provided below is important information related to your separation....**

| | | |
|---|---|---|
| COBRA | Continuation of Benefits | (800) 421-1362 |
| DISCOUNT CARD - RETIREE | Application Information | (800) 421-1362 |
| LIFE INSURANCE | Conversion of Benefits | (877) 740-2116 * must call within 31 days of date coverage ends |
| PROFIT SHARING | Account Information | (888) 968-4015 |
| STOCK OWNERSHIP | Account Information | (800) 438-6278 |
| 401K | Account Information | (888) WMT401K OR (888) 968-4015 |
| RESOURCES FOR LIVING | Counseling Service | (800) 825-3555 |

Print | Close



Johnson
EXHIBIT NO. 16
SARAH DITTMER
888-388-2723

WM_Johnson_0000354

App. 104

```
         IN THE UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF IOWA, CENTRAL DIVISION

EQUAL EMPLOYMENT            )
OPPORTUNITY COMMISSION,     )
                           )
           Plaintiff,      )
                           ) No.
     vs.                   ) 4:22-cv-00037-
                           ) SMR-SBJ
WALMART INC., and WAL-MART  )
STORES EAST, LP,           )
                           )
           Defendants.     )
```

> **EXHIBIT**
> **17**

        The remote videoconference deposition of

HILLARY ELKO, taken virtually before Angela M.

Ingham, Certified Shorthand Reporter and Registered

Professional Reporter within and for the State of

Illinois, pursuant to Federal Rule of Civil

Procedure 30, conducted via Zoom videoconference,

on January 23, 2023, at the hour of 9:30 a.m.

Page 2

```
1   APPEARANCES:
2       HS. HANNAH HENKEL
        MR. MILES SHULTZ
3       MR. JUSTIN MULAIRE
        EQUAL EMPLOYMENT OPPORTUNITY
4       COMMISSION
        230 South Dearborn Street
5       Suite 1866
        Chicago, Illinois 60604
6       312.872.9744
        hannah.henkel@eeoc.gov
7       miles.shultz@eeoc.gov
8           Appeared via videoconference on
            behalf of the Plaintiff;
9
        MS. HEIDI GUTTAU
10      BAIRD HOLM LLP
        1700 Farnam Street
11      Suite 1500
        Omaha, Nebraska 68102
12      402.344.0500
        hguttau@bairdholm.com
13
            Appeared via videoconference on
14          behalf of the Defendants.
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1           E X H I B I T S (Cont'd.)
2   NO.     DESCRIPTION                         PAGE
3   Plaintiff's  Deposition Exhibit Number
4   Exhibit 18  Walmart_Johnson_511, FY18 annual ..... 137
                performance evaluation for Kendra
5               Mouton
    Exhibit 19  Walmart_Johnson_445, breastfeeding ... 138
6               policy
    Exhibit 20  Walmart_Johnson_445, breastfeeding ... 143
7               policy
    Exhibit 21  Walmart_Johnson_623, breastfeeding ... 147
8               mothers' support policy management
                guidelines
9               (not attached)
    Exhibit 22  Walmart_Johnson_1608, blueprint of ... 147
10              Ottumwa store
    Exhibit 23  Walmart_Johnson_1608, blueprint of ... 156
11              Ottumwa store
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1               I N D E X
2   EXAMINATION                             PAGE
3   BY MS. HENKEL                              5
    BY MS. GUTTAU                            165
4   BY MS. HENKEL                           168
5               E X H I B I T S
6   NO.     DESCRIPTION                         PAGE
7   Plaintiff's  Deposition Exhibit Number
    Exhibit 1   Walmart_Johnson_1292, store hierarchy.  18
8               (not attached)
    Exhibit 2   Walmart_Johnson_452, salary ..........  19
9               management eligibility requirements
    Exhibit 3   Walmart_Johnson_343, chart............  25
10  Exhibit 4   Walmart_Johnson_346, four tables......  40
    Exhibit 5   Walmart_Johnson_463, estimated .......  55
11              associate commendation form
    Exhibit 6   Walmart_Johnson_353, spreadsheet .....  56
12              containing hiring data
    Exhibit 7   Walmart_Johnson_1289, Abigail Hunt ...  61
13              chart
    Exhibit 8   Walmart_Johnson_626, chart...........  68
14              (not attached)
    Exhibit 9   Walmart_Johnson_2045, job description  77
15              for the GM support manager chart
    Exhibit 10  Walmart_Johnson_629, chart...........  86
16  Exhibit 11  Walmart_Johnson_1584, job description  94
                for the consumables department manager
17              (not attached)
    Exhibit 12  Walmart_Johnson_1812, career .........  94
18              preference guide
    Exhibit 13  Walmart_Johnson_1945, Walmart ....... 103
19              requisition reviewing and selecting
                application hiring process
20  Exhibit 14  Walmart_Johnson_1917, hiring process, 117
                making the hiring decision
21  Exhibit 15  Walmart_Johnson_1961, flowchart...... 121
    Exhibit 16  Walmart_Johnson_2120, quick reference 123
22              guide to field management hiring
                managers
23  Exhibit 17  Walmart_Johnson_2120, spreadsheet .... 132
                containing hiring data for
24              requisition ID
```

