IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) Case No. 4:22-cv-00037-SMR-SBJ )  )  ) ORDER ON DEFENDANTS' MOTION |
| Plaintiff, | ) FOR SUMMARY JUDGMENT )  |
| v. | )  )  |
| WALMART, INC. and WAL-MART STORES EAST, LP, | )  )  )  |
| Defendants. | )  |

Plaintiff United States Equal Employment Opportunity Commission ("Plaintiff") brought this suit against Defendants Walmart, Inc. and Wal-Mart Stores East, LP, ("Defendants"), alleging that Defendants engaged in sex discrimination in the process of hiring a manager position in its Ottumwa, Iowa store. [ECF No. 1]. Defendants filed a Motion for Summary Judgment, seeking judgment on Plaintiff's claim. [ECF No. 173]. For the reasons discussed in greater detail below, Defendants' Motion for Summary Judgment is DENIED.

I.   BACKGROUND

*A.  Factual Background*

i.  Structure of Walmart Positions

Walmart stores have many levels of employees at any given location. [ECF No. 33-3 at 56 (Kendra Mouton Depo.)]. Associates are considered entry-level. *Id.* The staff above them are the Department Managers, who are responsible for certain sections of the store. *Id.* These staffers are supervised by Assistant Managers, who report to Co-Managers. *Id.* A Store Manager, who is "the highest person" at any given store, oversees the Co-Managers. *Id.*

1

ii. Johnson's Hiring

On June 27, 2014, the Walmart store located in Ottumwa, Iowa, hired Tiffanee Johnson ("Johnson") as a part-time overnight stocker associate. [ECF No. 33-3 at 15 (Johnson Depo.), 18 (Date of Hire)]. Upon hiring, Johnson attended a new employee orientation and completed a list of tasks that included receiving and reviewing Walmart's antidiscrimination and anti-harassment policies. *Id.* at 17–18. She also completed trainings about Walmart's policies, although she does not remember whether she completed computer-based training on the antidiscrimination and anti-harassment policies. *Id.* at 18.

iii. Disciplinary Actions

Shortly after hiring, Johnson incurred three instances of coaching, which is the method by which Walmart disciplines employees.[1] [ECF No. 33-3 at 20]. Each instance is discussed below.

The first instance of coaching occurred on January 2, 2014. [ECF No. 33-3 at 43 (Action Report)]. Johnson was directed to stock two grocery aisles and was provided three hours and twenty minutes to complete the tasks. *Id.* Johnson did not finish the tasks within the timeframe or in eight-hour shift that she worked that day. *Id.* She was reprimanded the following day and told to "communicate if you have issues and are not going to complete an assignment." *Id.* She acknowledged the written reprimand on January 3, 2014. *Id.*

On August 8, 2015, Johnson received another round of coaching. [ECF No. 33-3 at 45]. She was written up for being absent from work on August 1, 2015, which was her fourth in a six-month rolling period. *Id.* The manager implemented an action plan where she would appear for

---

[1] The record is unclear whether Johnson received an instance of coaching on March 11, 2015. [ECF No. 33-3 at 20]. The coach was entered into the system as a "second written" warning but was then marked "cancelled." *Id.* at 47. Johnson does not remember this instance of coaching in comparison to the other times. *Id.* at 20.

her work shift on time or notify management of her absence in a timely manner. *Id.* She was warned that the next level of discipline, if the behavior continued, would be a third write-up or potential termination. *Id.* Johnson acknowledged the reprimand on the same day. *Id.*

On August 23, 2015, Johnson was coached for a third time. [ECF No. 33-3 at 46]. The reason for her reprimand was that she called out of work the previous day with little to no advance notice. *Id.* This was Johnson's fifth absence in a six-month period. *Id.* The write-up explained the action would be termination if Johnson did not improve. *Id.* Johnson acknowledged the third write-up on August 25, 2015. *Id.* Johnson was not coached again. *Id.*

### iv. Changes in Position

After the reprimands, Johnson's role significantly shifted twice. Specifically, she received more favorable hours and positions. The Court discusses each in detail below.