Page 5

```
1       MS. REPORTER:  We'll now go on the record.  I
2   am not in the same location as the witness, and
3   this deposition is being conducted remotely.  Is
4   there any objection to my administering the oath
5   remotely?
6       MS. GUTTAU:  No objection.
7       MS. HENKEL:  No objection.
8           (Witness duly sworn.)
9       MS. HENKEL:  This deposition is the deposition
10  of Hillary Elko being taken pursuant to Federal
11  Rule of Civil Procedure 30.  My name is Hannah
12  Henkel.  I represent the plaintiff, Equal
13  Employment Opportunity Commission in this matter,
14  EEOC vs. Walmart.
15          HILLARY ELKO,
16  called as a witness herein, having been first duly
17  sworn, was examined and testified as follows:
18          EXAMINATION
19  BY MS. HENKEL:
20      Q.  Ms. Elko, good morning.
21      A.  Good morning.
22      Q.  Would you please state your full name.
23      A.  Hillary Diane Elko.
24      Q.  And could you please spell your first and
```

Page 18

1 Exhibit 1.
2       And I'm turning to table 3 under the
3 hierarchy tab; and, Ms. Elko, it identifies you as
4 the store manager in 2018 as we discussed before.
5 And when you were store manager, it looks like you
6 reported to the market manager, Mr. Joseph Becker,
7 is that correct?
8    A.  Yes.
9    Q.  Was that who you reported to?
10   A.  Yes.
11   Q.  And he reported to the senior director,
12 Luckie -- or Kyla Luckie, correct?
13   A.  Yes.
14   Q.  And as store manager, how many -- do you
15 remember how many departments you oversaw?
16   A.  As a store manager?  I was in charge of
17 the entire store.
18   Q.  So you were aware of the different types
19 of employees at the Ottumwa store based on your
20 experience as the store manager?
21   A.  Yes, yes.
22   Q.  I'm going to pull up Walmart Johnson 452.
23 It should be a PDF, and I'm sharing it up on the
24 screen as well.

Page 19

1    MS. GUTTAU:  Is it okay if I give her a paper
2 copy, too?
3    MS. HENKEL:  Of course.
4    MS. GUTTAU:  Okay.
5 BY MS. HENKEL:
6    Q.  And, Ms. Elko, this identifies the Walmart
7 salary management eligibility requirements up at
8 the top, do you see that?
9    A.  Yes.
10   Q.  And I'm going to mark this as Plaintiff's
11 Exhibit 2.
12       On this chart it states that store manager
13 is the first position listed under facility level
14 positions.  Were you the highest position at the
15 Ottumwa, Iowa, store?
16   A.  Yes.
17   Q.  And each of these positions listed below,
18 the co-manager, assistant manager, and auto care
19 manager, all reported to you?
20   A.  Yes.
21   Q.  Does the assistant manager position
22 include managers of the different departments?
23   A.  Sorry, can you ask that again?
24   Q.  I can rephrase.

Page 20

1       Were department managers part of the
2 facility level position of assistant manager, or
3 were they under the assistant managers?
4    A.  They were under the assistant managers.
5    Q.  But department managers do -- apologies,
6 let me rephrase.
7       Department managers did report to you as
8 well as the assistant managers and co-managers?
9    A.  Yes.
10   MS. GUTTAU:  Form.
11 BY MS. HENKEL:
12   Q.  Did department managers report to other
13 department managers?
14   A.  No.
15   Q.  I'm sorry, what was that?
16   A.  No.
17   Q.  I want to talk a little bit about the
18 promotion process at Walmart.
19       Who all is involved in the promotion
20 process for a department manager?
21   A.  It would be the assistant manager.  They
22 do the interviews for the requisition that they
23 have open, and the assistant manager will make a
24 determination based on the interview process, and

Page 21

1 then they give that paper to HR.
2    Q.  And how does the promotion process look
3 for assistant department managers?
4    MS. GUTTAU:  Form.  I think you said assistant
5 department, so that's, I think, the confusion, just
6 so you know.
7 BY MS. HENKEL:
8    Q.  Apologies.  No, I can ask a few
9 foundational questions as well.
10       Ms. Elko, are you aware of a type of
11 position at Walmart called assistant department
12 managers?
13   A.  No.
14   Q.  Who does department manager -- who do
15 department managers oversee in their position?
16   A.  Sales associates.
17   Q.  Was there a position at the Ottumwa, Iowa,
18 store that included assistants to a department
19 manager?
20   A.  I'm sorry, rephrase that.
21   Q.  Was there a position at the Ottumwa, Iowa,
22 store that was directly under the department
23 managers that was a step between a sales associate
24 and the department manager?

Page 170

1 where you said that they likely mixed you up with
2 Lisa, just in clarifying, now that we know that
3 Abby and Lisa were both HR personnel, was the main
4 person to check in with Lisa or does Abby have
5 relevant information as well?
6    MS. GUTTAU:  Form, foundation.
7    THE WITNESS:  I don't know.  I don't know who
8 that would be.
9 BY MS. HENKEL:
10    Q.  Okay.  And when you said you checked in to
11 see if the room had been cleaned up, did you check
12 in again with Abby?
13    A.  I followed up with both of them in HR.
14    Q.  Oh, you followed up with Lisa and Abby?
15    A.  Yeah.  I just said is the room cleaned?
16 Yes.  Okay.
17    Q.  But you were not involved with who cleaned
18 it or anything like that?
19    A.  No.  I don't have any knowledge of that
20 either.
21    Q.  And throughout today when we asked who the
22 best person was and you stated HR, who did you mean
23 by that?  Did you mean Lisa or Abby?
24    A.  Either one of them.  I mean, they're both