First, Johnson was transitioned from part-time to full-time employment. [ECF No. 33-3 at 15]. This process started when she spoke with manager Donald Busby.[2] *Id.* She then spoke with co-manager Patrick ("PJ") Finn. *Id.* After these interactions, Johnson worked alongside PJ in the store and he moved her to full-time status on the overnight shift. *Id.* at 20. Johnson had no complaints about PJ because they worked well together. *Id.* Johnson went on maternity leave from this position on October 24, 2017 and returned to work in January 2018. *Id.* at 16.

Second, Johnson applied for a full-time position while she was on maternity leave. [ECF No. 33-3 at 21]. This position in the crafts department would shift her schedule to daytime hours *Id.* She was offered the position without an interview. *Id.* She began immediately upon returning from maternity leave. *Id.* Johnson did not have issues with the department manager, an individual

---

[2] Busby signed off on Johnson's second and third write-up. [ECF No. 33-3 at 45–46].

named Cassie, during her time as a crafts associate. *Id.* She appreciated that the position allowed her flexibility for her family but noted she missed coworkers from the overnight shift. *Id.* at 24.

### v. Johnson's Department Manager Application Process

Shortly after returning from maternity leave, Johnson learned there would be openings for department manager positions. [ECF No. 33-3 at 24]. Specifically, she learned there would be an opening for a manger role in the consumables department because Kendra Mouton, an assistant manager, approached Johnson and encouraged her to apply. *Id.* at 26. Mouton acknowledges that she made this recommendation because others spoke highly of Johnson. *Id.* at 64. Following this conversation, Johnson applied to the position. *Id.* at 26.

Johnson was one of three candidates selected to interview for the consumables department manager position. [ECF No. 33-3 at 26]. Johnson did not receive advanced notice of the interview, which was conducted by Mouton; she was instead notified of her interview by being called into a manager's office. *Id.* Once there, the interview with Mouton lasted for approximately ten minutes.[3] *Id.* at 26–27. Johnson does not remember many details of the interview itself beyond the fact that Mouton took notes and Johnson returned to work afterwards. *Id.* at 27.

According to Johnson, she did not hear back about the position after the interview. [ECF No. 33-3 at 27]. She approached Mouton in the hallway outside of the human resources office and inquired why she was not offered the position. *Id.* Mouton allegedly told Johnson that she was not hired because she had small children at home. *Id.* at 67. Mouton also allegedly stated that she

---

[3] Mouton was responsible for hiring the consumables department manager position at the center of this dispute. [ECF No. 33-3 at 76 (Hemsley Depo.)]. Mouton selected the candidates to interview, interviewed the candidates, and chose the individual who was hired. *Id.* Managers like Hemsley were only involved in final approval of a hire if the assistant manager is new to hiring, which did not apply to Mouton. *Id.* at 60 (Mouton. Depo.), 82 (Hemsley Depo.).

4

– along with co-manager Patricia Hemsley – were not sure if Johnson wanted to further her career at Walmart. *Id.* at 27.

Johnson later spoke with Hemsley to follow up on the conversation with Mouton. [ECF No. 33-3 at 27]. Specifically, Johnson asked if the statement was accurate. [ECF No. 37-3 at 20]. Hemsley allegedly responded, "Kendra should not have told you that." *Id*. When Hemsley was asked in a deposition whether she made the statements regarding Johnson's family situation, she stated that "[n]o, I do not have any memory of that, but I can definitely tell you that I would not say that." [ECF No. 33-3 at 82]. Hemsley explained she would not have made this statement because she "first became a department manager" when her kids were small. *Id.*

### vi. Johnson's Decision to Leave Walmart

Shortly after the hiring was complete, Johnson handed in her written notice to the assistant manager of the crafts department. [ECF No. 33-3 at 36]. She explained she was resigning because she received a job opportunity outside of Walmart. *Id.* Prior to leaving, she spoke with a different assistant manager and told him she was quitting because of the lack of promotion. *Id.* Her resignation became official on May 24, 2018. *Id.*

### B. *Procedural Background*

On September 27, 2018, Johnson filed an initial inquiry with the EEOC, which alleged she was discriminated against on the basis of race. [ECF No. 37-3 at 64 (Initial Inquiry Form)]. She then spoke with an individual at the EEOC about her claim. *Id.* On December 19, 2018, Johnson filed an official charge of discrimination, alleging that Walmart discriminated against her on the basis of race, *i.e.*, being African-American, and sex, *i.e.*, her status as a mother. *Id.* at 72 (Official Charge of Discrimination). On August 20, 2019, the EEOC filed a Letter of Determination, finding that "there is reasonable cause to believe that there is a violation of Title VII" because Johnson

was "subjected to different terms and conditions based on race" and "denied promotion based on sex." *Id.* at 102. The EEOC later issued a notice of failure of conciliation. [ECF No. 1 at 3 (Complaint)].