Page 171

1 HR.  Lisa has been there the longest, and she was
2 more of a personnel coordinator, I think, whereas
3 Abby, I believe, was more of the training aspect of
4 it.
5    Q.  Okay.  I believe that is all I have today.
6 Thank you so much for sitting with us, Ms. Elko.
7    A.  You're welcome.
8    MS. GUTTAU:  Thank you.
9        You have the right to read and review it,
10 or you can waive that.  You can't change anything
11 substantive, but you can read the transcript.  If
12 there's -- you think there's a typo or something
13 like that, you can make a note, but you can waive
14 that if you want.  She's got, I think, it recorded
15 so if there's any issues --
16    THE WITNESS:  No, I can waive that.
17        FURTHER DEPONENT SAITH NOT
18
19
20
21
22
23
24

Page 172

1        R E P O R T E R   C E R T I F I C A T E
2
3        I, ANGELA M. INGHAM, a Notary Public
4 within and for the County of Cook, State of
5 Illinois, and a Certified Shorthand Reporter of
6 said state, do hereby certify that heretofore,
7 to-wit, on the 23rd day of January, 2023, HILLARY
8 ELKO virtually appeared before me, a witness in a
9 certain cause now pending and undetermined in the
10 United States District Court for the Southern
11 District of Iowa, Central Division, wherein Equal
12 Employment Opportunity Commission is the plaintiff
13 and Walmart Inc., et al., are the defendants.
14        I further certify that the said witness
15 was first duly sworn to testify the truth, the
16 whole and nothing but the truth in the cause
17 aforesaid; that the testimony then given by said
18 witness was reported stenographically by me, and
19 afterwards reduced to typewriting by Computer-Aided
20 Transcription, and the foregoing is a true and
21 correct transcript of the testimony so given by
22 said witness as aforesaid.
23        I further certify that the signature of
24 the witness to the foregoing deposition was waived

Page 173

1 by agreement of counsel for the respective parties;
2 and that I am not counsel for nor in any way
3 related to any of the parties to this suit, nor am
4 I in any way interested in the outcome thereof.
5        In witness whereof, I have hereunto set my
6 hand this 23rd day of February, 2023.
7
8
9
10
11
12 _____
13 ANGELA M. INGHAM
14 Notary Public, Cook County, Illinois
15 C.S.R. License No. 084-002984
16 Thompson Court Reporters, Inc.
17
18
19
20
21
22
23
24

EXHIBIT
18

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        Plaintiff,

v.

WALMART INC. and WAL-MART STORES
EAST, LP,

        Defendants.

CASE NO. 4:22-cv-00037-SMR-SBJ

**DECLARATION OF LISA ELROD**

    I, Lisa Elrod, hereby depose and state as follows:

    1.  I am over 21 years old and have personal knowledge of the matters set forth in this declaration.

    2.  I am a Digital Team Lead at Walmart located in Ottumwa, Iowa.  At the time of the events in this lawsuit, I was a Personnel Coordinator at the same store.

    3.  Walmart refers to its employees as "associates."

    4.  Exhibit 2 is a true and correct copy of Walmart's Discrimination and Harassment Prevention Policy in effect in 2018.

    5.  Exhibit 3 is a true and correct copy of Walmart's Open Door Communications Policy in effect in 2018.

    6.  Exhibit 6 is a true and correct copy of Tiffanee Johnson's coaching history.

    7.  Exhibit 14 is a true and correct copy of the Department Manager Job Description in effect in 2018.

    8.  Exhibit 15 is a true and correct copy of the Career Preferences-Internal Applicant List for the Consumables Department Manager position at issue in this case.

1

9.  Exhibit 19 is a true and correct copy of the GM Support Manager Job Description in effect in 2018.

10.  Exhibit 21 is a true and correct copy of Abby Hunt's job

11.  As shown on Exhibit 15, the pool of nine (9) candidates is set forth below.  Walmart does ___not___ keep records of whether its employees have children nor factor that into any decision making.  Subsequent to the filing of this lawsuit, I have been able to confirm the following information regarding whether the applicants had small children in February of 2018.

12. The slate of candidates for the Consumables Department Manager was:

| | Name | Gender | Whether or not had small children |
|---|---|---|---|
| 1. | Chastity M█████ | Female | Yes small child/children |
| 2. | Jack H████ | Male | Yes small child/children |
| 3. | Cody P██ | Male | No children |
| 4. | Corey J████ | Male | Unknown |
| 5. | Kimberly S█████ | Female | Unknown |
| 6. | Tiffanee J█████ | Female | Yes small child/children |
| 7. | Bryan S██████ | Male | No children |
| 8. | James B███ | Male | Unknown |
| 9. | Abigail H███ | Female | No children |

13.  Abigail Hunt had no discipline/coaching history at Walmart.

14. Upon information and belief, Greg W█████ did not have small children in the timeframe of 2017-2018.

2

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 21 day of April , 2023.

_Lisa Elrod_
Lisa Elrod



**Job Description**

**GM Support Manager**

| EXHIBIT |
| 19 |

This position is responsible for the operation of a department. An individual in this position will be expected to perform additional job related responsibilities and duties as assigned and/or necessary.