On February 9, 2022, Plaintiff filed this suit against Defendants Walmart, Inc. and Wal-Mart Stores East, LP. [ECF No. 1]. The lawsuit alleges that Defendants violated Section 703 of Title VII of the Civil Rights Act by discriminating against Johnson on the basis of race and sex during the course of her employment at Walmart. *Id.* On March, 21, 2023, the EEOC voluntarily dismissed the claim asserting discrimination based on race. [ECF No. 28]. On April 25, 2023, Defendants filed a Motion for Summary Judgment. [ECF No. 33]. After the submission of the appropriate appendices and briefs, [ECF Nos. 37; 38], the Motion is considered fully briefed and ready for review. For the reasons below, the Motion is DENIED.

## II.    LEGAL STANDARD

### A. Summary Judgment

"The basic inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Diesel Mach., Inc., v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (quotation omitted). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986)). The evidence is viewed "in the light most favorable to the nonmoving party" and all reasonable inferences that can be drawn from the record are construed in that party's favor. *Pedersen v. Bio-Med Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions." *Anderson*, 477 U.S. at 255. To preclude the entry of summary judgment, the non-movant must make a sufficient showing on every element for which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### B. Employment Discrimination

Title VII of the Civil Rights Act "prohibits an employer from 'discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex.'" *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1037 (8th Cir. 2010) (quoting 42 U.S.C. § 2000e–2(a)(1)). Discrimination occurs when sex "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). Gender or sex stereotyping "can violate Title VII when it influences employment decisions." *Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697, 702 (8th Cir. 2012) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)). "[T]he pervasive presumption that women are mothers first, and workers second" is among the sex stereotypes Congress has explicitly identified as impermissible. *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 736 (2003) (discussing the history of the FMLA). A plaintiff can show employment discrimination by producing "direct or circumstantial evidence which could reasonably support an inference of discrimination." *Lewis*, 591 F.3d at 1037 (citing *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)).

### III. ANALYSIS

The parties disagree on whether the sex discrimination claim, which is raised under a direct evidence theory and the *McDonnell Douglas* framework, survives Defendants' Motion for Summary Judgment. [ECF Nos. 33, 33-1, 37]. There is a genuine dispute of material fact and questions about which inferences can and should be drawn from the undisputed evidence. This means the Motion for Summary Judgment must be DENIED.

7

### A. *Direct Evidence*

Plaintiff maintains that the statements by Mouton and Hemsley, who were the supervisors responsible for filling the department manager position, are direct evidence showing they engaged in impermissible sex stereotyping when they declined to hire her. [ECF No. 37 at 8]. Defendants respond that Mouton's alleged statement about Johnson "having small children" does "not create an inference of sex discrimination." [ECF No. 38 at 2, n.4]. For the reasons discussed below, there is a genuine dispute of material fact that precludes the entry of summary judgment.

#### i. Applicable Law

A plaintiff may succeed on a sex discrimination case by submitting "direct evidence" that demonstrates "a specific link between the alleged discriminatory animus and the challenged decision." *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013) (quoting *Griffith*, 387 F.3d at 736). Evidence must be "sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision." *Shaffer v. Potter*, 499 F.3d 900, 904 (8th Cir. 2007) (quotation omitted). Plaintiff may use "conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude." *Schierhoff v. GlaxoKlineSmith Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006). An employee needs to show an "employer used a forbidden consideration with respect to 'any employment practice'" by a preponderance of the evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (quoting 42 U.S.C. § 2000e–2(m)).