## Essential Functions

*An individual must be able to successfully perform the essential functions of this position with or without a reasonable accommodation.*

Delivers customer service by engaging customers to identify their needs and serve them appropriately; modeling exceptional customer service on the sales floor; touring the store to monitor in-stock, inventory levels, and store cleanliness; ensuring departmental presentation (for example, fresh production, electronic demos) matches customer shopping patterns; monitoring customer experience tracker and builds plans to improve the score; ensuring other associates are up-to-date on proper customer service practices; auditing and testing products on the floor to make sure they meet customer standards; overseeing the stocking and rotation of merchandise throughout the facility; collaborating with key stakeholders to ensure execution of closing responsibilities; and verifying equipment is working properly and supplies are available

Drives financial performance of the facility by driving sales to meet financial goals; directing the operational activities of sales associates; staying up-to-date on throwaway processes and Customer Value Programs (CVP); demonstrating knowledge of products, equipment, and procedures in assigned area; aligning resources and people appropriately to meet customer demands; training and developing associates; and ensuring product is dated according to company policies and guidelines;

Demonstrates, promotes, and supports compliance with company policies, procedures, and standards of ethics and integrity by explaining, guiding, and demonstrating how to apply these in executing business processes and practices; implementing related action plans; using the Open Door Policy; and assisting management with correcting ethical and compliance issues and problems.

Develops, communicates, and implements processes and practices to meet business needs by collaborating with managers, co-workers, customers, and other business partners; analyzing and applying information from multiple sources; monitoring progress and results; and identifying and addressing improvement opportunities.

Leads and participates in teams by using and sharing resources, information, and tools; determining customer needs and business priorities; coordinating and executing work assignments; providing advice, feedback, and support to ensure timelines and work quality are achieved; and modeling and helping others with how to adapt to change or new challenges.

## Competencies

*An individual must be proficient in each of the competencies listed below to successfully perform the responsibilities of this position.*

Customer Centered: Service Area:  Shows care and concern when serving our associates and customers. Asks questions in order to understand associate and customer needs. Uses policies and information in order to exceed associate and customer expectations. Finds and uses the right resources (people, products, tools) at the right time in order to resolve associate and customer requests.

Enhance Experience in the Store:  Supports the Store of the Community merchandising concept and suggests merchandise to management that meets the needs of local customers. Plans for customer service and sales based on events outside the store (for example, weather, gas prices, local events). Stays current on competitors' prices, products, and displays to suggest to management ways to improve the store. Recommends ways to provide a convenient, safe, and pleasant shopping experience for customers. Shows associates how to address customer, merchandise, and store issues.

Ethics and Compliance:  Oversee Performance to Ethical Standards: Clearly explains policies and procedures and teaches others how to act in accordance with them.  Guides associates on how to use the highest standards of integrity and ethics in their work.  Helps managers find and correct ethical and legal problems.  Treats all associates fairly and with respect.

Execution and Results:  Oversee Work and Get Results: Makes sure work is completed to expectations.  Executes plans and manages own and others' time so that priorities are met.  Gives others the support and information they need to get results.  Organizes tasks and makes sure they are completed on time.

Customer/Member Centered:  Satisfy the Customer/Member: Uses information and feedback to determine customer/member expectations.  Works with others to exceed customer/member expectations.  Seeks out ways to improve customer/member service.  Teaches others how to find and use resources to respond to customer/member requests.

Judgment:  Make Informed Choices: Makes timely and effective decisions, even when information is not clear.  Identifies and uses policies, procedures, and guides to make the right choices.  Uses resources, data, tools, and facts to set priorities and make informed decisions.  Identifies what might be a problem and corrects it or clearly describes it to those who can correct it.

Adaptability:  Adapt to Requirements:  Adapts to changing demands and business needs.  Encourages and embraces change, even when others hesitate.  Builds the knowledge and skills to handle challenges and tasks.  Sets an example for others when implementing changes (for example, readily carries out improvement efforts, handles change-related issues).  Shows support for, commitment to, and trust in changes.

This job description supersedes all prior descriptions

WM_Johnson_0002045

App. 112

**Job Description**

**GM Support Manager**



Planning and Improvement:  Plan for and Improve Team Performance: Plans work based on business priorities and explains to others what is needed to get work done.  Identifies and oversees the tasks needed to reach goals.  Looks for and suggests ways to improve performance and results.

Talent: Provide Information and Feedback:  Guides and teaches associates on how to perform their work.  Assigns tasks to associates and provides the tools they need to carry them out.  Gives clear, constructive feedback on performance to associates and leaders.  Recognizes associates for their positive contributions.  Shows concern for associates and is available to meet with them.  Looks for and follows up on developmental opportunities.

## Physical Activities

*The following physical activities are necessary to perform one or more essential functions of this position.*

Moves, lifts, carries, and places merchandise and supplies weighing up to 25 pounds without assistance.

Reaches overhead and below the knees, including bending, twisting, pulling, and stooping.

Grasps, turns, and manipulates objects of varying size and weight, requiring fine motor skills and hand-eye coordination.

Enters and locates information on computer.

Creates documents, reports, etc., using a writing instrument (such as a pencil or pen) or computer.

Observes associate, customer, or supplier behavior.

Visually inspects equipment.

Visually locates merchandise and other objects.

Reads information, often in small print.

Visually verifies information, often in small print.

## Work Environment

*Working in the following environment is necessary to perform one or more of the essential functions of this position.*

Works varying shifts as required.