Once a plaintiff makes this initial showing, the *Price Waterhouse* mixed motive standard "should be applied" for liability purposes. *Pospisil v. O'Reilly Automotive, Inc.*, 619 F. Supp. 2d 614, 625 (N.D. Iowa 2007) (citation omitted). Evidence of an employer's motives for the action are irrelevant at the summary judgment stage under this theory. *Kratzer v. Rockwell Collins, Inc.*,

398 F.3d 1040, 1046 (8th Cir. 2005). This holds regardless of whether the reasons are legitimate or pretextual. *Griffith*, 387 F.3d at 735 ("the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action. If so, the presence of additional legitimate motives will not entitle the defendant to summary judgment."); *Richardson v. Sugg*, 448 F.3d 1046, 1057 (8th Cir. 2006).

ii. Genuine Dispute

The record provides two reasons to support a conclusion that the statements are genuinely disputed: the conflicting testimony of individuals and the lack of other corroborating information for either side's testimony. The Court discusses each below.

First, there is conflicting testimony on whether certain statements were made. Johnson has consistently asserted she approached Mouton outside of the human resources office to follow up about her application. [ECF No. 33-3 at 27 (Johnson Depo.), 31 (Johnson Decl.), 72 (Charging Doc.)]. When Johnson asked Mouton why she had not been hired, Mouton allegedly responded that it was because Johnson had small children and Hemsley was unsure whether Johnson wanted to further her career at Walmart. *Id.* at 27, 57 (Johnson Text to Assistant Manager Samantha Finn Recounting the Experience). When Johnson followed-up with Hemsley, Hemsley allegedly stated "Kendra should not have told you that." [ECF No. 37-3 at 20].

In contrast, Walmart staffers have responses ranging from denying that the conversation occurred to not remembering if it did. Mouton did not remember any portion of the conversation during her deposition. [ECF No. 33-3 at 67]. When she was asked if the conversation could have happened, she responded "I don't know". *Id.* Unlike Mouton, Hemsley denied the statements, stating "[n]o, I do not have memory of that, but I can definitely tell you that I would not say that" because "[I] first became a department manager . . . [when] my kids were small." *Id.* at 82.

9

Second, there does not appear to be any evidence beyond the testimony in the record to support either side's contention. In Johnson's deposition, she identified that her conversation with Mouton happened "in the back hallway not far from HR" and nobody else overheard it. [ECF No. 33-3 at 27]. There is nothing to suggest that Johnson's conversation with Hemsley was overheard or recorded in any manner. *Id.* Finally, Johnson did not file an internal complaint about the incident or use management's open-door policy. *Id.* at 28.

Given this lack of external documentation, there is a genuine dispute whether Mouton and Hemsley made the statements to Johnson. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). The next question is whether the statements are material to the disposition of the Motion.

### iii. Material Fact

The parties contest whether the statements are material. [ECF Nos. 33-3; 37]. Defendants contend they are not material because they do not constitute sex discrimination or sex stereotyping, instead representing beliefs about children. [ECF No. 38 at 2, n.4]. Plaintiff asserts the comments alone are sufficient direct evidence of sex stereotyping to survive summary judgment. [ECF No. 37 at 16]. When read in the light most favorable to the non-moving party, these statements raise a serious question whether Defendants engaged in sex discrimination when they did not select Johnson for the consumables department manager role.

### a. Governing Law

When ruling on a motion for summary judgment, the court "must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law." *Hartnagel*, 953 F.3d at 396. To establish liability, a plaintiff must show that they were discriminated against with respect to their "compensation, terms, conditions, or privileges of employment because of . . .

sex." *Lewis*, 591 F.3d at 1037 (quoting 42 U.S.C. § 2000e–2(a)(1)). Discrimination occurs if sex "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). The individual must demonstrate the following elements in a direct evidence claim of this type: 1) a statement was made by a person with decision making authority; 2) the statement directly relates to the decision-making process; and 3) the statement demonstrates a link between discriminatory bias and the adverse action. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1044–45 (8th Cir. 2011) (en banc).

### b. Decision Making Authority

It is undisputed Mouton was responsible for hiring the position of consumables department manager. [ECF No. 33-3 at 76]. Mouton selected candidates to interview, interviewed them, and selected her first choice. *Id.* After the interviews, Mouton spoke with Hemsley to get advice about the process.[4] *Id.* Given this structure, a jury could conclude that the disputed comments made by Mouton and Hemsley, a dispute the Court must resolve in favor of a non-movant at the summary judgment stage, were made by individuals who possessed decision-making authority over the adverse employment action. *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 699 (8th Cir. 2003). In short, Plaintiff has raised a genuine dispute about the decision-making authority of Mouton and Hemsley under the relevant standard. *Desert Palace*, 539 U.S. at 98.