## Entry Requirements

*Minimum Qualifications*

Will meet all store requirements to handle and/or sell firearms, such as completion of a firearms-specific Criminal Background Check (CBC),Firearms Authorization Training, and state specific requirements within time frames permitted.

Bishop, Ashley – 03/08/2023

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA, CENTRAL DIVISION

EQUAL EMPLOYMENT OPPORTUNITY   )

COMMISSION,                    )

                               )

     Plaintiff,                )

                               )

          v.                   )No.4:22-cv-00037-SMR-SBJ

                               )

WALMART INC., AND              )

WALMART STORES EAST, LP,       )

                               )

     Defendants.               )

| EXHIBIT |
| --- |
| **20** |

        The deposition of ASHLEY BISHOP,

taken under oath on March 8, 2023, at 10:00 a.m., via

Zoom videoconference, before Lindsay Welbers, in and

for the Southern District of Iowa.

App. 114

Page 3
2

EARANCES:

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, by

MR. MILES SCHULTZ

MS. HANNAH HENKEL

230 South Dearborn Street, Suite 1866

Chicago, IL 60604

appeared on behalf of the plaintiff;

BAIRD HOLM, by

MS. HEIDI GUTTAU

170 Farnam Street, Suite 1500

Omaha, Nebraska 68102

appeared on behalf of the defendant;

O PRESENT:

Lindsay Welbers, videographer

---

Page 4

I N D E X

PAGE

amination by Ms. Henkel               6

amination by Ms. Guttau              62

amination by Ms. Henkel              70

E X H I B I T S

POSITION EXHIBIT                     PAGE

hibit 1          Walmart 1606          32

hibit 2          Walmart Breastfeeding

                 Mothers Support Policy  44

hibit 3          Video                  74

                 (not attached)

---

Page 5

P R O C E E D I N G S

THE COURT REPORTER:  So here begins the web conference deposition of Ms. Ashley Bishop in the matter of EEOC versus Walmart, Inc., and Walmart Stores East, LP.  Today's date is March 8th, 2023, and the time is 10:01 a.m. Central.  My name is Lindsay Welbers of Thompson Court Reporters.  Beginning with noticing party, will counsel please introduce themselves, state whom they represent, and stipulate to the swearing in of the witness remotely?

MS. HENKEL:  My name is Hannah Henkel.  I represent the plaintiffs, Equal Employment Opportunity Commission, in this matter, and we so waive.

MS. GUTTAU:  I'm Heidi Guttau.  I represent both of the Walmart defendants, and we also so stipulate to the remote swearing in.

THE COURT REPORTER:  Ms. Bishop, would you please raise your right hand for me?

ASHLEY BISHOP

the deponent herein, called as a witness, after having been first duly sworn, was examined and testified as follows:

THE COURT REPORTER:  Parties have stated their agreement on the record.  Counsel, you may

---

Page 6

proceed.

EXAMINATION

BY MS. HENKEL:

Q.  Ms. Bishop, you can put your hand down, if you need to.  Would you mind if I call you Ashley?

A.  Yeah, that's fine.

Q.  Okay.  You can call me Hannah during this deposition.  Would you please state your full name for the record?

A.  Ashley Bishop.

Q.  Do you have a middle name?

A.  Oh, yes.  Ashley Dawn Bishop.

Q.  Could you spell your middle name, please?

A.  D-A-W-N.

Q.  And can you spell your last name?

A.  B-I-S-H-O-P.

Q.  Have you ever gone by a different name?

A.  No.

Q.  What is your current address?

A.  REDACTED. ZIP code's REDACTED.

Q.  And do you expect to be living at that same address as the case goes to trial later this year?

A.  Yes.

Q.  Do you know Chastity M████?

A.  Yes.

Q.  And do you know if she had small, young children around 2018?

A.  Yes.

Q.  Okay.  Do you know Jack H████?

A.  Yes.

Q.  Do you know if he had small children around 2018?

A.  Yes.

Q.  Do you know Cody P███?

A.  Yes.

Q.  Do you know if he had small children around 2018?

A.  No.

Q.  Does he have any kids?

A.  No.

Q.  Do you know Corey J██████?

A.  No.

Q.  Do you know Kimberly S█████?

A.  No.

Q.  Do you know Bryan S██████?

A.  Yes.

Q.  Do you know if he had any children around

2018?

A.  No.

Q.  And does he have any children now that you know of?

A.  No.

Q.  Do you know James B███?

A.  No.

Q.  And do you know Abigail Hunt, or Abby Hunt?

A.  Yes.

Q.  And do you know if she had small children around 2018?

A.  No.

Q.  Okay.  Did Walmart ever hinder you in any way in breastfeeding or pumping at work?

A.  No, they did not.

Q.  As we've looked at Exhibit -- I think it's Exhibit 1, is the blueprint, and that UPS office that's been tagged as Number 3 on Exhibit 1, do you know if that space is what's still used today for pumping moms?

A.  It is.

Q.  So I want to back up a little bit and talk about the TLE room.  And you used it, you said, a couple times?

A.  Yes.

Q.  Okay.  And the TLE office -- well, can you describe the interior?  Was it clean?  How would you describe it?

A.  It's kind of a typical shop office.  Not overly dirty, but I also carried wipes with me, and I'd wipe down the counters, because it's dirty, kind of greasy.  I mean, it's next to the shop.