### c. Related to Decision Making Process

The next question is whether the statement was related to some adverse action. *Torgerson*, 643 F.3d at 1046; *Turner v. Gonzales*, 421 F.3d 688, 696 (8th Cir. 2005); *LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691 (8th Cir. 2001) (holding that "an adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or

---

[4] Hemsley officially approved job offers with great deference to assistant managers. *Id.*

11

responsibilities."). Resolving the allegations in Plaintiff's favor, Johnson approached Mouton to ask why she was not offered the position. [ECF No. 33-3 at 67]. Mouton responded she was not hired because she has small children at home and the managers were not sure if she wanted to stay at Walmart. *Id.* at 27. This version of facts is sufficient for the jury to conclude improper beliefs impacted the decision-making process for the consumables department manager position.

### d. Link Between Discriminatory Bias and Adverse Action

Lastly, a Plaintiff "must show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." *Torgerson*, 643 F.3d at 1046 (citing *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860–61 (8th Cir. 2009)). Within this prong, the only issue is whether the statements of Mouton and Hemsley represent a discriminatory bias against Johnson because of her status as a mother.[5] With the inferences drawn in Plaintiff's favor, a reasonable fact finder could accept Johnson's story and conclude that Mouton and Hemsley engaged in sex stereotyping by denying Johnson the position based on the "pervasive presumption that women are mothers first, and workers second." *Hibbs,* 538 U.S. at 736. In essence, a reasonable jury could find this element was established by a preponderance of the evidence. *Desert Palace*, 539 U.S. at 98

### iv. Summary

Because there is a genuine dispute of material fact whether hiring supervisors at Walmart made statements indicating they did not promote Johnson because she is a mother with small children and may not stay, Defendants' Motion for Summary Judgment is DENIED. *Morrow v.*

---

[5] This is because the alleged statements explicitly drew a connection between the adverse action of not being hired and the underlying beliefs. [ECF No. 33-3 at 27 (Johnson explaining how Mouton told her she was not hired because she has children at home)].

*Zale Corp.*, 816 F.3d 1025, 1026 (8th Cir. 2016); *Roberts v. Park Nicollet Servs.*, 528 F.3d 1123, 1128 (8th Cir. 2008) (holding a single statement can defeat a motion for summary judgment).

### B. McDonnell Douglas *Framework*

Plaintiff argues that Defendants' conduct can, in the alternative, raise an inference of sex discrimination under the *McDonnell Douglas* framework. [ECF No. 37 at 18]. Defendants respond that Plaintiff cannot establish the fourth element of a prima facie case and cannot rebut its legitimate reasons for hiring another individual over Johnson. [ECF Nos. 33-1 at 12–14, 38 at 5]. For the reasons detailed below, the Court concludes there are genuine disputes of material fact that preclude the grant of summary judgment for Defendants on this theory of liability.

#### i. Governing Law

An employee may use "the *McDonnell Douglas* burden-shifting framework" to raise "an inference of unlawful discrimination." *Tenge v. Phillips Modern Ag. Co.*, 446 F.3d 903, 907 (8th Cir. 2006). "Under this framework, the plaintiff bears the burden of establishing a prima facie case of discrimination." *McGinnis v. Union Pacific R.R.*, 496 F.3d 868, 873 (8th Cir. 2007) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981)). To make a case, an individual must show: "(1) she was a member of the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008) (citing *Clegg v. Ark. Dep't of Corrs.*, 496 F.3d 922, 926 (8th Cir. 2007)). When a plaintiff succeeds "in establishing a prima facie case," the "burden shifts to [the employer] to rebut that presumption by offering a legitimate . . . reason for any adverse employment action." *Brannum v. Mo. Dep't of Corrs.*, 518 F.3d 542, 548 (8th Cir. 2008) (citing *Buettner v. Arch Coal Sales, Co.*, 216 F.3d 707, 714 (8th Cir. 2000)). "Upon such a showing, the burden shifts back to the employee to show that

the employer's reason was pretextual." *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 701 (8th Cir. 2006). This standard is flexible and not "rigid, mechanized, or ritualistic." *Lewis*, 591 F.3d at 1039 (quoting *Swierkiewicz v. Sorema N.A.*, 438 U.S. 506, 512 (2002)).