Q.  Okay.  And did they keep merchandise in that area in that office?

A.  They do.

Q.  And so you would be interrupted if they needed to get merchandise out for customers?

A.  Yes.

Q.  And then once you were walked in -- you decided that was not the place to be?

A.  Correct.

Q.  Would you have recommended the TLE office as a pumping space to anybody?

A.  No.

Q.  And you never told Lisa Elrod that you'd used the TLE office.  Had you?

A.  No.

Q.  Did you ever have a conversation with Tiffanee Johnson regarding pumping?

A.  No.

Q.  Regarding a pumping space?

A.  No.

Q.  Did you even know she was a pumping mom at the time she was there?

A.  I did not.

Q.  Did you first learn that during this lawsuit?

A.  Yes.

Q.  If you needed assistance in any way with any elements of your employment, did you find Lisa Elrod to be helpful?

A.  I did.

Q.  Are you aware of anyone else ever using the TLE office to pump?

A.  No.

Q.  And you never had a key to the TLE office. Did you?

A.  No.

Q.  Your husband let you in?

A.  Yes.

Q.  And if somebody needed merchandise while you were in there, he could come in and get it?

A.  Yes.

Q.  I want to talk about -- back to the blueprint

Page 75

1    A.  Yes.
2    Q.  Have there been any updates to that office,
3  compared to the video?
4    A.  Yes.
5    Q.  What updates have been made?
6    A.  I know there is a chair, a glider in there
7  now.  There's also a small refrigerator.  They also
8  have books in there and a lamp.
9    Q.  Is there still shelving in there?
10    A.  There's a bookcase, but I believe it's just
11  for books.  I don't think there's anything else on it.
12    Q.  And the glider, is that, like, one of those
13  rocking chairs, almost?  Or is it, like, a padded
14  chair?
15    A.  Yes.  Yes.
16    Q.  So there's a padded rocking chair in there
17  now.  Correct?
18    A.  Correct.
19    Q.  There's bookcases now.
20    A.  Yes.
21    Q.  And has there been anything done to alleviate
22  some of the heat that you said earlier was your
23  reasoning for not using the UPS room?
24    MS. GUTTAU:  Foundation.

Page 76

1    THE WITNESS:  I am not sure.
2    Ms. HENKEL:  Is there any storage still in that
3  room?
4    THE WITNESS:  No.
5    MS. GUTTAU:  Foundation.  Sorry.  Got it.
6    THE WITNESS:  No.
7  BY MS. HENKEL:
8    Q.  And you said that there is a refrigerator in
9  there now?
10    A.  Yes.
11    Q.  Do you know when these changes were made?
12    MS. GUTTAU:  Foundation.
13    THE WITNESS:  No.
14    MS. HENKEL:  All right.  I think that is all I
15  have.
16    MS. GUTTAU:  Okay.  Nothing further.  Ashley, you
17  have the right to read the transcript when it's done,
18  if you want.  You can't change anything substantive,
19  but if you see, like, you know, something -- maybe a
20  spelling or something that seems off, you can point it
21  out.  But this is recorded, so the court reporter will
22  have that to refer to before she completes it.  So most
23  people waive that, don't want to deal with it.  But --
24    MS. BISHOP:  I feel strongly.

Page 77

1    MS. GUTTAU:  Okay.  We'll waive.
2    THE COURT REPORTER:  Sounds good.  Ms. Henkel,
3  would you like a copy of the transcript?
4    MS. HENKEL:  I will have to discuss and get a
5  purchase order before I can order a transcript.  So we
6  may, but I cannot answer that right now.
7    THE COURT REPORTER:  Sounds good.  How about you,
8  Ms. Guttau?  Would you like a copy?
9    MS. GUTTAU:  Yes, I will, in a condensed.
10    THE COURT REPORTER:  Awesome.  Now that we are off
11  the record, I would like to confirm a few spellings.
12        (Whereupon the deposition
13        adjourned.)
14
15
16
17
18
19
20
21
22
23
24

Page 78

. Digitally signed by Madison Wagaman

        DIGITALLY SIGNED CERTIFICATE

    THOMPSON REPORTERS hereby certifies that the

attached pages represent an accurate transcript of the

electronic sound recording of the proceedings in the

United States District Court for the Southern District

of Iowa, Central Division, in the matter of:

        No.4:22-cv-00037-SMR-SBJ

    EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

            v.

    WALMART INC., AND WALMART STORES EAST, LP

        By:

        _____

        MADISON WAGAMAN

        Transcriber

| WIN_NBR | FIRST_NAME | MIDDLE_NAME | LAST_NAME | PAY_TYPE_CODE | ASC_TYPE_CODE | STORE_NBR | JOB_NBR | WMT_JOB_CODE | JOB_DESC | SCHED_DEPT_NBR | DIV_NBR | EEOC_CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ABIGAIL | P | HUNT | 1 | P | 1285 | 000201 | | SALES ASSOCIATE | 16 | 1 | 1 |
| | ABIGAIL | P | HUNT | 1 | F | 1285 | 000201 | | SALES ASSOCIATE | 16 | 1 | 1 |
| | ABIGAIL | P | HUNT | 1 | F | 1285 | 002050 | | GM SUPPORT MANAGER | 3 | 1 | 1 |
| | ABIGAIL | P | HUNT | 1 | F | 1285 | 000101 | | DEPARTMENT MANAGER | 2 | 1 | 1 |
| | ABIGAIL | P | HUNT | 1 | F | 1285 | 000101 | | DEPARTMENT MANAGER | 2 | 1 | 1 |
| | ABIGAIL | P | HUNT | 1 | F | 1285 | 000101 | | DEPARTMENT MANAGER | 2 | 1 | 1 |
| | ABIGAIL | P | HUNT | 1 | F | 1285 | 000101 | | | | | |