ii. Prima Facie Case

Defendants contend Plaintiff cannot meet the fourth element of the *McDonnell Douglas* framework because Plaintiff has not provided a comparator class for the purpose of analysis and parentage is not a protected class. [ECF No. 33-1 at 7]. Plaintiff maintains that the statements by Mouton and Hemsley, as well as the inconsistent explanations for Johnson's lack of promotion, permit a jury to infer discrimination. [ECF No. 37 at 21]. Based on the record, a jury may conclude Plaintiff has established a prima facie case.

The fourth element of a prima facie case is that plaintiff must show that "circumstances permit an inference of discrimination." *Bearden*, 529 F.3d. at 831 (citing *Clegg*, 496 F.3d at 926). A reviewing court must consider this element based on "the specific facts of each case." *Young v. Warner-Jenkinson Co. Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998) (quoting *Hindman v. Transkrit Corp*, 145 F.3d 986, 990–91 (8th Cir. 1998), *abrogated on other grounds by Torgerson*, 631 F.3d 1031 (8th Cir. 2011)).[6] The analysis must focus on "the reasons for the *individual plaintiff*'s treatment, not the relative treatment of different *groups* within the workplace." *Lewis*, 591 F.3d at 1039 (quoting *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 121 (2d Cir. 2004)); *Conn. v. Teal*, 457 U.S. 440, 453 (1982) ("The principal focus of [Title VII] is the

---

[6] Although *Young* addresses employment discrimination on the basis of disability under the Americans with Disabilities Act ("ADA"), the Eighth Circuit has incorporated portions of the decision's reasoning into the analysis needed for claims of employment discrimination based on sex. *Lewis*, 591 F.3d at 1039–40.

protection of the individual employee, rather than the protection of the minority group as a whole.").

An individual may meet this element by offering "evidence that she was treated differently than similarly situated males." *Lewis*, 591 F.3d at 1039 (citing *Warner-Jenkinson*, 152 F.3d at 1022). When this type of evidence is provided in support of the fourth element, courts require an adequate comparator and comparison evidence. *Id.* The Eighth Circuit has explained, however, that "[i]t does not follow [] that evidence of disparate treatment is the exclusive means by which a plaintiff may establish an inference of discrimination." *Warner-Jenkinson*, 152 F.3d at 1022 (citing *Miners v. Cargill Commc'ns, Inc.*, 113 F.3d 820, 824 n.7 (8th Cir. 1997)). Regardless of the method used, "the threshold of proof necessary to establish a prima facie case is minimal." *Id*.

There is sufficient evidence in the record to give rise to an inference of discrimination. Johnson applied to the department manager position in part because of Mouton's encouragement. [ECF No. 33-3 at 25]. Mouton interviewed Johnson for the position and took notes, none of which were provided with the motion. *Id.* at 26. Johnson later spoke with Mouton because she had not been provided an update on her application, despite the fact that hiring managers traditionally speak with unsuccessful candidates. *Id.* at 27, 60. When Johnson asked Mouton why she had not been hired, Mouton allegedly responded it was because of her status as a mother and Hemsley was concerned Johnson was not committed to the company long-term. *Id.* at 27. After this, Johnson spoke with Hemsley, who stated, "Kendra should not have told you that." *Id.* When the factual disputes and relevant inferences are drawn in Plaintiff's favor, a jury could infer sex discrimination was a contributing factor in the decision to not hire Johnson. Plaintiff has established a prima facie case under the *McDonnell Douglas* framework.

iii.     Burden Shifting

The Court shifts to consider the application of the burden-shifting framework. On the first step, Defendants claim they hired another individual because Johnson had a history of write-ups, had a weak work ethic, and lacked supervisory experience. [ECF Nos. 33-1 at 12–16, 38 at 5–7]. Plaintiff contends each reason is pretextual based on the record. As discussed below, Defendants have provided legitimate reasons for not hiring Johnson and Plaintiff has offered sufficient evidence to raise a genuine dispute whether the reasons were pretextual.