WM_Johnson_00001289 – Excel Tab Page labeled "Employment History"

Walmart Inc. Confidential

2/7/2023

1

EXHIBIT

21

| ETHNICITY | PAY_DATE | EMP_STAT_CODE | HIRE_DATE | TERM_DATE | TERM_REASON_CODE | TERM_DESC | HR_SOURCE_CODE | EFF_DATE | EXPIRATION_DATE | BASE_PAY | ROWNUM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) | 2017-04-16 | | 2017-04-05 | | | | 1 | 2017-04-05 | 2017-07-14 | | 1 |
| WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) | 2017-07-23 | | 2017-04-05 | | | | 1 | 2017-04-05 | 2017-07-14 | | 1 |
| WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) | 2017-07-23 | | 2017-04-05 | | | | 1 | 2017-07-15 | 2018-03-02 | | 1 |
| WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) | 2018-03-18 | | 2017-04-05 | | | | 1 | 2018-03-03 | 2018-09-12 | | 1 |
| WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) | 2018-04-15 | | 2017-04-05 | | | | 1 | 2018-03-03 | 2018-09-12 | | 1 |
| WHITE OR CAUCASIAN (NOT HISPANIC OR LATINO) | 2018-09-16 | T | 2017-04-05 | 2018-09-12 | 25 | DISSATISFIED - CAREER OPP | 1 | 2018-03-03 | 2018-09-12 | | 1 |

Walmart Inc. Confidential

2/7/2023

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA, CENTRAL DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION

Plaintiff,

v.

NO.4:22-cv-00037-SMR-SBJ

WALMART INC., AND
WAL-MART STORES EAST, LP
Defendants.

### DECLARATION OF TIFFANEE JOHNSON

I, Tiffanee Johnson, state and declare the following:

1.   I started working for Walmart in Ottumwa, Iowa in June 2014 as a part-time stocker on the night shift.

2.   I later became a full-time modular team associate on the night shift.

3.   I went on maternity leave from October 2017 through January 2018.

4.   When I returned from maternity leave in January 2018, I was a sales associate in the fabrics and crafts department.

5.   In 2018, Kendra Mouton was an assistant manager at the store.

6.   In 2018, Patti Hemsley was a co-manager of the Ottumwa store.

7.   A co-manager is the second highest type of manager, just below the store manager.

8.   An assistant manager is the third highest type of manager, just below a co-manager.

9.   In early 2018, Mouton told me about an open manager position for the consumables department.

1

Johnson
EXHIBIT NO. 22
SARAH DITTMER
888-388-2723

10.     I believed at the time the department was also called the pet department.

11.     If I became a department manager it would have been a promotion.

12.     I wanted to become a department manager partly for the raise in pay, and also to get my foot in the door for other higher management positions.

13.     I would have liked to eventually become a salaried supervisor, such as an assistant manager.

14.     I took the manager test and passed.

15.     Then I applied to be the department manager for the consumables department.

16.     I interviewed with Kendra Mouton.

17.     Walmart promoted Abigail Hunt to the position instead of me.

18.     When I asked Mouton why I didn't get the promotion, Mouton said that Hemsley told her that I had small children at home and she (Hemsley) didn't think I wanted to work at Walmart long-term.

19.     During this time, I was a mentee in a Walmart program to another manager, Samantha Finn.

20.     Finn had been helping me find opportunities for growth at Walmart.

21.     After I didn't get the consumables position, I texted Finn: "Im in fabrics and crafts but i had an interview for dm in pets and it was also someone else as well. I was told i did really well for my interview but i didn't get the position because she wants to become a asm and they didnt think i wanted to be a asm so they gave her the position. I thought it was bull especially since i have customers, other associates, asm telling me how much of i great worker i am."

2

22.     In the text message quoted in Paragraph 21, above, an "asm" refers to assistant store manager.

23.     In the text message quoted in Paragraph 21, above, "dm" refers to department manager.

24.     In the text message quoted in Paragraph 21, above, "she" refers to Hunt.

25.     When I came back from maternity leave in January 2018, I was unsure of where to pump my breast milk.

26.     I asked Lisa Elrod where I could pump.

27.     Elrod was in human resources at the time.

28.     Elrod suggested I pump in the bathroom, but I did not want to do that because I was uncomfortable giving my baby breast milk that I pumped in an unsanitary place like a bathroom.

29.     After this, I found out that another employee, Ashley Bishop, was able to pump in a manager's office known as the TLE (tire lube express) office.

30.     Ashley Bishop is white.

31.     I am African American.

32.     After I found out that Bishop had been allowed to pump in the TLE office, I asked to use the TLE office to pump.

33.     Walmart instead made me pump in a utility closet that was small, cluttered, and that I considered nasty and unsanitary.

34.     I felt uncomfortable pumping in the closet which decreased my ability to pump as much as I needed.

35.     Instead, I only pumped enough to get me through the shift.

36.     Because of this, I needed to supplement my breast milk with formula to provide a sufficient amount of milk to my child.

37.     At Walmart I got two 15-minute breaks for my 9 hour shift.

38.     I primarily only pumped during these two 15-minute breaks.

39.     I complained about the condition of the utility closet to Elrod.

40.     Wal-Mart attempted to clean the utility closet once after I complained, but its condition was still not clean.

41.     For one day only, Walmart did allow me to pump once in a manager's office.

42.     This office had cameras but there were curtains to provide me with a private space to pump where I couldn't see the cameras.

43.     The condition of the manager's office was much better than the utility closet.


Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct this 25th day of January, 2023.


*Tiffanee Johnson*
Tiffanee Johnson (Jan 25, 2023 17:51 CST)
Tiffanee Johnson

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        Plaintiff,

v.

WALMART INC. and WAL-MART STORES
EAST, LP,

        Defendants.

CASE NO. 4:22-cv-00037-SMR-SBJ

**DECLARATION OF PATRICIA
HEMSLEY**

I, Patricia Hemsley, hereby depose and state as follows:

1. I am over 21 years old and have personal knowledge of the matters set forth in this declaration.

2. I am a Fresh Food and Consumables Coach at a Walmart store located in Iowa City, Iowa. At the time of the events of this litigation, I was a Co-Manager at the Ottumwa, Iowa store.

3. Between 2017 and 2020, I was the decision maker for three promotions to supervisory positions. Bryan S     who was promoted to GM Support Manager on May 28, 2018; Greg W    , who was promoted to GM Support Manager on July 14, 2017; and Abigail Hunt, who was promoted to GM Support Manager on July 14, 2017.

4. To the best of my knowledge, none of them had no small children at the time.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this __24__ day of April, 2023.

*Patricia Hemsley*
Patricia Hemsley

DOCS/2959927.1

**EXHIBIT
23**

Facebook
Tiffanee
Home



Jan 23, 2019 7:43:22am
Tiffanee Johnson
They wont even speak to me when im in there as a customer because they mad i left the company but the bill is only 5 something not much but its the point. I was thinking of calling joe
or corporate and see if i can do something then because i just have a feeling Hillary wouldnt be any help

Johnson
EXHIBIT NO. 26
SARAH DITTMER
888-388-2723

EEOC_0000430

App. 125

Mar 16, 2018 7:19:53pm
Tiffanee Johnson
Oh ok
Mar 13, 2018 7:09:23pm
Samantha Finn
Try and keep an eye out for positions that you may be interested in!
Mar 13, 2018 7:06:46pm
Samantha Finn
But yea I try and answer all your questions.
Mar 13, 2018 7:05:39pm
Samantha Finn
Mentor as in I check in with you at least once a week (I don't want to be too pushy) :) cuz you know how "pushy " I can been ! Lol
Mar 13, 2018 7:05:05pm
Tiffanee Johnson
Like i have 2 children now so i need more money. Like yes i have help but still so i said i was gone look into another walmart for higher positions
Mar 13, 2018 7:05:01pm
Tiffanee Johnson
Maybe she did not sure and her name is abby. She wasnt there when you were.
Mar 13, 2018 7:03:58pm
Tiffanee Johnson
What do you mean by mentor tho? I mean ik what a mentor is but like what would be going on?
Mar 13, 2018 7:03:22pm
Samantha Finn
Who is it?
Mar 13, 2018 7:02:59pm
Samantha Finn
Maybe she mentioned it in her interview
Mar 13, 2018 7:02:52pm
Samantha Finn
Weird
Mar 13, 2018 7:02:41pm
Samantha Finn
Oh
Mar 13, 2018 7:02:37pm
Tiffanee Johnson
No but it wasnt in hers either. They say eventually she wants to be 1.
Mar 13, 2018 7:02:20pm
Samantha Finn
That you want to be an assistant manager?
Mar 13, 2018 7:01:09pm
Samantha Finn
I see. Is it in your career preference
Mar 13, 2018 7:00:53pm
Tiffanee Johnson
Im in fabrics and crafts but i had an interview for dm in pets and it was also someone else as well. I was told i did really well for my interview but i didn't get the position because she wants to become a asm and they didnt think i wanted to be a asm so they gave her the position. I thought it was bull especially since i have customers, other associates, asm telling me how much of i great worker i am.
Mar 13, 2018 6:50:51pm
Samantha Finn
Where are you on days ? What department for you work for?
Mar 13, 2018 6:43:21pm
Samantha Finn
Really?!
Mar 13, 2018 6:42:19pm
Tiffanee Johnson
Yea that would be absolutely fine. And thanks for that. Starting to get discouraged about it
Mar 13, 2018 6:40:58pm
Samantha Finn
I know you really do want to move up and I see that happening for you in the future. I would love to be able to help you get there!
Mar 13, 2018 6:33:33pm
Samantha Finn
Hey! So they have this thing we're you have to choose two people to mentor. They have to both work for Walmart of course and have to be people you see great potential for (you are one of the best people that come to mind when I want to choose who to mentor) would it be ok if I put your name down? )
Mar 13, 2018 6:32:12pm
Tiffanee Johnson
Yea i seen you say that but im sure he understands tho. So will you be home for good or have to leave again?



Feb 24, 2018 10:08:12am
Tiffanee Johnson
Well thats good for pj and you as well now you dont have to worry about it and he gets a extended vacation lol

Feb 02, 2018 1:06:11pm
Samantha Finn