a. Write-Ups

The first reason why Mouton declined to offer the department manager position to Johnson is allegedly because of Johnson's history of write-ups. The first write-up occurred on January 2, 2014. [ECF No. 33-3 at 43]. She was written up August 8, 2015 for attendance issues. *Id.* at 45. Johnson received her third write-up on August 23, 2015 because of work absences. *Id.* at 46. The write-ups are legitimate reasons for Walmart to decline to promote Johnson. *Pittman v. Ripley Cnty. Mem. Hosp.*, No. 1:07CV00111LMB, 2009 WL 1738491, at *12–13 (E.D. Mo. June 18, 2009). The Court turns to examine whether Plaintiff has provided sufficient evidence to raise a genuine dispute that the write-ups are pretext for sex discrimination.

After these write-ups, Johnson received significant praise and positive changes in her role with Walmart. First, Johnson was moved from part-time to full-time employment by managers at the store. [ECF No. 33-3 at 15]. Second, Johnson applied to a full-time position with better hours while on maternity leave and was offered the position without an interview. *Id.* at 21. Third, Mouton encouraged Johnson to apply for the consumables department manager role after hearing people from the night shift speak highly of her. *Id.* at 26, 64. Fourth, Mouton selected Johnson for an interview for the position and conducted it. *Id.* at 26. Fifth, Johnson did not hear back from

16

Mouton about the status of her application despite Walmart's practice of discussing the rejections with unsuccessful candidates. *Id.* Finally, Johnson did not receive additional write-ups between the last write-up and her resignation. *Id.* at 43–47. Based on these facts, a jury could conclude that this reason is merely a pretext to hide the real reason for denying Johnson the position: her status as a single mother.

In short, a jury could fairly rule for either party on the question of whether the write-ups were a legitimate reason for Johnson's non-promotion.

### b. Direct Work with Mouton

The second reason why Mouton allegedly did not offer the department manager position to Johnson is because Mouton noticed they did not work well together. [ECF 33-3 at 64]. According to Mouton, she asked Johnson to fill and price shelves of Easter candy while Mouton tended to other tasks in the store. *Id.* When Mouton returned, she observed that Johnson had not filled the shelves and was waiting for her to return. *Id.* Mouton explained this issue with stocking shelves led Mouton to wonder about "work ethic and her productivity in getting things done in a timely manner." *Id.* This behavior was important to Mouton because Mouton would work with Johnson as her supervisor and wanted a good fit. *Id.* If a jury believed Mouton, this would be a legitimate non-discriminatory reason to not promote her.

However, Johnson testified that this interaction may not have occurred. [ECF No. 37-2]. Specifically, Johnson testified she did not recall being asked to refill a candy station with Easter candy by Mouton leading up to the decision on hiring. *Id.* There is also no corroborating evidence of this incident, either in the form of audio, video, or written documentation. *Id.* This is in sharp contrast to prior complaints about Johnson that included write-ups. [ECF No. 33-3 at 44–47]. Based on these facts, a jury could believe that the candy story did not occur or was pretext.

Given the aforementioned evidence, a jury could reasonably return a verdict for either party on the question of whether this explanation was a legitimate reason for non-promotion.

### c. Supervisory Experience

The third explanation proffered by Defendants is that the hired candidate had "supervisory experience." [ECF No. 33-1 at 13]. Specifically, Defendants explain that the person held a GM Support Manager position that provided her with supervisory experience Johnson did not have and would be helpful. [ECF No. 33-3 at 113 (Elrod Depo.), 115 (Job Position), 122 (Applicant Job Coding)]. However, this reason is undercut by Mouton's deposition testimony that a GM Support Manager "wasn't a supervisor position" and was instead "a regular hourly position." [ECF No. 37-3 at 3]. When the conflict is resolved against a moving party as required at summary judgment, a jury could conclude the supervisory experience explanation is pretext.

### iv. Summary

As discussed above, there is sufficient evidence for a jury to conclude Plaintiff has shown a prima facie case of discrimination. Defendants provided evidence raising a genuine possibility they had legitimate reasons for hiring someone else over Johnson. In turn, Plaintiff has adduced testimony to demonstrate that these reasons may be pretextual. Accordingly, the issue of liability under *McDonnell Douglas* must be submitted to and decided by a jury.

## IV. CONCLUSION

For the reasons discussed above, the Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

Dated this 25th day of July, 2023

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT